Anne L. Weismann
D.C. Bar No. 298190
Melanie Sloan
D.C. Bar No. 434584
Citizens for Responsibility
and Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, D.C.  20005
202-408-5565

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON 1400 Eye Street, N.W., Suite 450, Washington, D.C.  20005<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION 400 Maryland Avenue, S.W. Washington, D.C. 20202,<br><br>Defendant. | Civil Action No. |

## COMPLAINT FOR DECLARATORY JUDGMENT

1.  This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C. §706,

and the Federal Records Act ("FRA"), 44 U.S.C. §§ 2101 et seq., 2901 et seq., 3010 et seq., and

3301 et seq., which includes the Disposal of Records Act, 44 U.S.C. §§3301-3314, challenging

as contrary to law the knowing failure of the U.S. Department of Education ("Education") to

preserve copies of electronic records of official Education business created by agency employees

through the use of outside (i.e., non-governmental) email accounts.

2. This case seeks declaratory relief that Education's record- keeping guidelines and directives are arbitrary, capricious, and contrary to the FRA because they fail to ensure preservation of electronic records created in the conduct of agency business.

## JURISDICTION AND VENUE

3. This Court has both subject matter jurisdiction over this action and personal jurisdiction over Education pursuant to 5 U.S.C. § 702, which gives the Court jurisdiction over agency actions where an aggrieved party has suffered wrong within the meaning of a "relevant statute," here the FRA. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue lies in this district under 5 U.S.C. § 703.

## PARTIES

4. Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the governmental decision-making process. To advance its mission, CREW uses a combination of research, litigation, and advocacy. As part of its research, CREW uses government records made available to it under the Freedom of Information Act ("FOIA").

5. CREW has invested considerable organizational resources in pushing the U.S. government to take ethics issues seriously. CREW monitors closely the laws and rules applicable to government agencies.

6. CREW has sought records from Education under the FOIA in the past and intends to

seek similar records in the future, given their usefulness in identifying the actual policies and practices of Education

7.  CREW is harmed by Education's failure to adopt and comply with record-keeping guidelines and directives mandated by the FRA, because that failure has denied CREW access to records that are a critical part of the evidentiary record concerning Education's implementation of the Reading First Program and other aspects of the No Child Left Behind Act -- information that is "in the public interest."  44 U.S.C. §3303(a)(c)(3); *see also* <u>American Friends Service Comm. v. Webster</u>, 720 F.2d 29 (D.C. Cir. 1983).

8.  Defendant Education is an agency within the meaning of 5 U.S.C. § 702.  Education has adopted a record-keeping policy that has resulted in the agency's failure to preserve agency records and is responsible for the harm done to CREW's ability to obtain and make public those records.  *See* 44 U.S.C. §§ 3301, <u>et</u> <u>seq</u>.; 5 U.S.C. §702.

## STATUTORY FRAMEWORK

9.  The FRA is a collection of statutes that governs the creation, management and disposal of federal records.  <u>See</u> <u>generally</u> 44 U.S.C. §§ 2101 <u>et seq</u>., 2901 <u>et seq</u>., 3010 <u>et seq</u>., and 3301 <u>et seq</u>.  Among other things, the FRA ensures "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," as well as "judicious preservation and disposal of records."  44 U.S.C. § 2902.

10.  To fulfill this purpose, the FRA requires the head of each agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency."  <u>Id.</u> at § 3101.  Under the statute, each agency must also "establish and maintain an active, continuing program for the

3

economical and efficient management of the records of the agency," id. at § 3102, and must

"establish safeguards against the removal or loss of records" the agency head determines are

necessary and required by regulations of the Archivist. Id. at § 3105.

11.  The FRA also prescribes the exclusive mechanism for the disposal of federal records,

which it defines to include:

> all books, papers, maps, photographs, machine readable
> materials, regardless of physical form or characteristics,
> made or received by an agency of the United States
> Government under Federal law or in connection with
> the transaction of public business and preserved or
> appropriate for preservation by that agency . . as evidence
> of the organization, functions, policies, decisions, procedures
> operations, or other activities of the Government or because
> of the informational value of data in them.

44 U.S.C. § 3301.  No records may be "alienated or destroyed" except pursuant to the disposal

provisions of the FRA.  Id. at § 3314.

12.  The Archivist administers the provisions of the FRA and may authorize an agency to

dispose of records that the agency no longer needs and that do not have "sufficient

administrative, legal, research, or other value to warrant their continued preservation by the

Government."  44 U.S.C. § 3303a(a).  Only if the Archivist determines that agency records do

not have administrative, legal, research, or other value can the Archivist authorize their disposal.

Id. at §§ 3303a(a), (d), and (e).

13.  An agency wishing to dispose of records must first submit to the Archivist either lists

of records the agency head determines "are not needed by it in the transaction of its current

business," 44 U.S.C. § 3303a(2), or "schedules proposing the disposal after the lapse of specified

periods of time of records of a specified form or character" that the agency head determines will

not have "sufficient administrative, legal, research, or other value to warrant their further preservation by the Government." Id. at § 3303a(3). Upon receipt of such a request, the Archivist must issue a notice requesting public comment on the agency's proposal and the Archivist's staff must conduct its own assessment of the value of the records the agency is proposing to destroy. Id. at § 3303a(a). The Archivist is free to accept or reject an agency's proposal. Id.

14. If the Archivist learns of "any actual, impending, or threatened unlawful removal . . . or destruction of records in the custody of [an] agency," the Archivist is required to notify the head of the agency and assist the agency head "in initiating action through the Attorney General for the recovery of records wrongfully removed and for other redress provided by law." 44 U.S.C. § 2905(a). If the agency head does not initiate such action, the Archivist "shall request the Attorney General to initiate such action, and shall notify the Congress when such a request has been made." Id.

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

15. On March 28, 2007, CREW sent a FOIA request to Education seeking records, regardless of format and including electronic records and information, of communications and other contacts concerning the Reading First program. Letter from Daniel C. Roth to U.S. Department of Education, Office of Management, March 28, 2007 (attached as Exhibit A).

16. On May 9, 2007, CREW's counsel participated in a conference call with Education about CREW's FOIA request. Education officials -- who included representatives from the agency's FOIA office, its Office of the General Counsel and its Office of Elementary and Secondary Education -- advised CREW that the agency could not search for email pertaining to

any particular subject matter without having the identity of a specific recipient or sender. In addition, a Department official advised CREW that Education personnel "often use private email addresses" and that Education "wouldn't have access to that." Education officials confirmed that agency personnel use private email accounts for official business and that this issue had arisen in the past in the context of other FOIA requests. See Letter from Melanie Sloan, Executive Director, CREW to John P. Higgins, Jr., Inspector General, Education, May 15, 2006 (attached as Exhibit B).

17. In a follow-up telephone call on May 14, 2007, an Education FOIA officer confirmed to CREW's counsel that Education employees sometimes use private email addresses to conduct official business, that such material would not be included in the agency's response to CREW's FOIA request and that this issue had come up in the past. Id.

18. In light of this information, CREW sent a letter to Education's Inspector General dated May 15, 2007, requesting that he commence an immediate investigation "to assess the extent and duration" of Education's practice of using outside email accounts to conduct official business, "the amount of official correspondence that has been lost or destroyed, and the effect of this practice on all records requests to the Department of Education." Id.

19. CREW's May 15 letter also pointed out that in addition to CREW's FOIA request, reporters have also been requesting agency documents under the FOIA, as has Rep. George Miller, Chairman of the House Committee on Education and Labor. Id.

20. To date, CREW has not received copies of any emails responsive to its March 28, 2007 FOIA request that were sent or received by Education employees using outside email accounts.

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE

#### (Policy to Fail to Maintain Records Subject to the FRA)

21.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

22. The electronic records that Education creates when it uses outside email accounts to conduct official business are records within the meaning of the Federal Records Act, 44 U.S.C. § 3314.  Accordingly, any agency policy regarding preservation of these records must conform to the requirements of the FRA.

23.  The policy of Education to permit agency employees to use outside email accounts to conduct official business with the knowledge that electronic records created as a result of that use were and continue to be sought under the FOIA is arbitrary, capricious, and contrary to law because it results in the failure to preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency.  44 U.S.C. § 3101.

24.  As a result of Education's unlawful policy in violation of the FRA, plaintiff was denied a right of access to information in the public interest, including evidence concerning how Education has implemented the Reading First program.

### CLAIM TWO

#### (Policy to Destroy Records Subject to the FRA)

25.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

26. The electronic records that Education creates when it uses outside email accounts to conduct official business are records within the meaning of the Federal Records Act, 44 U.S.C. §

7

3314.  Accordingly, any agency policy that permits or authorizes disposal or non-preservation of these records must conform to the requirements of the FRA.

27.  The policy of Education to permit agency employees to use outside email accounts to conduct official business and then to dispose of any electronic records created by that use is arbitrary, capricious and contrary to law because it permits the disposal of records that have administrative, legal, research, or other value and because it permits the disposal of records that have not been subject to a disposition schedule that has been subject to notice and public comment and approved by the Archivist.  Id. at  §§ 3303(a), (d) and (e).

28.  As a result of Education's unlawful policy in violation of the FRA, plaintiff was denied a right of access to information in the public interest, including evidence of how Education has implemented the Reading First program.

29.  As a result of Education's unlawful policy, plaintiff was denied its right to notice and the opportunity to comment on the proposed destruction of agency

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

(1) Declare that Education's policy of  permitting agency employees to use outside email accounts to conduct official business with the knowledge that electronic records created as a result of that use are not being preserved as agency records is arbitrary, capricious and contrary to law;

(2) Declare that Education's policy of knowingly permitting agency employees to destroy electronic records created by agency employees in the conduct of agency business through the use of outside email accounts is arbitrary, capricious and contrary to law;

(3) Award plaintiff reasonable attorney fees and litigation costs in this action, pursuant to

5 U.S.C. § 552(a)(4)(E); and

(4) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
 in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (20) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

May  22, 2006

# EXHIBIT A

# CREW | citizens for responsibility and ethics in washington

March 28, 2007

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**By fax, (202) 245-6623, and First Class mail**

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department) regulations, 34 CFR §§ 5.6 *et. seq.*

Specifically, CREW seeks any and all Department documents and records dating from January 20, 2001, to the present, in the following categories:

1.  All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2.  All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

3.  All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4.    To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*. See Andrew Brownstein & Travis Hicks, <u>Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close</u>, Title I Monitor (undated) (Attached as Exhibit 1). As these documents have been already culled and processed for disclosure, we expect production of these records in short order. As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

Please search responsive records regardless of format, medium, or physical characteristics. Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), <u>cert</u>. <u>denied</u>, 415 U.S. 977 (1972). As you are aware, a <u>Vaughn</u> index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." <u>Founding Church of Scientology v. Bell</u>, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the <u>Vaughn</u> index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." <u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" <u>Id</u>. at 224 (citing <u>Mead Data Central v. U.S. Dep't of the Air Force</u>, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. <u>See</u> 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. <u>Mead Data Central</u>, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a <u>Vaughn</u> index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

2

## Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program, an issue on which the public record is unclear. For example, recently disclosed emails and statements by a former Department appointee appear to contradict statements by Secretary Spellings that she was not involved in Reading First until she became Secretary in January 2005. See Brownstein & Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated).

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

3

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Attachment

4

**EXHIBIT 1**

-->


Insight you trust.

**Home | My page | Search | News Desk | Support | Resources | Contact us**

**Titleionline**

**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**     "I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller,D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel their way have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

### Jumping Through Hoops

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

### A Strong Firewall

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

### Bias and Objectivity

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

### Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries, "she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

### Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

### Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

**Reading Leadership Academies**

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

**SFA Shut Out**

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

**EXHIBIT B**

# CREW | citizens for responsibility and ethics in washington

May 15, 2007

John P. Higgins, Jr.
Inspector General
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-1500

**BY FAX:** 202-245-7628

Dear Inspector General Higgins:

Citizens for Responsibility and Ethics in Washington ("CREW") respectfully requests that you investigate the extent to which Department of Education employees have been using non-governmental e-mail accounts for official business -- with the full knowledge of the Department's Office of General Counsel -- in violation of federal law.

On March 28, 2007, CREW filed a Freedom of Information Act ("FOIA") request with the Department of Education, seeking records related to the Reading First program. The Department's FOIA office and CREW's counsel, Dan Roth, arranged a conference call on May 9, 2007, to discuss the Department's response. In addition to Mr. Roth, participating in the call were Angela Arrington and Maria-Teresa Cueva from the FOIA office, Marcella Goodridge and Dennis Koeppel from the Office of the General Counsel, and James Butler from the Office of Elementary and Secondary Education.

During the course of the telephone conference, the FOIA officers and Ms. Goodridge explained to Mr. Roth the difficulties in searching Department emails. Specifically, Department officials told Mr. Roth that without identifying a specific recipient or sender, it is impossible to search for email pertaining to any particular subject matter. Without prompting, Ms. Goodridge then stated that Department personnel "often use private email addresses," and that the Department "wouldn't have access to that." Mr. Roth asked whether private email accounts were used for official business and Ms. Goodridge replied that they were, adding that this issue has arisen in the past in reference to other FOIA requests.

On May 14, 2007, Mr. Roth called Ms. Arrington for clarification on several issues. During the course of that conversation, Mr. Roth asked if he had understood Ms. Goodridge correctly to state that because Department of Education employees sometimes use private email addresses for official business, such material would not be included in the Department's response to CREW's FOIA and that this issue had come up in the past. Ms. Arrington confirmed Ms. Goodridge's statements.

The Federal Records Act ("FRA"), 44 U.S.C. §§ 3301 et seq., governs the preservation and disposal of federal records. Among other things, the FRA ensures "[a]ccurate and complete

Mr. John P. Higgins, Jr.
May 15, 2007
Page 2

documentation of the policies and transactions of the Federal Government," as well as "judicious preservation and disposal of records." 44 U.S.C. § 2902. To fulfill this purpose, the FRA requires the head of each agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency." Id. § 3101. Under the statute, each agency must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," id. § 3102, and must "establish safeguards against the removal or loss of records" the agency head determines are necessary and required by regulations of the Archivist. Id. § 3105.

The FRA also prescribes the exclusive mechanism for disposal of federal records, which it defines to include:

> all books, papers, maps, photographs, machine readable materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency . . . as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them.

44 U.S.C. § 3301. No records may be "alienated or destroyed" except pursuant to the disposal provisions of the FRA. Id. at § 3314.

If, as Ms. Goodridge represented, Department of Education employees are using or have used outside, non-governmental email addresses for government business and have not retained copies of those records on the Department's files, the Department is failing to "accurate[ly] and complete[ly] document[]" the policies and transactions of the Federal Government," by failing to retain and/or properly dispose of federal records in violation of the FRA. 44 U.S.C. § 2902. Similarly, the failure to search for records in response to FOIA requests would also be unlawful. See 5 U.S.C. § 552, et. seq.

As you know, the administration of the Reading First program has been the subject of intense scrutiny following the issuance of your office's six reports on the program. In addition to CREW's FOIA request, press accounts indicate that reporters also have been requesting related Department documents under the FOIA. See e.g. Andrew Brownstein & Travis Hicks, Congress Grills Spellings on Reading First Progam; OIG Investigation Draws to a Close, Title I Monitor (undated) (attached as Exhibit 1). Similarly, on May 1, 2007, Rep. George Miller (D-CA), Chairman of the House Committee on Education and Labor, requested documents from Secretary

Mr. John P. Higgins, Jr.
May 15, 2007
Page 3

Spellings on Reading First and the student loan industry. Letter from Rep. George Miller to Hon. Margaret Spellings, Secretary, U.S. Department of Education (May 1, 2007) (attached as Exhibit 2).

In order for the Department to respond to these and all other requests in accordance with federal law, all responsive departmental records must be searched. If, however, employees are regularly using private email accounts to send official email and the Department neither tracks nor stores such email, the full complement of responsive records clearly will not be produced to any requesters.

By failing to maintain all departmental communications as federal records, the Department of Education is likely operating in violation of the Federal Records Act, and appears to have been doing so for some time. In addition, the use of private email accounts to conduct official Department business raises serious concerns about the adequacy of Department searches in response to FOIA requests. As a result, CREW respectfully requests that you commence an immediate investigation to assess the extent and duration of this disturbing practice, the amount of official correspondence that has been lost or destroyed, and the effect of this practice on all records requests to the Department of Education.

Thank you for your attention to this matter.

Sincerely,

Melanie Sloan
Executive Director

Encls.

cc:     Honorable Edward M. Kennedy, Chairman
        Honorable Michael B. Enzi, Ranking Member
        U.S. Senate Committee on Health, Education, Labor and Pensions

        Honorable George Miller, Chairman
        Honorable Howard P. "Buck" McKeon, Ranking Member
        U.S. House Committee on Education and Labor

Mr. John P. Higgins, Jr.
May 15, 2007
Page 4

     Honorable Henry Waxman, Chairman
     Honorable Thomas M. Davis, Ranking Member
     Ranking Member, U.S. House Committee on Oversight and Government Reform

     Dr. Allen Weinstein
     Archivist of the United States

**EXHIBIT 1**

http://www.thompson.com/libraries/titleionline/news_desk/tio070321...

-->







**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

"I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

**Site Index**

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller, D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

## Jumping Through Hoops

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

## A Strong Firewall

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

## Bias and Objectivity

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries," she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. …If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal data and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

## Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

## SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

**EXHIBIT 2**

MAJORITY MEMBERS:

GEORGE MILLER, CALIFORNIA, Chairman

DALE E. KILDEE, MICHIGAN, Vice Chairman
DONALD M. PAYNE, NEW JERSEY
ROBERT E. ANDREWS, NEW JERSEY
ROBERT C. "BOBBY" SCOTT, VIRGINIA
LYNN C. WOOLSEY, CALIFORNIA
RUBÉN HINOJOSA, TEXAS
CAROLYN McCARTHY, NEW YORK
JOHN F. TIERNEY, MASSACHUSETTS
DENNIS J. KUCINICH, OHIO
DAVID WU, OREGON
RUSH D. HOLT, NEW JERSEY
SUSAN A. DAVIS, CALIFORNIA
DANNY K. DAVIS, ILLINOIS
RAÚL M. GRIJALVA, ARIZONA
TIMOTHY H. BISHOP, NEW YORK
LINDA T. SÁNCHEZ, CALIFORNIA
JOHN P. SARBANES, MARYLAND
JOE SESTAK, PENNSYLVANIA
DAVID LOEBSACK, IOWA
MAZIE HIRONO, HAWAII
JASON ALTMIRE, PENNSYLVANIA
JOHN A. YARMUTH, KENTUCKY
PHIL HARE, ILLINOIS
YVETTE D. CLARKE, NEW YORK
JOE COURTNEY, CONNECTICUT
CAROL SHEA-PORTER, NEW HAMPSHIRE



**COMMITTEE ON EDUCATION AND LABOR**

U.S. HOUSE OF REPRESENTATIVES

2181 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6100

MAJORITY – 202-225-3725
MINORITY – 202-225-4527
http://edlabor.house.gov

MINORITY MEMBERS:

HOWARD "BUCK" McKEON, CALIFORNIA,
Senior Republican Member

THOMAS E. PETRI, WISCONSIN
PETER HOEKSTRA, MICHIGAN
MICHAEL N. CASTLE, DELAWARE
MARK E. SOUDER, INDIANA
VERNON J. EHLERS, MICHIGAN
JUDY BIGGERT, ILLINOIS
TODD RUSSELL PLATTS, PENNSYLVANIA
RIC KELLER, FLORIDA
JOE WILSON, SOUTH CAROLINA
JOHN KLINE, MINNESOTA
CATHY McMORRIS RODGERS, WASHINGTON
KENNY MARCHANT, TEXAS
TOM PRICE, GEORGIA
LUIS G. FORTUÑO, PUERTO RICO
CHARLES W. BOUSTANY, JR., LOUISIANA
VIRGINIA FOXX, NORTH CAROLINA
JOHN R. "RANDY" KUHL, JR., NEW YORK
ROB BISHOP, UTAH
DAVID DAVIS, TENNESSEE
TIMOTHY WALBERG, MICHIGAN
DEAN HELLER, NEVADA

May 1, 2007

**VIA FACSIMILE- 202-401-0596**

The Honorable Margaret Spellings
Secretary
U.S. Department of Education
400 Maryland Avenue, SW, Rm. 7W301
Washington, DC 20202

Dear Secretary Spellings:

Over the past few weeks, the Committee on Education and Labor has held investigative hearings that produced evidence of unethical practices in the student loan industry and of pervasive mismanagement and conflicts of interest in the Reading First program. The Committee's ongoing investigations into these two multi-billion-dollar programs have uncovered significant lapses in oversight among senior level White House and Department of Education officials responsible for their stewardship.

For several years, the Administration has been aware of the unethical practices among lenders and schools participating in the federal student loan programs, yet has to act to protect the integrity of the $85 billion-a-year programs. Recent news accounts have cited formal warnings dating back to at least 2001 that highlighted the dangers of inducements and other prohibited activities if left unchecked. Similarly, warnings raised years ago about the overall mismanagement of the Reading First program – and of the failure to mitigate conflicts of interest in the program – were ignored by the Administration. This consistent failure to act in the interests of our nation's students raises significant questions about why such warnings have been ignored.

Given the preliminary results of our ongoing investigations and the daily public reporting of unethical practices in programs within the Education Department, I seek additional information about the Department of Education's stewardship of the government's student loan and Reading First programs.

I ask that you provide me with the details of all senior-level Department of Education communications regarding the unethical practices among student lenders and schools (e.g., prohibited inducements) and the design and implementation of the Reading First program beginning January 20, 2001, through the receipt of this request. Specifically, I request the communications of former Secretary of Education Rodney Paige; former Senior Advisor to Secretary Paige, Beth Ann Bryan; former Deputy Secretary William Hansen; former Under Secretary and Deputy Secretary Eugene Hickok; present Chief of Staff to the Secretary David Dunn; and any other senior-level staff with responsibilities for the student loan and Reading First programs. I am sending a similar request to the White House.

I respectfully request your written response within 10 days of receiving this letter. I further ask that your staff coordinate the production of the requested information with Michael Zola, Chief Investigative Counsel, House Education and Labor Committee at (202) ███-███.

Sincerely,


**GEORGE MILLER**
Chairman

cc: Senior Republican Member Howard "Buck" McKeon


Enclosure:  Information Request Supplemental Instructions

# EXHIBIT A

# CREW | citizens for responsibility and ethics in washington

March 28, 2007

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**By fax, (202) 245-6623, and First Class mail**

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department) regulations, 34 CFR §§ 5.6 *et. seq.*

Specifically, CREW seeks any and all Department documents and records dating from January 20, 2001, to the present, in the following categories:

1.    All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2.    All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors.  The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

3.    All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees.  The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4.  To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*.  See Andrew Brownstein & Travis Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated) (Attached as Exhibit 1).  As these documents have been already culled and processed for disclosure, we expect production of these records in short order.  As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

Please search responsive records regardless of format, medium, or physical characteristics.  Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM.  We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs.  Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972).  As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979).  Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added).  Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records.  See 5 U.S.C. § 552(b).  If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document.  Mead Data Central, 566 F.2d at 261.  Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a Vaughn index.  If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

2

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program, an issue on which the public record is unclear. For example, recently disclosed emails and statements by a former Department appointee appear to contradict statements by Secretary Spellings that she was not involved in Reading First until she became Secretary in January 2005. See Brownstein & Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated).

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

**Conclusion**

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

3

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Attachment

**EXHIBIT 1**

-->



Insight you trust.

Home    My page    Search    News Desk    Support    Resources    Contact us

**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

"I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller, D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Site Index

Congress Grills Spellings On Reading First Program          http://www.thompson.com/libraries/titleonline/news_desk/tio070321...

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

**Jumping Through Hoops**

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

**A Strong Firewall**

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

**Bias and Objectivity**

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

### Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries, "she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

### Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

### Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."

In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

### Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

### SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

**EXHIBIT B**

# CREW | citizens for responsibility and ethics in washington

May 15, 2007

John P. Higgins, Jr.
Inspector General
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-1500

**BY FAX:** 202-245-7628

Dear Inspector General Higgins:

Citizens for Responsibility and Ethics in Washington ("CREW") respectfully requests that you investigate the extent to which Department of Education employees have been using non-governmental e-mail accounts for official business -- with the full knowledge of the Department's Office of General Counsel -- in violation of federal law.

On March 28, 2007, CREW filed a Freedom of Information Act ("FOIA") request with the Department of Education, seeking records related to the Reading First program. The Department's FOIA office and CREW's counsel, Dan Roth, arranged a conference call on May 9, 2007, to discuss the Department's response. In addition to Mr. Roth, participating in the call were Angela Arrington and Maria-Teresa Cueva from the FOIA office, Marcella Goodridge and Dennis Koeppel from the Office of the General Counsel, and James Butler from the Office of Elementary and Secondary Education.

During the course of the telephone conference, the FOIA officers and Ms. Goodridge explained to Mr. Roth the difficulties in searching Department emails. Specifically, Department officials told Mr. Roth that without identifying a specific recipient or sender, it is impossible to search for email pertaining to any particular subject matter. Without prompting, Ms. Goodridge then stated that Department personnel "often use private email addresses," and that the Department "wouldn't have access to that." Mr. Roth asked whether private email accounts were used for official business and Ms. Goodridge replied that they were, adding that this issue has arisen in the past in reference to other FOIA requests.

On May 14, 2007, Mr. Roth called Ms. Arrington for clarification on several issues. During the course of that conversation, Mr. Roth asked if he had understood Ms. Goodridge correctly to state that because Department of Education employees sometimes use private email addresses for official business, such material would not be included in the Department's response to CREW's FOIA and that this issue had come up in the past. Ms. Arrington confirmed Ms. Goodridge's statements.

The Federal Records Act ("FRA"), 44 U.S.C. §§ 3301 et seq., governs the preservation and disposal of federal records. Among other things, the FRA ensures "[a]ccurate and complete

Mr. John P. Higgins, Jr.
May 15, 2007
Page 2

documentation of the policies and transactions of the Federal Government," as well as "judicious preservation and disposal of records." 44 U.S.C. § 2902. To fulfill this purpose, the FRA requires the head of each agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency." Id. § 3101. Under the statute, each agency must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," id. § 3102, and must "establish safeguards against the removal or loss of records" the agency head determines are necessary and required by regulations of the Archivist. Id. § 3105.

The FRA also prescribes the exclusive mechanism for disposal of federal records, which it defines to include:

> all books, papers, maps, photographs, machine readable materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency . . . as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them.

44 U.S.C. § 3301. No records may be "alienated or destroyed" except pursuant to the disposal provisions of the FRA. Id. at § 3314.

If, as Ms. Goodridge represented, Department of Education employees are using or have used outside, non-governmental email addresses for government business and have not retained copies of those records on the Department's files, the Department is failing to "accurate[ly] and complete[ly] document[] the policies and transactions of the Federal Government," by failing to retain and/or properly dispose of federal records in violation of the FRA. 44 U.S.C. § 2902. Similarly, the failure to search for records in response to FOIA requests would also be unlawful. See 5 U.S.C. § 552, et. seq.

As you know, the administration of the Reading First program has been the subject of intense scrutiny following the issuance of your office's six reports on the program. In addition to CREW's FOIA request, press accounts indicate that reporters also have been requesting related Department documents under the FOIA. See e.g. Andrew Brownstein & Travis Hicks, Congress Grills Spellings on Reading First Progam: OIG Investigation Draws to a Close, Title I Monitor (undated) (attached as Exhibit 1). Similarly, on May 1, 2007, Rep. George Miller (D-CA), Chairman of the House Committee on Education and Labor, requested documents from Secretary

Mr. John P. Higgins, Jr.
May 15, 2007
Page 3

Spellings on Reading First and the student loan industry. Letter from Rep. George Miller to Hon. Margaret Spellings, Secretary, U.S. Department of Education (May 1, 2007) (attached as Exhibit 2).

In order for the Department to respond to these and all other requests in accordance with federal law, all responsive departmental records must be searched. If, however, employees are regularly using private email accounts to send official email and the Department neither tracks nor stores such email, the full complement of responsive records clearly will not be produced to any requesters.

By failing to maintain all departmental communications as federal records, the Department of Education is likely operating in violation of the Federal Records Act, and appears to have been doing so for some time. In addition, the use of private email accounts to conduct official Department business raises serious concerns about the adequacy of Department searches in response to FOIA requests. As a result, CREW respectfully requests that you commence an immediate investigation to assess the extent and duration of this disturbing practice, the amount of official correspondence that has been lost or destroyed, and the effect of this practice on all records requests to the Department of Education.

Thank you for your attention to this matter.

Sincerely,

Melanie Sloan
Executive Director

Encls.

cc:    Honorable Edward M. Kennedy, Chairman
       Honorable Michael B. Enzi, Ranking Member
       U.S. Senate Committee on Health, Education, Labor and Pensions

       Honorable George Miller, Chairman
       Honorable Howard P. "Buck" McKeon, Ranking Member
       U.S. House Committee on Education and Labor

Mr. John P. Higgins, Jr.
May 15, 2007
Page 4

       Honorable Henry Waxman, Chairman
       Honorable Thomas M. Davis, Ranking Member
       Ranking Member, U.S. House Committee on Oversight and Government Reform

       Dr. Allen Weinstein
       Archivist of the United States

**EXHIBIT 1**

Congress Grills Spellings On Reading First Program          http://www.thompson.com/libraries/titleionline/news_desk/tio070321...

-->


THOMPSON
Insight you trust.

Home | My page | Search | News Desk | Support | Resources | Contact us

**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**

"I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller,D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

### Jumping Through Hoops

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*"...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

### A Strong Firewall

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

### Bias and Objectivity

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

## Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries," she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

## Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

## Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time." In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

### Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

### SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/olg/whatsnew.html*

**EXHIBIT 2**

MAJORITY MEMBERS:

GEORGE MILLER, CALIFORNIA, Chairman

DALE E. KILDEE, MICHIGAN, Vice Chairman
DONALD M. PAYNE, NEW JERSEY
ROBERT E. ANDREWS, NEW JERSEY
ROBERT C. "BOBBY" SCOTT, VIRGINIA
LYNN C. WOOLSEY, CALIFORNIA
RUBÉN HINOJOSA, TEXAS
CAROLYN McCARTHY, NEW YORK
JOHN F. TIERNEY, MASSACHUSETTS
DENNIS J. KUCINICH, OHIO
DAVID WU, OREGON
RUSH D. HOLT, NEW JERSEY
SUSAN A. DAVIS, CALIFORNIA
DANNY K. DAVIS, ILLINOIS
RAÚL M. GRIJALVA, ARIZONA
TIMOTHY H. BISHOP, NEW YORK
LINDA T. SÁNCHEZ, CALIFORNIA
JOHN P. SARBANES, MARYLAND
JOE SESTAK, PENNSYLVANIA
DAVID LOEBSACK, IOWA
MAZIE HIRONO, HAWAII
JASON ALTMIRE, PENNSYLVANIA
JOHN A. YARMUTH, KENTUCKY
PHIL HARE, ILLINOIS
YVETTE D. CLARKE, NEW YORK
JOE COURTNEY, CONNECTICUT
CAROL SHEA-PORTER, NEW HAMPSHIRE

MINORITY MEMBERS:

HOWARD "BUCK" McKEON, CALIFORNIA,
Senior Republican Member

THOMAS E. PETRI, WISCONSIN
PETER HOEKSTRA, MICHIGAN
MICHAEL N. CASTLE, DELAWARE
MARK E. SOUDER, INDIANA
VERNON J. EHLERS, MICHIGAN
JUDY BIGGERT, ILLINOIS
TODD RUSSELL PLATTS, PENNSYLVANIA
RIC KELLER, FLORIDA
JOE WILSON, SOUTH CAROLINA
JOHN KLINE, MINNESOTA
CATHY McMORRIS RODGERS, WASHINGTON
KENNY MARCHANT, TEXAS
TOM PRICE, GEORGIA
LUIS G. FORTUÑO, PUERTO RICO
CHARLES W. BOUSTANY, JR., LOUISIANA
VIRGINIA FOXX, NORTH CAROLINA
JOHN R. "RANDY" KUHL, JR., NEW YORK
ROB BISHOP, UTAH
DAVID DAVIS, TENNESSEE
TIMOTHY WALBERG, MICHIGAN
DEAN HELLER, NEVADA



## COMMITTEE ON EDUCATION AND LABOR

U.S. HOUSE OF REPRESENTATIVES
2181 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6100

MAJORITY – 202-225-3725
MINORITY – 202-225-4527
http://edlabor.house.gov

May 1, 2007

**VIA FACSIMILE- 202-401-0596**
The Honorable Margaret Spellings
Secretary
U.S. Department of Education
400 Maryland Avenue, SW, Rm. 7W301
Washington, DC 20202

Dear Secretary Spellings:

Over the past few weeks, the Committee on Education and Labor has held investigative hearings that produced evidence of unethical practices in the student loan industry and of pervasive mismanagement and conflicts of interest in the Reading First program. The Committee's ongoing investigations into these two multi-billion-dollar programs have uncovered significant lapses in oversight among senior level White House and Department of Education officials responsible for their stewardship.

For several years, the Administration has been aware of the unethical practices among lenders and schools participating in the federal student loan programs, yet has to act to protect the integrity of the $85 billion-a-year programs. Recent news accounts have cited formal warnings dating back to at least 2001 that highlighted the dangers of inducements and other prohibited activities if left unchecked.  Similarly, warnings raised years ago about the overall mismanagement of the Reading First program – and of the failure to mitigate conflicts of interest in the program – were ignored by the Administration. This consistent failure to act in the interests of our nation's students raises significant questions about why such warnings have been ignored.

Given the preliminary results of our ongoing investigations and the daily public reporting of unethical practices in programs within the Education Department, I seek additional information about the Department of Education's stewardship of the government's student loan and Reading First programs.

I ask that you provide me with the details of all senior-level Department of Education communications regarding the unethical practices among student lenders and schools (e.g., prohibited inducements) and the design and implementation of the Reading First program beginning January 20, 2001, through the receipt of this request. Specifically, I request the communications of former Secretary of Education Rodney Paige; former Senior Advisor to Secretary Paige, Beth Ann Bryan; former Deputy Secretary William Hansen; former Under Secretary and Deputy Secretary Eugene Hickok; present Chief of Staff to the Secretary David Dunn; and any other senior-level staff with responsibilities for the student loan and Reading First programs. I am sending a similar request to the White House.

I respectfully request your written response within 10 days of receiving this letter. I further ask that your staff coordinate the production of the requested information with Michael Zola, Chief Investigative Counsel, House Education and Labor Committee at (202) ███-███.

Sincerely,


**GEORGE MILLER**
Chairman

cc: Senior Republican Member Howard "Buck" McKeon


Enclosure:  Information Request Supplemental Instructions

## CIVIL COVER SHEET

JS-44
(Rev. 2/01 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Citizens for Responsibility and Ethics in Washington | U.S. Department of Education |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___11001___ (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___11001___ (IN U.S. PLAINTIFF CASES ONLY) NOTE: In land condemnation cases, use the location of the tract of land involved. |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Anne L. Weismann Citizens for Responsibility and Ethics in Washington 1400 Eye Street, N.W., Suite 450 Washington, D.C. 20005 202-408-5565 | |

**II BASIS OF JURISDICTION**
(SELECT ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (SELECT ONE FOR PLAINTIFF AND ONE FOR DEFENDANT)
( FOR DIVERSITY CASES ONLY!)

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Select one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes:**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ **G. Habeas Corpus/2255** | ○ **H. Employment Discrimination** | ● **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

● 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. 706 (APA) and 44 U.S.C. 2101, et seq. (Fed. Records Act) - agency policy to permit nonpreservation and destruction of agency records unlawful

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Select YES only if demanded in complaint

JURY DEMAND:    ☐ YES    ☒ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☐ YES    ☒ NO    If yes, please complete related case form.

DATE  5/22/07    SIGNATURE OF ATTORNEY OF RECORD  _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.