**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS) | | |
| IN WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:07CV00963-RMU |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION**

**INTRODUCTION**

Plaintiff, Citizens for Responsibility and Ethics in Washington ("Plaintiff"), filed this action under the Federal Records Act ("FRA") to challenge as arbitrary and capricious a Department of Education "policy" that does not exist. Specifically, Plaintiff contends that Department policy authorizes agency employees to use outside, personal email accounts to conduct official business and to dispose of such emails without complying with the agency's approved records disposition schedule. That erroneous contention is based on Plaintiff's misconstruing certain guidance the Department provided on narrowing an overbroad request Plaintiff submitted pursuant to the Freedom of Information Act ("FOIA"). That request seeks all communications between the Department and any educational publisher or White House staff. Plaintiff was advised that the Department could not process that request in part because, without specific names, its search could not capture communications that publishers sent from personal email accounts. Plaintiff transformed that explanation into the non-existent Department policy challenged here. The Department, however, has never had a policy authorizing its employees to

conduct government business on personal email accounts.  This action, which purports to challenge that policy, is therefore completely unfounded.

However, without even reaching that issue, this Court should dismiss this action for lack of jurisdiction.  Even if the challenged policy did exist – and it emphatically does not – Plaintiff lacks standing to bring this action under the FRA.  Without deciding the issue, courts in this Circuit have indicated that it is "questionable" whether an organization such as Plaintiff that claims to need access to government records under FOIA has standing under the FRA.  This case now squarely presents that question and this Court should rule that such organizations do not.

Even if this Court concludes otherwise, Plaintiff here lacks standing because it has not alleged a cognizable injury.  Plaintiff's only allegation of injury is that it has been "denied a right of access to information in the public interest," specifically, emails responsive to its FOIA request.  That alleged injury, however, is not the result of the agency conduct challenged here but of Plaintiff's failure to narrow its FOIA request and Plaintiff's appeal of the denial of its fee waiver request.  Since Plaintiff has not suffered any injury as a result of the challenged conduct, Plaintiff lacks standing.

Alternatively, this Court should dismiss this action as unripe.  Since the Department is unable to process Plaintiff's FOIA request for reasons unrelated to the agency's record retention practices, Plaintiff can only speculate that records responsive to that request are affected by the policy alleged in this action.  This Court thus would be ruling on a matter involving, at best, a hypothetical controversy between the parties.  Article III precludes the Court from doing so.  This action accordingly should be dismissed.

## STATUTORY BACKGROUND

The Federal Records Act sets forth agency requirements for records creation, management, and disposal.  *See* 44 U.S.C. §§ 2901, *et seq.*, 3101, *et seq.*, 3301, *et seq.* Specifically, the Act requires agencies to establish standards and procedures intended to promote "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," "[c]ontrol of the quantity and quality of records produced by the Federal Government," "[s]implification of the activities, systems, and processes of records creation and of records maintenance and use," and "[j]udicious preservation and disposal of records."  44 U.S.C. § 2902(1), (2), (4), (5).  The Archivist "shall provide guidance and assistance to Federal agencies . . . to ensur[e] adequate and proper documentation of the policies and transactions of the Federal Government and ensur[e] proper records disposition."  44 U.S.C. § 2904.

Towards those ends, agencies are required to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency."  44 U.S.C. § 3101.  Each agency must establish "controls over the creation and . . . maintenance and use" of such records and establish safeguards against their unauthorized removal or loss.  44 U.S.C. §§ 3102, 3105.  Every agency head must submit to the Archivist a list of records in the agency's custody and proposed schedules for their disposal after specified lapses of time.  *See* 44 U.S.C. § 3303.  The disposal schedules are published for notice and comment and thereafter must be approved by the Archivist before records may be disposed pursuant to them.  *See* 44 U.S.C. §§ 3303, 3303a.  Federal records may only be destroyed pursuant to disposition schedules approved by the Archivist.  *See* 44 U.S.C. §§ 3303, 3303a.

If an agency head becomes aware of "any actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of [agency] records," the agency head, with the assistance of the Archivist, "shall initiate action through the Attorney General for the recovery of the records he knows or has reason to believe have been unlawfully removed from his agency." 44 U.S.C. § 3106. If the Archivist learns of such actual or threatened unlawful activity, he must notify the agency head and, if the agency head fails to take action to recover the records or seek other redress within a reasonable time, the Archivist shall request that the Attorney General initiate such an action. *See* 44 U.S.C. § 2905.

## STATEMENT OF FACTS[1]

On March 28, 2007, Plaintiff submitted a FOIA request to the Department of Education seeking four broad categories of documents:

(1) "All communications from any Department office . . . to, from, or referencing any member of the White House staff . . . that mention or relate to Reading First, 'Science Based Reading Research'/'SBRR,' DIBELS, or any other issue related to reading instruction or education";

(2) "All Department contacts or communications . . . with educational publishers, their executives, employees, consultants, or contractors";

(3) "All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees"; and

(4) "[A]ll documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*.

---

[1] The Statement of Facts is based on the allegations in the Complaint and the attached Declaration of Angela Arrington ("Arrington Decl,"), which this Court properly may consider in ruling on a motion to dismiss for lack of jurisdiction. *See National Community Reinvestment Coalition v. National Credit Union Admin.*, 290 F. Supp. 2d 124, 131 (D.D.C. 2003) ("In resolving a Rule 12(b)(1) motion for lack of jurisdiction . . . courts are generally free to consider relevant materials outside the pleadings.").

Compl. Ex. A.  Plaintiff requested that the fees associated with processing its request be waived.
*See* Compl. Ex. A.

Department personnel, upon receiving Plaintiff's request, reviewed it and determined that
it did "not reasonably describe the records sought" and therefore could not be processed as
written.  *See* Arrington Decl. ¶ 7.  Plaintiff's request, for example, did not specify the names of
Department or White House personnel or publishing company employees whose communications
were sought.  *See* Arrington Decl. ¶ 7.  A search for records with "White House" or a publisher's
name would be unduly burdensome and overly broad.  *See* Arrington Decl. ¶ 7.

By letter dated April 16, 2007, the Department acknowledged receipt of Plaintiff's FOIA
request and enclosed a CD responsive to item (4) of Plaintiff's request containing documents
"previously disclosed under FOIA to the Title I Monitor."  *See* Arrington Decl. Ex. B.  The letter
went on to explain that the Department needed "clarification for items 1 through 3 of [Plaintiff's]
request" which "encompass a large volume of information on broad topics related to individuals
in the Department and 'White House staff,' without identifying specific individuals, offices, or
subjects."  Arrington Decl. ¶ 8 & Ex. B.  Plaintiff was advised that "the Department is unable to
process your request regarding items 1 through 3 without further clarification."  Arrington Decl.
¶ 8 & Ex. B.  The letter also informed Plaintiff that its fee waiver request had been denied
because Plaintiff had not demonstrated entitlement to a waiver under FOIA.  *See* Arrington Decl.
¶ 8.  The Department therefore did not begin processing Plaintiff's request.  *See* Arrington Decl.
¶¶ 5c & 8.

At Plaintiff's request, agency personnel participated in a teleconference with Plaintiff to discuss its FOIA request. *See* Arrington Decl. ¶ 9. Plaintiff did not understand why the Department could not process its request as written and apparently was under the misimpression that the Department had centralized electronic search capabilities. *See* Arrington Decl. ¶ 9a. In an effort to correct that misimpression, the teleconference participants explained that to fulfill Plaintiff's request for "[a]ll Department . . . communications . . . with educational publishers, their executives, employees, consultants, or contractors," every Department employee's email account would have to be searched "one at a time." *See* Arrington Decl. ¶¶ 6 & 9a. Plaintiff was further advised that, even assuming the Department had the resources to conduct such a broad search, the agency could not capture all such communications because without individual names, the Department could not identify publishers' "executives, employees, consultants, or contractors . . . [that] chose to contact Department employees using private e-mail accounts." *See* Arrington Decl. ¶ 9c. Plaintiff inquired what it needed to do to sufficiently narrow its request and was advised to review the request in light of the discussion. *See* Arrington Decl. ¶ 9.

By email dated May 14, 2007, Plaintiff confirmed its understanding of the May 9, 2007 discussion on narrowing its FOIA request as follows:

> the Department's FOIA technology does not allow for subject matter or keyword searches throughout the email system, so a search undertaken pursuant to the original terms of our request would require individual searches of each of the Department's approximately 4,500 employee email accounts. Additionally, . . . email communications on personal email accounts would not be covered by such a search[2] . . . .

---

[2] This statement evidently is the source of Plaintiff's confusion. Plaintiff was actually told that "it is not unheard of for members of the public to contact Department employees using private e-mail accounts" and that without individual names, the Department would not be able to capture such communications in its search. *See* Arrington Decl. ¶ 9c.

*See* Arrington Decl. Ex. D.  Plaintiff also renewed its request for a copy of the FOIA request submitted by Title I Monitor.  *See* Arrington Decl. Ex. D.  Plaintiff indicated that it would "formalize any narrowing language in a letter to the Department."  *See* Arrington Decl. Ex. D. Plaintiff's purportedly narrowed FOIA request sought from fourteen identified Department offices, "[a]ll communications . . . [with] White House staff . . . that mention or relate to Reading First, Early Reading First, 'Scientifically Based Reading Research'/'Science Based Reading Research'/'SBRR' or DIBELS" and "all communications" with employees of Houghton Mifflin, SRA/McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and Intellitools.  *See* Arrington Decl. Ex. E.  However, Plaintiff provided only two publishing company employees by name.  *See* Arrington Decl. Ex. E.  Plaintiff also added a request for all communications that mention or relate to an additional program, Early Reading First.  *See* Arrington Decl. Ex. E.  Otherwise, "all other language in [Plaintiff's] original request [] remain[ed] unchanged."  *See* Arrington Decl. Ex. E.

On May 15, 2007, Plaintiff sent a letter to the Department's Inspector General requesting that his office commence an investigation into "the extent to which Department of Education employees have been using non-governmental e-mail accounts for official business."  Compl. Ex. B.  The letter speculated that "[i]f [] employees are regularly using private email accounts to send official email and the Department neither tracks nor stores such email . . . the Department . . . is likely operating in violation of the Federal Records Act."  Compl. Ex. B.  A week later, Plaintiff filed the instant action alleging that the Department had violated the FRA by failing to preserve and properly dispose of records allegedly created pursuant to the "policy of Education to permit agency employees to use outside email accounts to conduct official business."  Compl. ¶¶ 23, 27.

**ARGUMENT**

Plaintiff's claims under the FRA are predicated on a "policy" that does not exist.  This

Court, however, need not reach that issue because Plaintiff has improperly invoked this Court's

jurisdiction.  "The 'judicial power' of the United States . . . is not an unconditioned authority"

but is limited by Article III of the Constitution.  *Valley Forge Christian College v. Americans*

*United for Separation of Church & State*, 454 U.S. 464, 471 (1982).  That Article "confines the

federal courts to adjudicating actual 'cases' and 'controversies.'"  *Allen v. Wright*, 468 U.S. 737,

750 (1984).  In the absence of an actual case or controversy, the Court is without jurisdiction to

decide the case.  *See Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Poe v. Ullman*, 367

U.S. 497, 502 (1961).  Thus, a court must ensure that its authority is invoked where there is "a

lively conflict between antagonistic demands, actively pressed, which make resolution of the

controverted issue a practical necessity," (*id.* at 503) – a requirement "founded in concern about

the proper – and properly limited – role of the courts in a democratic society," (*Warth*, 422 U.S.

at 498).  Otherwise, "the courts would be called upon to decide abstract questions of wide public

significance even though other governmental institutions may be more competent to address the

questions and even though judicial intervention may be unnecessary to protect individual rights."

*Id.* at 500.

In an effort to give meaning to Article III's case-or-controversy requirement, "courts have

developed a series of principles termed 'justiciability doctrines,' among which are standing,

ripeness, mootness, and the political question doctrine."  *National Treas. Employees Union v.*

*United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996).  These doctrines consist of both "prudential

elements which Congress is free to override and core component[s] which are essential and unchanging part[s] of the case-or-controversy requirement of Article III." *Id.* (internal quotations omitted). This action implicates core components of that requirement – standing and ripeness – whose absence requires dismissal for lack of jurisdiction.

## I.    THIS COURT SHOULD DISMISS THIS ACTION BECAUSE PLAINTIFF LACKS STANDING.

This action should be dismissed for lack of standing. A plaintiff's standing is a "predicate to any exercise of [this Court's] jurisdiction." *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996). Standing is "an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The requirements of standing are well established. *See id.* at 560-61. "[A plaintiff] must show injury in fact that was caused by the conduct of the defendants and that can be redressed by judicial relief." *Public Citizen, Inc. v. National Highway Traffic Safety Admin.* __ F.3d __, 2007 WL 1713334, at *7 (D.C. Cir., June 15, 2007). The absence of any one of these elements is sufficient to dismiss a claim on standing grounds. *See US Ecology, Inc. v. United States Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000) ("a deficiency on any one of the three [elements] suffices to defeat standing"). Indeed, "[u]ntil a judicially cognizable injury is shown no other inquiry is relevant to consideration of [] standing." *Schlesinger v. Reservists Comm. to Stop War*, 418 U.S. 208, 227 n.16 (1974). Dismissal is required here because Plaintiff has not alleged a cognizable injury.

### A.    Plaintiff's Alleged Injury Is Insufficient to Confer Standing.

Plaintiff's only alleged injury is a "denied [] right of access to information in the public interest, including evidence of how Education has implemented the Reading First program." Compl. ¶ 28; *see also* Compl. ¶ 24.  This case squarely presents a question left open in prior FRA cases, namely, whether such an injury is sufficient for standing purposes.  Courts in this Circuit have suggested that its sufficiency is "questionable."  *See American Friends Serv. Comm. v. Webster*, 720 F.2d 29, 46 (D.C. Cir. 1983); *American Friends Serv. Comm. v. Webster*, 485 F. Supp. 222, 227 (D.D.C. 1980).  In *Webster*, three categories of plaintiffs brought an action to challenge the FBI's record destruction program.  One category of plaintiffs included "organizations whose goals and purposes are alleged to require access to the files and records of the FBI in order to enable them to disseminate information for organizational, educational, and political purposes."  *Id.*  These plaintiffs claimed that if the FBI's files were destroyed, "they w[ould] be deprived of raw material for primary research in the areas of their activities."  *Id.*  The district court regarded that claimed injury as "questionable" for standing purposes.  *Id.*  However, because the other plaintiffs had adequately shown injury for standing purposes, the district court concluded that it was "not necessary to decide that question."  *Id.*  In the subsequent appeal, the D.C. Circuit also refrained from deciding that question "[s]ince the district court based its finding of standing only on the injuries . . . [of the other] groups of plaintiffs."  *Webster*, 720 F.2d at 282.  Thus, it is "unsettled whether the requisite injury-in-fact standard is met by a claim that government documents, earmarked for destruction, are needed for organizational political purposes."  *Webster*, 485 F. Supp. at 227.

Even if that injury is sufficient for standing purposes, Plaintiff cannot make that claim here because of the status of Plaintiff's FOIA request.  The Department has not begun to process Plaintiff's requests for communications between the Department and White House staff concerning the Reading First Program or for communications between the Department and educational publishers.  *See* Arrington Decl. ¶ 16.  Therefore, no determination has been made as to which Department records are responsive to that request and thus Plaintiff cannot possibly claim that any documents needed for its political purposes have been earmarked for destruction. *See* Arrington Decl. ¶ 17.  Plaintiff merely speculates that documents responsive to its request are not properly being maintained.  *See* Compl. Ex. B. ("If . . . Department of Education employees are using or have used outside, non-governmental email addresses for government business and have not retained copies of those records on the Department's files, the Department is failing to 'accurate[ly] and complete[ly] document[] the policies and transactions of the Federal Government' . . . in violation of the FRA"); *id.* ("If [] employees are regularly using private email accounts to send official email and the Department neither tracks nor stores such email . . . the Department of Education is likely operating in violation of the Federal Records Act").  It is well established, however, that speculative or hypothetical claims of injury are insufficient to confer standing.  *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 44 (1976) ("unadorned speculation will not suffice to invoke the federal judicial power").  Rather, the alleged injury "must be certainly impending," *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotation marks and citations omitted), and "real and immediate," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  Since Plaintiff's claimed injury is neither, Plaintiff lacks standing.

**B.    Plaintiff's Alleged Injury Is Traceable Only to Its Own Failure to Narrow the Scope of Its FOIA Request and Plaintiff's Appeal of the Denial of Its Fee Waiver Request.**

Plaintiff alternatively lacks standing because its alleged injury is not caused by the Department's alleged unlawful conduct. Standing requires that the alleged injury be "fairly traceable to the challenged act." *National Treasury*, 101 F.3d at 1427. Plaintiff's alleged injury is clearly not. Plaintiff "[t]o date [] has not received copies of any emails responsive to its March 28, 2007 FOIA request," (Compl. ¶ 20), not because of any Department policy permitting the use of personal email accounts but because the Department is not processing Plaintiff's overly broad FOIA request. *See* Arrington Decl. ¶ 16. Plaintiff was advised *before this lawsuit was filed* that the Department would not begin processing its request until Plaintiff clarified the records sought and resolved the issue of fees. *See* Compl. ¶ 16 (admitting that "Education officials . . . advised [Plaintiff] that the agency could not search for email pertaining to any particular subject matter without having the identity of a specific recipient or sender"); *see also* Arrington Decl. Ex. B ("Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request."); *id.* ("your request does not reasonably describe the records sought, and the Department is unable to process your request regarding items 1 through 3 without further clarification"). Plaintiff, however, has done neither. *See* Arrington Decl. ¶¶ 14, 15, 16.

Although Plaintiff submitted a purportedly narrowed request the day before filing this action, Plaintiff's revised request "failed to sufficiently narrow the scope or reasonably describe the records sought" and therefore remains insufficient for processing under the FOIA. *See* Arrington Decl. ¶ 13 & Ex. E. Plaintiff was advised by letter dated June 8, 2007 that further narrowing of its request was required and that Plaintiff's request for a fee waiver had been

-12-

denied.  *See* Arrington Decl. Ex. F.  Plaintiff has not accepted the Department's denial of

Plaintiff's fee waiver request.  Indeed, by letter dated June 21, 2007, Plaintiff appealed that

denial.  *See* Arrington Decl. Ex. G.  By regulation, as long as Plaintiff's fee waiver request is

unresolved, "[p]rocessing of the FOIA request is suspended."  *See* Arrington Decl. ¶ 5c; *see also*

34 C.F.R. Subtitle A, Part 5 (the Department's implementing regulations under FOIA).  Thus, to

the extent that Plaintiff has suffered any injury at all, it is traceable to its refusal to accept the

denial of its fee waiver request and its failure to submit an appropriately narrow FOIA request.

*See* Arrington Decl. ¶ 16 ("As [Plaintiff's] request currently reads, it does not reasonably

describe the records sought and therefore, even upon resolution of the fee dispute, the

Department cannot begin to search for responsive records until the requester clarifies the

request.").  Standing, however, requires that the alleged injury be traceable to the conduct

challenged.  Since here it is not, this action should be dismissed for lack of jurisdiction.

## II.   THE COURT SHOULD DISMISS THIS ACTION BECAUSE PLAINTIFF'S CLAIM IS UNRIPE.

This Court alternatively should dismiss this action because it is not ripe.  The ripeness

doctrine "shares the constitutional requirement of standing that an injury in fact be certainly

impending," which, as discussed earlier, is not so here.  *National Treasury*, 101 F.3d at 1427.

Prudentially, however, the ripeness doctrine "prevent[s] the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements."  *Worth v.

Jackson*, 451 F.3d 854, 861 (D.C. Cir. 2006).  By refusing to hear such disagreements, federal

courts "enhance judicial economy, and ensure that a record adequate to support an informed

decision exists when the case is heard."  *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C.

Cir. 1997).  Where, as here, "the dispute is so shapeless that the [C]ourt is necessarily called

upon to hypothesize regarding not only the *facts* of the dispute, but the very 'policy' . . . that is challenged[] such is the [] paradigm of an advisory opinion." *Hotel & Restaurant Employees Union v. Smith*, 846 F.2d 1499, 1517 (D.C. Cir. 1988). Since this Court lacks jurisdiction to issue such opinions, this action should be dismissed.

Plaintiff effectively concedes that whether the challenged policy – *even assuming it existed* – violates the FRA is contingent on whether the Department is properly retaining and disposing of emails from personal accounts. *See* Compl. Ex. B ("If [] employees are regularly using private email accounts to send official email and the Department neither tracks nor stores such email . . . the Department of Education is likely operating in violation of the Federal Records Act"). The Complaint, however, fails to provide a factual basis from which the Court can make that inference. The most Plaintiff can say is that it was advised that "[communications from private email addresses] would not be included in the agency's response to [Plaintiff's] FOIA request." Compl. ¶ 17. Thus, the record before the Court is wholly inadequate for an informed decision. *See Navegar, Inc.*, 103 F.3d at 998 (noting that the ripeness requirement ensures that the record before the court is "adequate to support an informed decision"). Dismissal of this action under the ripeness doctrine is therefore warranted.

## CONCLUSION

For the foregoing reasons, the Department of Education respectfully requests that the Court grant this motion and dismiss this action for lack of jurisdiction.

Dated:  July 23, 2007                    Respectfully submitted,

OF COUNSEL:                              PETER D. KEISLER
JENNIFER A. GOODMAN                      Assistant Attorney General,
Attorney                                 Civil Division
U.S. Department of Education

                                         JEFFREY A. TAYLOR
                                         United States Attorney

                                         ARTHUR R. GOLDBERG
                                         Assistant Branch Director,
                                         Federal Programs Branch

                                          s/ Jacqueline Coleman Snead
                                         JACQUELINE COLEMAN SNEAD
                                         (D.C. Bar No. 459548)
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Avenue, N.W., Rm 7214
                                         Washington, DC 20530
                                         Tel: (202) 514-3418
                                         Fax: (202) 616-8470
                                         jacqueline.snead@usdoj.gov

                                         **Counsel for United States Department of
                                         Education**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND ETHICS)
IN WASHINGTON,                        )
                                      )
                    Plaintiff,        )
                                      )     Case No. 1:07CV00963-RMU
            v.                        )
                                      )
UNITED STATES DEPARTMENT OF           )
EDUCATION,                            )
                                      )
                    Defendant.        )
_____)

**PROPOSED ORDER**

Upon consideration of Defendant's Motion to Dismiss, the opposition thereto, and the

complete record in this case, it hereby

ORDERED that Defendant's motion is granted.  This action is dismissed.

IT IS SO ORDERED.


                                    _____
                                    Ricardo M. Urbina
                                    UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2007, a true and correct copy of the foregoing

Defendant's Motion to Dismiss was electronically filed through the U.S. District Court for the

District of Columbia Electronic Document Filing System (ECF) and that the document is

available for viewing on that system.

\_\_\_\_\_s/ Jacqueline Coleman Snead\_\_\_\_\_
JACQUELINE COLEMAN SNEAD

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Citizens for Responsibility and Ethics in Washington | ) ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 07-cv-963 RMU |
| v. | ) ) ) | |
| United States Department of Education | ) ) ) | |
| Defendant. | ) ) | |

## <u>DECLARATION OF ANGELA ARRINGTON</u>

I, <u>Angela Arrington</u>, declare and state as follows:

1.      I am a Supervisory IT Specialist (GS-2210-15) for the Information Management Case Services Team within the Regulatory Information Management Services (RIMS), Office of Management, U.S. Department of Education (Department).  I have been employed at the Department for 5 years.

2.      My responsibilities include supervising a staff of 14 people (government and contractor staff) to facilitate public access to agency records under the Freedom of Information Act, 5 U.S.C. § 552 (FOIA).

3.      This declaration is submitted in support of Defendant's motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  All information contained herein is based upon my personal knowledge or information furnished to me in my official capacity and upon my personal review of the records at issue in this litigation.

**Department of Education's FOIA Policies/Procedures:**

4.      The Department's Chief FOIA Officer has delegated the authority for administration of the FOIA to RIMS. The FOIA staff within RIMS provides Department-wide assistance for the management and implementation of the FOIA. The FOIA staff assists Department employees in processing FOIA requests by providing technical advice and training, serving as coordinators and requester point-of-contacts for all Department principal offices, and serving as deciding officials at Department headquarters for determinations under the FOIA. The FOIA staff is responsible for oversight of the entire process, from intake of the request to release of responsive records under the FOIA. This includes, but is not limited to, issuance of the written acknowledgement letters, coordinating responses among principal offices, collecting all responsive records and monitoring the redaction process, reviewing all fee waiver requests, assisting in the assessment of fees, preparing the release of the responsive records to the requester with an accompanying cover letter, and managing the Department's FOIA website and reading room.

5.      The Department follows the requirements of the FOIA and the Department's implementing regulations, located at 34 C.F.R. Subtitle A, Part 5, when processing a FOIA request.

    a.      Upon receipt of a FOIA request, the request is assigned to the FOIA Coordinator(s) of the principal office(s) having custody of the records sought.

b.    The FOIA staff then notifies the requester, in writing, of receipt of the request.

c.    If the requester has asked for a fee waiver, RIMS in consultation with the custodial office and the General Counsel's office will review the request and any supporting documentation.  RIMS will then issue a decision on the fee waiver request.  Processing of the FOIA request is suspended until RIMS has made a fee waiver determination.  If the fee waiver request is granted, the Department will immediately begin processing the request.  If the fee waiver is denied, the requester can appeal the denial to the Department's Assistant Secretary for Management for a final determination.  If the fee waiver appeal is granted, again, the Department will immediately begin processing the request. However, if the fee waiver appeal is denied, the requester has the option of seeking judicial relief through the courts.  In this circumstance, all processing of the request is suspended until the case is resolved judicially.

d.    Once any fee issues are resolved and the request is ready for processing, the subject matter expert(s) in the principal office(s) review the responsive records and make initial recommendations regarding what records will be released (in whole or in part) and what records will be withheld pursuant to 5 U.S.C. § 552(b).

e.    After processing the responsive records, the FOIA Coordinator within the principal office prepares a fee estimate.  If the estimated charges are more than $25.00, the FOIA staff will notify the requester of the amount.  If the

charges exceed $250.00, the FOIA staff will collect the fee in advance unless the requester has a history of prompt payment.

   f.  The FOIA staff will issue a cover letter and prepare the package of responsive documents. The documents may be transmitted electronically or in hardcopy form. The cover letter also provides the requester with the statutory appeal rights.

   g.  In the event that a requester is denied access to records under the FOIA (i.e. a determination to deny access in whole or in part to any record responsive to a request; a determination that a requested record does not exist; a determination that a requested record is not readily reproducible in the form or format sought by the requester; a determination that what has been requested is not a record subject to the FOIA; a determination on any disputed fee matter, including a denial of a request for a fee waiver; and a denial of a request for expedited processing), the requester then has 30 days within which to appeal the FOIA denial.

**CREW's FOIA Request:**

   6.  By letter dated March 28, 2007, Plaintiff, Citizens for Responsibility and Ethics in Washington ("CREW") submitted a FOIA request (case number 07-00517-F) to RIMS seeking access to the following records dating from January 20, 2001 to the present:

     (1)  All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White

House staff, including, but not limited to, then-Domestic Policy Advisor

Margaret Spellings, that mention or relate to Reading First, "Science

Based Reading Research"/"SBRR," DIBELS, or any other issue related to

reading instruction or education;

(2)    All Department contacts or communications, including calendar

references and meeting notes, with educational publishers, their

executives, employees, consultants, or contractors.  The list of education

publishers and/or their subsidiaries includes, but is not limited to,

Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager,

Cambium Learning, Sopris West, and IntelliTools;

(3)    All Department contacts or communications that mention or relate

to contacts with education publishers, their executives, or employees.  The

list of educational publishers and/or their subsidiaries includes, but is not

limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman,

Voyager, Cambium Learning, Sopris West, and IntelliTools;

(4)    To the extent not included in the above request, please provide all

documents previously disclosed under FOIA to Andrew Brownstein,

Travis Hicks and/or the Title I Monitor.  [attached letter as Exhibit A]

CREW's FOIA request also includes a request for a fee waiver.  In its request, CREW

stated that the request is primarily for non-commercial purposes, and the information

requested is likely to contribute to the public's understanding of the operations of the

federal government.

7.    Department personnel reviewed CREW's request and determined that items (1), (2), and (3) of the request as written did not reasonably describe the records sought. For example, the request seeks contacts between Department personnel and personnel at the White House, as well as personnel from various publishing companies, without identifying specific individuals relevant to each source category. Without specific names, a search for responsive records would include "White House" and the names of the various publishing companies, which would yield a substantial volume of documents, especially when searching electronic records, that is not responsive to CREW's request. Further, facially, the request does not reasonably describe the records sought and, at times, borders on the nonsensical: item 3, essentially seeks records of "contacts … that …relate to contacts…" Without clarification, the Department determined that it could not process items (1), (2), and (3) of the request and therefore has not begun doing so.

8.    By letter dated April 16, 2007, the Department released to the requester, Mr. Daniel C. Roth, Counsel, CREW, a CD containing 421 pages of documents responsive to item 4 of the March 28, 2007 request (i.e. records regarding the Reading First program that were previously disclosed under FOIA to the Title I Monitor). In this letter, the Department also requested the needed clarification for items 1 through 3 of the request and indicated that these items as presently written were too broad and general for Department employees to identify and locate responsive records. Additionally, this letter served as the Department's denial of CREW's request for a fee waiver, as the requester did not provide sufficient information to justify such a waiver. Specifically, the Department determined that the requester failed to meet elements 3 and 4 of the first

statutory requirement for a fee waiver (i.e. disclosure of the information is in the public interest) by failing to demonstrate that the disclosure would contribute to the understanding of the public at large and that disclosure would contribute significantly to the public understanding of government operations or activities, respectively [attached letter as Exhibit B]

9.    On May 9, 2007, at CREW's request, a teleconference took place between Department personnel and Mr. Roth to discuss the March 28, 2007 request. During this discussion, of which I was a participant, Department staff discussed with Mr. Roth the need for CREW to narrow the request. In addition, Department staff generally explained the Department's electronic search capabilities.

a.  The Department staff explained to Mr. Roth that the Department does not have centralized electronic search capabilities that allow for a search of all electronic communications of all relevant parties at the same time. Instead, the Department has only the capability to search individual accounts one at a time. Accordingly, the Department does not have the capability to process such a broad request and would have to conduct individualized searches of the electronic records of all Department employees to process the request. This limitation would also be applicable to the search of electronic records of former employees.

b.  Department staff also explained that because Mr. Roth requested communications from executives, employees, consultants, or contractors of various educational publishers, but did not provide the names of these individuals, a search for responsive materials would be ineffectual.

Specifically, the search of a particular email account would capture the name

of particular educational publishers, like McGraw Hill, but that would not

necessarily produce a responsive record.

c.  Department staff also explained that an electronic search would not capture

these same executives, employees, consultants, or contractors if they chose to

contact Department employees using private e-mail accounts.  Department

staff advised Mr. Roth that it is not unheard of for members of the public to

contact Department employees using private e-mail accounts.

During this teleconference, Department staff suggested that Mr. Roth review the request

based upon the discussion so that the Department would be able to process his request.

Also during this teleconference, Department staff agreed to informally allow CREW to

submit additional information in order for the Department to subsequently reconsider the

fee waiver request based on the supplemental information.

10.    On May 11, 2007, the Department received an e-mail from Mr. Roth

constituting an informal fee waiver appeal, as discussed during the May 9, 2007

teleconference.  In this e-mail, Mr. Roth provided the Department with supplemental

information in support of his fee waiver request.  [attached as Exhibit C]

11.    On May 14, 2007, I returned a phone call from Mr. Roth.  Mr. Roth

wanted to confirm from the May 9, 2007 conference call that the Department would not

conduct a search of private email addresses.  I informed Mr. Roth that if he wanted the

Department to proceed with searching private email addresses, he would need to provide

the Department with a list of the private email addresses he would like for the

Department to include in its search.

12.     On May 14, 2007, the FOIA staff received an e-mail from Mr. Roth requesting further information on narrowing CREW's request for information. In this correspondence, Mr. Roth asked for (1) an estimate of the time it would take to process CREW's request if the request was not narrowed, and (2) an estimate of the time it would take to process the request if CREW narrowed the request and requested communications only within the Office of the Secretary and the Office of Elementary and Secondary Education. [attached as Exhibit D]

13.     By e-mail dated May 21, 2007, CREW submitted a revised request that failed to sufficiently narrow the scope or reasonably describe the records sought. My office determined that the revised request had the following problems:

> a. The May 21, 2007 e-mail maintained that CREW was looking for documents for the same expansive time period, January 20, 2001 to the present. This beginning date, however, predates the enactment of both No Child Left Behind and the Reading First Program, which came into existence on January 20, 2002.

> b. Although the revised request did narrow the scope from "any Department office" to a list of 14 offices, this did not significantly narrow the request in terms of the magnitude of Department personnel potentially impacted by this request as 14 offices is the equivalent of half of all principal offices at the Department and the magnitude of the search remains at more than 3,500 Department employees.

  c. CREW added additional search terms and an additional program, the Early

  Reading First program, to its revised request thereby expanding the scope of

  its request.

As a result, the May 21, 2007 e-mail did not sufficiently narrow CREW's request so that

the Department could begin processing it even if the fee waiver issue had been resolved.

[attached as Exhibit E]

  14. By letter dated June 8, 2007, the Department denied CREW's fee waiver

request after taking into account the supplemental information provided to the

Department in Mr. Roth's May 11, 2007 e-mail. Specifically, the Department determined

that CREW met the third element of the public interest prong of the fee waiver, based on

the information contained in CREW's May 11, 2007 e-mail; however, CREW failed to

meet the fourth element of the public interest prong. That letter also advised CREW that

"the broad scope of your request would require significant time and resources to search

for and review responsive records. Under the circumstances, we encourage you to

narrow the scope of your request so that we may provide you with the requested

information as expeditiously as possible." [attached letter as Exhibit F]

  15. CREW appealed the Department's fee waiver denial by letter dated June

21, 2007 and received on June 22, 2007. That appeal is currently pending. [attached

letter as Exhibit G]

  16. To date, CREW has not provided sufficient clarification to its request to

allow Department personnel to locate responsive documents with a reasonable amount of

effort. As the request currently reads, it does not reasonably describe the records sought

and therefore, even upon resolution of the fee dispute, the Department cannot begin to search for responsive records until the requester clarifies the request.

17.    The Department has not begun processing CREW's request and therefore has not determined what agency records, if any, may be responsive to the request.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 20 day of July 2007 in Washington, D.C.

Angela Arrington
Supervisory IT Specialist
Office of Management
U.S. Department of Education

# Declaration
# Exhibit
# A

# CREW | citizens for responsibility and ethics in washington

March 28, 2007

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**By fax, (202) 245-6623, and First Class mail**

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department) regulations, 34 CFR §§ 5.6 *et. seq.*

Specifically, CREW seeks any and all Department documents and records dating from January 20, 2001, to the present, in the following categories:

1.   All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2.   All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors.  The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools.

3.   All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees.  The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

RECEIVED MAR 2 9 2007

4.      To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*. *See* Andrew Brownstein & Travis Hicks, <u>Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close</u>, Title I Monitor (undated) (Attached as Exhibit 1). As these documents have been already culled and processed for disclosure, we expect production of these records in short order. As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

Please search responsive records regardless of format, medium, or physical characteristics. Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), <u>cert</u>. <u>denied</u>, 415 U.S. 977 (1972). As you are aware, a <u>Vaughn</u> index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." <u>Founding Church of Scientology v. Bell</u>, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the <u>Vaughn</u> index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." <u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply,'" <u>Id</u>. at 224 (citing <u>Mead Data Central v. U.S. Dep't of the Air Force</u>, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. <u>See</u> 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. <u>Mead Data Central</u>, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a <u>Vaughn</u> index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

2

## Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program, an issue on which the public record is unclear. For example, recently disclosed emails and statements by a former Department appointee appear to contradict statements by Secretary Spellings that she was not involved in Reading First until she became Secretary in January 2005. See Brownstein & Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated).

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

### Conclusion

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

3

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Attachment

4

**EXHIBIT 1**

-->



**THOMPSON**
Insight you trust.

Home | My page | Search | News Desk | **Support** | Resources | Contact us

**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**

"I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller, D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

**Jumping Through Hoops**

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

**A Strong Firewall**

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

**Bias and Objectivity**

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

## Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said she did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries," she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

## Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

## Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

## Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academics, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academics. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

## SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success For All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academics provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

# Declaration
# Exhibit
# B



# UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

ASSISTANT SECRETARY

April 16, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter is in response to your fax dated March 28, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on March 29, 2007. You asked for the following information:

1. All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS or any other issue related to reading instruction or education.

2. All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools.

3. All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4. To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated).

Enclosed is a CD containing 421 pages of documents responsive to item 4 of your request. The documents provided are: documents regarding the Reading First program that were previously disclosed under FOIA to the Title I Monitor.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

In an effort to process your request as expeditiously as possible, we need clarification for items 1 through 3 of your request. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Items 1 through 3 of your request encompass a large volume of information on broad topics related to individuals in the Department and "White House staff", without identifying specific individuals, offices, or subjects. In addition, your request does not specify any relevant time frames. Consequently, your request does not reasonably describe the records sought, and the Department is unable to process your request regarding items 1 through 3 without further clarification. See Dale v. Internal Revenue Service, 238 F.Supp.2d 99 (D.D.C. 2002).

Fee Waiver
In addition, you have requested a fee waiver for your request. The requester bears the burden of justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S. Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the information must be in the public interest because the information primarily benefits the general public and is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) disclosure of the information must not be primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the narrow public interest cognizable under the FOIA, the Department must consider the following four (4) factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government";
2. In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested information must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the Department conclude that a requester has satisfied the first prong of the public interest element of the statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

Page 3 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

1. Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and

2. If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee waiver or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

See also 34 C.F.R. § 5.64(b)(3).

For your information, the Department does not customarily grant blanket waivers, but rather considers each waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to provide sufficient information to justify the Department's grant of a fee waiver. You state that, "[t]he subject of this request concerns the operations of the federal government, and the disclosure will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way." Although not entirely clear from the information provided, the Department assumes, for the sake of argument, that the responsive materials for items 1 through 3 of your request meet the first two elements of the public interest prong of the statutory requirement for a fee waiver because they presumably relate to the Department's administration of the Reading First program. However, it is clear that you have not satisfied the burden with regard to the third and fourth elements of the public interest prong of the statutory requirement.

As stated above, the third factor of the public interest analysis requires that the disclosure contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons. In order to satisfy this element of the public interest prong, the public must derive the benefit from the disclosure of this information, and not the personal benefit that may be derived from the requester, or a narrow segment of the population. Mells v. Internal Revenue Service, 2002 U.S. Dist. LEXIS 24275 (D.D.C. Nov. 21, 2002). In this regard, the identity of the requester will be considered so that an agency may determine whether the requester is in a position to contribute to the public understanding through the disclosure of the requested materials. Burriss v. CIA, 524 F. Supp. 448 (M.D. Tenn. 1981). As part of this analysis, the Department will consider whether the requester has the expertise in the subject area, and a demonstrated ability and intent to disseminate the information to the general public. Id. Additionally, while not for profit organizations are often capable of disseminating information, they do not automatically qualify for a waiver or reduction of fees because of their non-profit status. VoteHemp, Inc. v. DEA, 237 F. Supp. 2d 55 (D.D.C. 2002); see also McClain v. U.S. Dep't of Justice, 13 F.3d 220, 221 (7th Cir. 1993).

In your request you have indicated that "CREW will disseminate any documents it acquires from this request to the public .... [through] an interactive website where members of the public can analyze and comment on public documents[.] ... Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests." While this statement does demonstrate that you intend to disseminate the information, it does not demonstrate how the potentially responsive documents in this case will contribute to the "understanding of the public at large." Based upon your letter, it appears that members of the public would have to individually "analyze" the data to reach any possible understanding of the information. Consequently, you have failed to meet the third prong of the public interest analysis.

Page 4 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The fourth element of the public interest prong of the statutory requirement for a fee waiver requires that the disclosure must "contribute significantly" to public understanding of government operations or activities. For this element, an agency is required to determine whether the disclosure of the information will make a significant contribution to the public's understanding of the operations or activities of government. D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development, 85 F.Supp.2d 46, 49 (D.D.C. 2000). "Significance" is measured by a likely enhancement of the public's understanding of the subject at issue as a result of the disclosure, compared to the public's level of understanding of that same issue prior to disclosure. Id.; see also Judicial Watch v. U.S. Department of Justice, 185 F.Supp.2d 54, 62 (D.D.C. 2002).

In your letter, you stated "the disclosures [of the information] will likely contribute to a better understanding of relevant government procedures by ... the general public in a significant way", and specifically, refer to "the public's understanding of the extent of White House involvement in the administration of the Reading First program[.]" It is interesting to note that you refer to an article on the very issue that you contend is unclear. Accordingly, information regarding this issue already exists in the public domain. Consequently, you have failed to show how the disclosure of the requested information will significantly enhance the public's understanding of the Reading First program beyond the information that already exists in the public domain. Carney v. U.S. Dep't of Justice, 19 F.3d 807, 815 (2d Cir. 1994).

In sum, the Department's denies your request for a fee waiver in the present case.

Fees are charged for searching/reviewing and duplication for responsive records. The fee is calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge and the duplication costs are ten cents per photocopied page. Our regulations, 34 CFR § 5.61 require us to allow you to modify your request if the cost is more than $25.00. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is to be greater than $250.00, the requester must pay in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Your appeal should be received by the FOIA office on or before
Mary 24, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

**Appeal Address:**

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: FOIA Appeals
Washington, DC 20202-4500

Page 5 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request. Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

Enclosures

# Declaration
# Exhibit
# C

## ED FOIA Manager

**From:**    Dan Roth [droth@citizensforethics.org]
**Sent:**    Friday, May 11, 2007 6:31 PM
**To:**    ED FOIA Manager
**Subject:**    No. 07-00517-F, Informal Fee Waiver Appeal

Dear Ms. Arrington,

Thank you again for setting up the call this past Wednesday to help CREW narrow our March 28, 2007 FOIA request to the Department of Education. As we discussed during that call, I am following up with an informal appeal of the Department's denial of fee waiver contained in Ms. Cueva's letter dated April 16, 2007.

First of all, the Department suggests that because certain information already exists in the public domain on Reading First, CREW's request would not contribute significantly to the public's understanding of the issues involved. (Letter from M. Cueva, p. 4). As CREW's request makes clear, there are significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education. The records CREW seeks would clarify the public record one way or another with respect to Secretary Spellings and anyone else in the White House. With respect to items 2 and 3 of CREW's request, relating to contacts with educational publishers, very little is known about this topic beyond an email discussed by Title I Monitor and included on the CD provided to CREW in response to item 4 of our request. For these reasons, and because Reading First has garnered so much attention from the public, Congress, and the press, it can hardly be said that the records CREW seeks would only contribute to the understanding of a narrow segment of the population, as the Department's letter denying the fee waiver claims.

The Department's letter also mistakenly asserts that the public would be required to do its own analysis of the requested documents to "reach any possible understanding of the information." (Letter from M. Cueva, p. 3). On page 3 of our March 28 FOIA request, it clearly states that "CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases." Moreover, the press, the House Education and Labor Committee, the Department's Inspector General, and most recently Senator Kennedy, have given the public ample background information with which to understand the information CREW seeks. Secretary Spellings herself stated at yesterday's hearing that Senator Kennedy's report left her "deeply concerned." That report focused on individuals who were instrumental in Reading First from its inception and their financial ties to educational publishers.

In sum, CREW is seeking information that will add significantly to the public's understanding of the administration of a six billion dollar federal program aimed at helping some of the most vulnerable members of our society. CREW does not seek these records for any private gain, and has both the intent and the capability to distribute the information it receives widely, and to analyze that information for the public. For all of the reasons discussed, and for the reasons initially stated in CREW's FOIA request, the Department should grant CREW's request for a fee waiver in this matter.

Again, I appreciate your time, and look forward to your response regarding CREW's request for a fee waiver and the Department's initial denial of that request.

Sincerely,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

---

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

# Declaration Exhibit D

## Dan Roth

| | |
|---|---|
| **From:** | Dan Roth |
| **Sent:** | Monday, May 14, 2007 1:28 PM |
| **To:** | 'EDFOIAManager@ed.gov' |
| **Subject:** | No. 07-00517-F Narrowing Discussion |

Dear Ms. Arrington,

As we discussed earlier today, I am writing to memorialize our conversation about narrowing CREW's March 28, 2007 FOIA request.

As I understand it from last Wednesday's telephone conversation, the Department's key concern with respect to our FOIA is that CREW is seeking records from "any Department office, including any and all field offices." Ms. Marcela Goodridge stated that the Department's FOIA technology does not allow for subject matter or keyword searches throughout the email system, so a search undertaken pursuant to the original terms of our request would require individual searches of each of the Department's approximately 4,500 employee email accounts. Additionally, Ms. Goodridge noted that email communications on personal email accounts would not be covered by such a search (which is an issue that has arisen in the past).

In order to aid CREW in the narrowing process, we request the following information from the Department:

1) An estimate of the time it would take to process CREW's request if we do not narrow it further
2) An estimate of the time it would take to process our request if we narrow and request communications only within the a) Office of the Secretary and b) Office of Elementary and Secondary Education.

If these time estimates will not be available before May 19 (this coming Friday), please let me know.

In addition, you affirmed that it would be helpful for CREW to limit the list of publishers in items 2 and 3 to the seven publishers already listed. We are considering a limitation along those lines (which would eliminate the phrase "includes, but is not limited to " in items 2 and 3 of the March 28 request) but have not yet made a decision.

CREW will formalize any narrowing language in a letter to the Department as soon as we receive the requested information.

Finally, I neglected to ask on the phone whether a copy of the Title I Monitor FOIA would be forthcoming soon, but I'll renew my request for it here.

Again, I greatly appreciate your time and assistance with this request. Please contact me any time.

Best Regards,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

---

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

# Declaration
# Exhibit
# E

**From:** Dan Roth [droth@citizensforethics.org]
**Sent:** Monday, May 21, 2007 3:18 PM
**To:** ED FOIA Manager
**Subject:** 07-00517-F Proposed Narrowing Terms

Dear Ms. Arrington,

As we discussed on May 9 and May 14, CREW is seeking to aid the Department in its search for responsive records by narrowing the terms of our March 28, 2007 FOIA request, No. 07-00517-F. Though our request sufficiently describes the records we seek, you and others at the Department have advised us that technological limitations of the Department's email search technology would require the Department to search approximately 4,500 email accounts unless the request is narrowed further. Accordingly, we suggest the following narrowed terms for the search in response to Request No. 07-00517-F:

Any and all documents and records from January 20, 2001, to the present, in the offices of: 1) The Secretary, 2) Senior Counselor, 3) Chief of Staff, 4) Deputy Secretary, 5) Management Improvement Team, 6) Elementary and Secondary Education, 7) Institute of Education Sciences, 8) Planning Evaluation and Policy Development, 9) Civil Rights, 10) Innovation and Improvement, 11) Special Education and Rehabilitative Services, 12) Management, 13) Chief Financial Officer and 14) Communications and Outreach, in the following categories:

1. All communications of the above-listed offices to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR" or DIBELS.

2. All communications of the above-listed offices, including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.

3. All communications of the above-listed offices, including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited, to Randy Best), Cambium Learning, Sopris West, and Intellitools.

Apart from Item 4 of CREW's original request, to which the Department has already responded in the form of a CD containing documents previously disclosed to the *Title I Monitor* and received by CREW on April 23, 2007, all other language in CREW's original request (pages 2-4) remains unchanged. We also note that it is not only emails, but "all communications," that CREW requested.

Thank you for your time and attention to this matter.

Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

---------------------------------------------------------------------------------------------------------------------------
-----------------------------------------------------------------------

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

# Declaration
# Exhibit
# F



## UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF MANAGEMENT

June 8, 2007

Daniel C. Roth, Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter responds to your May 11, 2007 e-mail. In a letter dated April 16, 2007, the Department denied your request for a fee waiver submitted in connection with your March 28, 2007 fax requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.[1]

On May 9, 2007, Department staff conferred with you by telephone and agreed to allow you to submit additional information, and to reconsider your fee waiver request in light of this supplemental information. Your May 11, 2007 e-mail represents the supplemental information you wish the Department to consider in support of your fee waiver request.

The Department notes initially that, because you received information responsive to item number 4 of your March 28, 2007 request, your request for a fee waiver is deemed to concern only the items numbered 1, 2 and 3 of your March 28, 3007 request.

---

1 In your March 28, 2007 fax, you requested access to the following information: "(1) All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, 'Science Based Reading Research'/'SBRR,' DIBELS or any other issue related to reading instruction or education; (2) All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to; Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools; (3) All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools; and (4) To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated)." Included with our April 16, 2007, in response to item number 4 above, the Department provided you with a CD containing 430 pages of documents regarding the Reading First program that were previously disclosed to the Title I Monitor in response to a FOIA request.

Page 2 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The Department has reviewed all of the information you submitted in support of your fee waiver and denies the request because it fails to provide sufficient information to justify the grant of a fee waiver. This denial represents the Department's decision regarding your request for a fee waiver in connection with FOIA Request No. 07-00517-F. The reasons for the denial are set forth below.

The Department's April 16, 2007 letter to you outlined in detail the legal standard for analyzing fee waiver requests and assessing whether a waiver or reduction of fees is appropriate; that standard is referred to and incorporated by reference herein.

As previously stated in our April 16, 2007 letter, the Department assumes, for the sake of argument, that the documents responsive to items 1 through 3 of your FOIA request meet the first two elements of the public interest prong of the fee waiver analysis because they are presumed to relate to the Department's administration of the Reading First program. The Department has also concluded that, based upon the information contained in your May 11, 2007 e-mail, items 1 through 3 of your request meet the third element of the public interest prong of the fee waiver analysis. Nevertheless, the Department finds that you have not met your burden with regard to the fourth element of the public interest prong of the fee waiver analysis, i.e., the requirement that disclosure of the records in question "contribute significantly" to public understanding of government operations or activities. "Significance" is measured by the likely enhancement of the public's understanding of the subject at issue as a result of disclosure, compared to the public's level of understanding of that same issue prior to disclosure. D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development, 85 F. Supp. 2d 46, 49 (D.D.C. 2000); see also Judicial Watch v. U.S. Department of Justice, 185 F.Supp.2d 54, 62 (D.D.C. 2002).

Your fee waiver request generally stated: "[T]he disclosures [of the information] will likely contribute to a better understanding of relevant government procedures by ... the general public in a significant way," and specifically, "[contribute] to the public's understanding of the extent of White House involvement in the administration of the Reading First program[.]" Your May 11, 2007 e-mail states: "[T]here are significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education. The records CREW seeks would clarify the public record. .... [R]elating to contracts with educational publishers, very little is known about the topic beyond an e-mail discussed by Title I Monitor and included on the CD provided to CREW in response to item 4 of our request." For a number of reasons, discussed below, the Department does not find your arguments persuasive.

First, we note that the language of your request is extremely broad in that it seeks voluminous records concerning a wide range of Department contacts and/or communications with the White House, educational publishers, their executives, employees, consultants, or contractors, and documents mentioning or relating to such contacts, concerning not only Reading First but also such subjects as Science Based Reading Research/SBRR, DIBELS, and any other issue related to reading instruction and education. As it is apparent that many of the documents responsive to items 1 through 3 of your FOIA request – implicating contacts and communications on a range of educational topics – have nothing to do with the Reading First program, it is equally clear that the disclosure of such materials could in no way enhance public understanding of the Department's administration of that program, much less do so significantly.

Page 3 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Your May 11, 2007 e-mail also states that the records you seek would clarify the public record because of alleged "significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education." However, you have failed both to identify the nature or extent of such inconsistencies, and to articulate in what way disclosure of the documents responsive to items 1 through 3 of your request would be likely to inform the public's understanding of such matters. Without any such evidence, there is no nexus between the alleged inconsistencies and the requested records, and no evidence of how the records you seek would add anything of significance to the public's understanding of the Reading First program. See Carney v. U.S. Dep't of Justice, 19 F.3d 807 (2d Cir. 1994).

You also state that very little is known about the topic of the Department's contacts with educational publishers. Contrary to your assertions, there are several sources of information on this topic, including, but not limited to information found at the following web sites:
http://www.cnn.com/2007/EDUCATION/05/09/reading.conflicts.ap/index.html;
http://www.usatoday.com/news/education/2007-05-09-reading-first-program_N.htm;
http://kennedy.senate.gov/newsroom/press_release.cfm?id=3CC1E674-CB51-42C2-A4F9-90395A0DC291

For these reasons, the Department denies your request for a fee waiver in connection with FOIA Request No. 07-00517-F.

Fees are charged for searching, reviewing and duplication of responsive records, and are calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The Department calculates search and review fees based on the employee's hourly rate of pay, plus a 16% administrative charge, and charges ten cents ($0.10) per photocopied page for duplication. Our regulations, at 34 CFR § 5.61, require us to allow a requester to modify his/her request if fees of more than $25.00 are anticipated. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is expected to be greater than $250.00, the requester must pay in advance.

As the Department indicated during the May 9, 2007 conference call, the broad scope of your request would require significant time and resources to search for and review responsive records. Under the circumstances, we encourage you to narrow the scope of your request so that we may provide you with the requested information as expeditiously as possible.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Please submit your appeal to the FOIA office on or before July 13, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

### Appeal Address:

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: Appeals Office
Washington, DC 20202-4500

Page 4 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

# Declaration
# Exhibit
# G

# CREW | citizens for responsibility and ethics in washington

June 21, 2007

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: Appeals Officer
Washington, D.C. 20202-4500

**By first class mail**

**Re: Freedom of Information Act Appeal (No. 07-00517-F)**

Dear Sir/Madam:

By letter dated June 8, 2007, Maria-Teresa Cueva, FOIA Public Liaison, Office of Management, U.S. Department of Education ("the Department"), advised Citizens for Responsibility and Ethics in Washington ("CREW") that our request for a fee waiver for our Freedom of Information Act ("FOIA") request of March 28, 2007 (attached as Exhibit A), was denied. See Letter from Maria-Teresa Cueva, FOIA Public Liaison, U.S. Department of Education, to Dan Roth (June 8, 2007) (attached as Exhibit B). CREW's fee waiver request was initially denied by letter dated April 16, 2007 (attached as Exhibit C). CREW appealed that denial via email on May 11, 2007 (attached as Exhibit D), pursuant to an arrangement made with Education officials in a phone conversation on May 9, 2007. CREW hereby appeals the June 8 denial and requests that you reverse it for the reasons set forth below.

## Background

CREW's March 28, 2007 FOIA request sought all Department records dating from January 20, 2001, to the present, in four categories:

1.  All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2.  All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill,

Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

3.  All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

As indicated in the Department's June 8 letter, this fee waiver appeal concerns only Items 1-3 of CREW's request, as the Department has already responded to Item 4 (requesting documents previously released under FOIA to the *Title I Monitor*). See Exhibit B at 1.

CREW also sought a waiver of fees associated with the processing of its request. See Exhibit A at 3. As CREW explained, the records sought would "likely contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program," particularly because the public record on this issue contains inconsistent statements by current and former Department officials. As examples of these inconsistencies, CREW pointed out that 1) statements by former Education appointee Michael Petrilli directly contradict Secretary Margaret Spellings statements that she was not involved with Reading First during her tenure as White House Domestic Policy Advisor and 2) emails referencing then-Advisor Spellings contradict her account, as well. Id. CREW included the article documenting these examples as Exhibit 1 to its FOIA request.

By letter dated April 16, 2007, the Department denied CREW's fee waiver, stating that CREW had failed to show both that disclosure of documents to CREW would contribute to the understanding of the public at large and that the disclosure would contribute significantly to the public's understanding of government operations. See Exhibit C at 2-4.

On May 9, 2007, at the Department's request, CREW discussed the possibility of narrowing the scope of its request and the fee waiver issue in a teleconference with Department officials. CREW sent an email on May 14 requesting more information from the Department to aid in the narrowing process (attached as Exhibit E), but never received a response. On May 21, CREW sent an email proposing to narrow the records sought to those

... in the offices of: 1) The Secretary, 2) Senior Counselor, 3) Chief of Staff, 4) Deputy Secretary, 5) Management Improvement Team, 6) Elementary and Secondary Education, 7) Institute of Education Sciences, 8) Planning Evaluation and Policy Development, 9) Civil Rights, 10) Innovation and Improvement, 11) Special Education and Rehabilitative Services, 12) Management, 13) Chief Financial Officer and 14) Communications and Outreach, in the following categories:

1.  All communications of the above-listed offices to, from, or referencing any member of the White House staff, including, but not limited to, then-

Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR" or DIBELS.

2.    All communications of the above-listed offices, including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.

3.    All communications of the above-listed offices, including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited, to Randy Best), Cambium Learning, Sopris West, and Intellitools.

(Exhibit F). The Department never responded to this email.

CREW's initial March 28, 2007 FOIA request fully satisfies the two-prong statutory test for a fee waiver: 1) "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government" and 2) "is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

The Department concedes that this request is not in CREW's commercial interest, but has now twice denied CREW's fee waiver request based on the Department's contention that CREW has failed to provide sufficient information to show how the requested records will contribute "significantly" to the public understanding. See Exhibit B. According to the Department, there are two alleged deficiencies in CREW's fee waiver request: 1) that parts of CREW's FOIA request do not describe the records CREW seeks with enough specificity to show how disclosure of those records would contribute to the public understanding of Department operations, and 2) that CREW has not shown that the information sought will contribute "significantly" enough to merit a fee waiver. Id. at 2-3.

## I. Specificity and Relation to Operations of the Federal Government

The Department's June 8 fee waiver denial is based on its conclusion that many of the records responsive to CREW's request "have nothing to do with the Reading First program," and

-3-

thus "disclosure of such materials could in no way enhance public understanding of the Department's administration of that program, much less do so significantly." Id. at 2. The Department relies in part on language from CREW's March 28 FOIA request, including the phrase "any other issue related to reading instruction or education" Id.

The Department's analysis fails to take into account CREW's request as narrowed on May 21, 2007, which dropped this broad phrase and replaced it with more specific, revised language. See Exhibit F. Having requested that CREW narrow its request, the Department cannot legitimately rely on the original, pre-narrowed language to deny CREW a fee waiver.

The Department cannot and does not argue that the records sought will not enhance the public's understanding of the operations of the federal government. This is all that the fee waiver provision of the FOIA requires of a requester that has shown that the information sought is not primarily in its commercial interest. See 5 U.S.C. § 552(a)(4)(A)(iii). The records CREW seeks are particularly significant to the public interest given that the No Child Left Behind Act is scheduled to be re-authorized this fiscal year. As discussed at length below, the records CREW seeks all relate to public controversies regarding Department operations, programs and officials, the White House and educational publishers.

## II. Significance of the Records CREW Seeks

The Department's June 8 fee waiver denial is based on its finding that CREW has failed to identify and provide examples of the significant inconsistencies in the public record with respect to Secretary Spellings' involvement in Reading First prior to her tenure as Secretary. See Exhibit B. To the contrary, Exhibit 1 to CREW's FOIA request (an article published in the *Title I Monitor*) documents at least some of these inconsistencies. As reported in the *Title I Monitor*, during the Secretary's testimony before the Senate education appropriations subcommittee

> Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked [Secretary Spellings] about claims by Michael Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

> "Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

*     *     *

> Despite Spellings' attempts to distance herself from the controversy, previously released emails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

-4-

Andrew Brownstein & Travis Hicks, <u>Congress Grills Spellings on Reading First Program; OIG</u>
<u>Investigation Draws to a Close</u>, Title I Monitor (undated).

     This is just one of many publications that document serious inconsistencies between how
Secretary Spellings has described her involvement in Reading First during her White House
tenure and the observations of other at the Department.  Additional examples include the
following:

> Education Secretary Margaret Spellings, who until 2005 was a White House domestic
> policy adviser, says the troubles occurred before her move to the Education Department.
> But Mike Petrilli, a former associate deputy secretary under Spellings' predecessor, Rod
> Paige, says Spellings "micromanaged the implementation of Reading First from her West
> Wing office."  Greg Toppo, <u>Textbook scandal reaches Congress; Democrats will spell out</u>
> <u>possible conflict-of-interest case in program</u>, USA Today, Apr. 16, 2007 (attached as
> Exhibit G).

> [Secretary Spellings] denied accusations from a former political appointee at the
> department, Michael Petrilli, who said she had essentially run Reading First from her post
> as domestic policy adviser at the White House. Mr. Petrilli is now a vice president at a
> nonprofit education research foundation.  Diana J. Schemo, <u>Oversight Is Set for</u>
> <u>Beleaguered U.S. Reading Program</u>, N.Y. Times, Mar. 15, 2007 (attached as Exhibit H).

> "Margaret Spellings was involved in [Reading First] from day one in her role as
> domestic-policy adviser," ... Ms. Spellings has not yet responded to these allegations.
> <u>Scathing Report Casts Cloud Over 'Reading First'; Federal officials encouraged use of</u>
> <u>specific programs, inspector general finds</u>, Education Week, Oct. 4, 2006 (attached as
> Exhibit I).

> "Secretary Spellings responded to the report by blaming other department employees and
> noting that the events occurred before she took over the Department," Harkin said.
> "However, as President Bush's domestic policy adviser, she exerted enormous control
> over Department activities.  A former Department official, Michael Petrilli, said this
> week that 'she micromanaged the implementation of Reading First from her West Wing
> office.'" SEN. HARKIN CALLS ON DEPARTMENT OF EDUCATION SECRETARY
> SPELLINGS TO DISCLOSE INVOLVEMENT IN READING FIRST SCANDAL, U.S.
> Fed News, Sept. 28, 2006 (Attached as Exhibit J).

     As these examples indicate, there is an ongoing dispute between Mr. Petrilli and
Secretary Spellings's accounts of her involvement with Reading First.  The only documentary
evidence so far released to the public, quoted in Exhibit 1 to CREW's March 28, 2007 FOIA
request, suggests that Secretary Spellings, at the very least, was involved in discussions regarding
publishers interested in Reading First programs in New York City.  The released email states
"CAN YOU FORWARD TO MARGARET?  WE HAVE TO DISCUSS PUBLISHERS

TODAY WITH MARGARET. WE HAVE BEEN MEETING WITH SOME CEOs FROM THE INDUSTRY AND THEY WANT TO PLAY BALL." Email from Reid Lyon, National Institutes of Child Health and Human Development, to Beth Ann Bryan, Senior Advisor to the Secretary, U.S. Department of Education (Jan. 30, 2003) (emphasis in original) (attached as Exhibit K); See also Exhibit 1 to FOIA Request. The email's author, Dr. Reid Lyon, has confirmed that the "Margaret" to whom he referred in the email is then-Domestic Policy Advisor Margaret Spellings. See Brownstein & Hicks, Title I Monitor (undated).

Department records and Mr. Petrilli's statements clearly conflict with Secretary Spellings's congressional testimony about her involvement in Reading First. CREW's fee waiver request and initial appeal, which relied explicitly on these articles and documentary evidence, described the issues it seeks to illuminate with "reasonable specificity" and is not based solely on "conclusory allegations." Judicial Watch v. U.S. Dep't of Energy, 310 F. Supp. 2d 271, 290-91 (D.D.C. 2004). Moreover, the records CREW seeks will go beyond the "he-said, she-said" that makes up the current public record on this subject by providing documentation illuminating the actual level of Secretary Spellings' involvement in Reading First during her White House tenure.[1]

Finally, the Department has challenged CREW's assertion that "little is known" about the Department's contacts with educational publishers, relying on three internet links to demonstrate that the Department's contacts with educational publishers has already been examined in the public sphere. The first link is expired, and the second and third links connect the reader to a recent report put out by Senator Edward Kennedy's office and a *USA Today* article covering that report. The Kennedy report focused on the financial interests of Reading First Technical Assistance Center ("TAC") employees and their ties to publishers during their service at the TACs. As stated clearly in the USA Today article: "The [Kennedy] report *zeroed in on four people who directed the program's regional Technical Assistance Centers.*" Nancy Zuckerbrod, More conflicts disclosed in Reading First program, Associated Press, as published in USA Today, May 9, 2007 (emphasis added) (attached as Exhibit L). The Department contacts CREW seeks – with several companies not even mentioned in the Kennedy report – are categorically and obviously distinct from those cited and attached to the Kennedy report. Presenting this argument as a rationale for denying CREW's fee waiver request strains the bounds of good faith. CREW's FOIA request is vastly different in scope and focus from Senator Kennedy's report.

The records CREW seeks in items 2 and 3 will likely contribute significantly to the public's understanding of the extent to which publishers were in contact with Department and administration personnel during the Reading First development and grant process. Furthermore,

---

[1] CREW notes that on May 1, 2007, Rep. George Miller, Chairman of the House Committee on Education and Labor, also requested records of communications between the Department and the White House on Reading First and other matters. See Letter from Hon. George Miller, Chairman, to Hon. Margaret Spellings, Secretary, U.S. Department of Education (May 1, 2007) (attached as Exhibit M).

the public will likely gain significant knowledge about the extent and nature of the contacts between individuals like Ms. DiMarco and Department officials. Little is known about the Department's contacts with publishers with respect to the types of records CREW requested; to the extent these records go beyond Reading First, they will still shed light on the operations of the federal government, and therefore meet the public interest requirement for a fee waiver.

## CONCLUSION

The documents CREW has requested will amplify the information already in the public domain and help answer the remaining questions raised by the conflicting comments of Michael Petrilli and Secretary Spellings and the limited universe of emails thus far disclosed. Accordingly, disclosure of the information CREW seeks will contribute significantly to the public's understanding of how the Department of Education has operated the Reading First program, how the Department operates with respect to educational publishers, and related issues of literacy policy. As a court found recently under similar circumstances, CREW satisfies the criteria for a public interest fee waiver where, *inter alia*, it is able to explain "with reasonable specificity how [the documents sought] would increase public knowledge of the functions of government." CREW v. Dep't of Health and Human Services, No. 05-1127, 2006 U.S. Dist. LEXIS 95700, at *22 (D.D.C. Sept. 8, 2006). Here, CREW has met and exceeded that standard.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver. Accordingly, we request that you reverse the Department's determination to deny CREW a fee waiver.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and
    Ethics in Washington
(202) 408-5565
droth@citizensforethics.org

-7-

**EXHIBIT A**



March 28, 2007

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**By fax, (202) 245-6623, and First Class mail**

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department") regulations, 34 CFR §§ 5.6 *et. seq.*

Specifically, CREW seeks any and all Department documents and records dating from January 20, 2001, to the present, in the following categories:

1.    All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2.    All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

3.    All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4.    To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*. See Andrew Brownstein & Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated) (Attached as Exhibit 1). As these documents have been already culled and processed for disclosure, we expect production of these records in short order. As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

Please search responsive records regardless of format, medium, or physical characteristics. Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

2

## Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program, an issue on which the public record is unclear. For example, recently disclosed emails and statements by a former Department appointee appear to contradict statements by Secretary Spellings that she was not involved in Reading First until she became Secretary in January 2005. See Brownstein & Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated).

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Attachment

4

**EXHIBIT 1**

Congress Grills Spellings On Reading First Program          http://www.thompson.com/libraries/titleionline/news_desk/tio070321...

-->





**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**  "I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller, D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First, "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

### Jumping Through Hoops

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*"...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*"...[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*"The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

### A Strong Firewall

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

### Bias and Objectivity

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

**Honor System for Consultants?**

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries, "she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

**Pressure on DIBELS**

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

**Two Complaints**

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

**Reading Leadership Academies**

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

**SFA Shut Out**

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

**EXHIBIT B**



# UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

June 8, 2007

Daniel C. Roth, Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, DC  20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter responds to your May 11, 2007 e-mail.  In a letter dated April 16, 2007, the Department denied your request for a fee waiver submitted in connection with your March 28, 2007 fax requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.[1]

On May 9, 2007, Department staff conferred with you by telephone and agreed to allow you to submit additional information, and to reconsider your fee waiver request in light of this supplemental information. Your May 11, 2007 e-mail represents the supplemental information you wish the Department to consider in support of your fee waiver request.

The Department notes initially that, because you received information responsive to item number 4 of your March 28, 2007 request, your request for a fee waiver is deemed to concern only the items numbered 1, 2 and 3 of your March 28, 3007 request.

---

[1] In your March 28, 2007 fax, you requested access to the following information: "(1) All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, 'Science Based Reading Research'/'SBRR,' DIBELS or any other issue related to reading instruction or education; (2) All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools; (3) All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools; and (4) To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated)." Included with our April 16, 2007, in response to item number 4 above, the Department provided you with a CD containing 430 pages of documents regarding the Reading First program that were previously disclosed to the Title I Monitor in response to a FOIA request.

Page 2 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The Department has reviewed all of the information you submitted in support of your fee waiver and denies the request because it fails to provide sufficient information to justify the grant of a fee waiver. This denial represents the Department's decision regarding your request for a fee waiver in connection with FOIA Request No. 07-00517-F. The reasons for the denial are set forth below.

The Department's April 16, 2007 letter to you outlined in detail the legal standard for analyzing fee waiver requests and assessing whether a waiver or reduction of fees is appropriate; that standard is referred to and incorporated by reference herein.

As previously stated in our April 16, 2007 letter, the Department assumes, for the sake of argument, that the documents responsive to items 1 through 3 of your FOIA request meet the first two elements of the public interest prong of the fee waiver analysis because they are presumed to relate to the Department's administration of the Reading First program. The Department has also concluded that, based upon the information contained in your May 11, 2007 e-mail, items 1 through 3 of your request meet the third element of the public interest prong of the fee waiver analysis. Nevertheless, the Department finds that you have not met your burden with regard to the fourth element of the public interest prong of the fee waiver analysis, i.e., the requirement that disclosure of the records in question "contribute significantly" to public understanding of government operations or activities. "Significance" is measured by the likely enhancement of the public's understanding of the subject at issue as a result of disclosure, compared to the public's level of understanding of that same issue prior to disclosure. D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development, 85 F. Supp. 2d 46, 49 (D.D.C. 2000); see also Judicial Watch v. U.S. Department of Justice, 185 F.Supp.2d 54, 62 (D.D.C. 2002).

Your fee waiver request generally stated: "[T]he disclosures [of the information] will likely contribute to a better understanding of relevant government procedures by ... the general public in a significant way," and specifically, "[contribute] to the public's understanding of the extent of White House involvement in the administration of the Reading First program[.]" Your May 11, 2007 e-mail states: "[T]here are significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education. The records CREW seeks would clarify the public record. ..... [R]elating to contracts with educational publishers, very little is known about the topic beyond an e-mail discussed by Title I Monitor and included on the CD provided to CREW in response to item 4 of our request." For a number of reasons, discussed below, the Department does not find your arguments persuasive.

First, we note that the language of your request is extremely broad in that it seeks voluminous records concerning a wide range of Department contacts and/or communications with the White House, educational publishers, their executives, employees, consultants, or contractors, and documents mentioning or relating to such contacts, concerning not only Reading First but also such subjects as Science Based Reading Research/SBRR, DIBELS, and any other issue related to reading instruction and education. As it is apparent that many of the documents responsive to items 1 through 3 of your FOIA request – implicating contacts and communications on a range of educational topics – have nothing to do with the Reading First program, it is equally clear that the disclosure of such materials could in no way enhance public understanding of the Department's administration of that program, much less do so significantly.

Page 3 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Your May 11, 2007 e-mail also states that the records you seek would clarify the public record because of alleged "significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education." However, you have failed both to identify the nature or extent of such inconsistencies, and to articulate in what way disclosure of the documents responsive to items 1 through 3 of your request would be likely to inform the public's understanding of such matters. Without any such evidence, there is no nexus between the alleged inconsistencies and the requested records, and no evidence of how the records you seek would add anything of significance to the public's understanding of the Reading First program. See Carney v. U.S. Dep't of Justice, 19 F.3d 807 (2d Cir. 1994).

You also state that very little is known about the topic of the Department's contacts with educational publishers. Contrary to your assertions, there are several sources of information on this topic, including, but not limited to information found at the following web sites:
http://www.cnn.com/2007/EDUCATION/05/09/reading.conflicts.ap/index.html;
http://www.usatoday.com/news/education/2007-05-09-reading-first-program_N.htm;
http://kennedy.senate.gov/newsroom/press_release.cfm?id=3CC1E674-CB51-42C2-A4F9-90395A0DC291

For these reasons, the Department denies your request for a fee waiver in connection with FOIA Request No. 07-00517-F.

Fees are charged for searching, reviewing and duplication of responsive records, and are calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The Department calculates search and review fees based on the employee's hourly rate of pay, plus a 16% administrative charge, and charges ten cents ($0.10) per photocopied page for duplication. Our regulations, at 34 CFR § 5.61, require us to allow a requester to modify his/her request if fees of more than $25.00 are anticipated. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is expected to be greater than $250.00, the requester must pay, in advance.

As the Department indicated during the May 9, 2007 conference call, the broad scope of your request would require significant time and resources to search for and review responsive records. Under the circumstances, we encourage you to narrow the scope of your request so that we may provide you with the requested information as expeditiously as possible.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Please submit your appeal to the FOIA office on or before July 13, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

**Appeal Address:**

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: Appeals Office
Washington, DC 20202-4500

Page 4 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

**EXHIBIT C**



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

ASSISTANT SECRETARY

April 16, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter is in response to your fax dated March 28, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on March 29, 2007. You asked for the following information:

1.  All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS or any other issue related to reading instruction or education.

2.  All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools.

3.  All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4.  To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated).

Enclosed is a CD containing 421 pages of documents responsive to item 4 of your request. The documents provided are: documents regarding the Reading First program that were previously disclosed under FOIA to the Title I Monitor.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-4500
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

Page 2 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

In an effort to process your request as expeditiously as possible, we need clarification for items 1 through 3 of your request. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Items 1 through 3 of your request encompass a large volume of information on broad topics related to individuals in the Department and "White House staff", without identifying specific individuals, offices, or subjects. In addition, your request does not specify any relevant time frames. Consequently, your request does not reasonably describe the records sought, and the Department is unable to process your request regarding items 1 through 3 without further clarification. See Dale v. Internal Revenue Service, 238 F.Supp.2d 99 (D.D.C. 2002).

Fee Waiver
In addition, you have requested a fee waiver for your request. The requester bears the burden of justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S. Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the information must be in the public interest because the information primarily benefits the general public and is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) disclosure of the information must not be primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the narrow public interest cognizable under the FOIA, the Department must consider the following four (4) factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government";
2. In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested information must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the Department conclude that a requester has satisfied the first prong of the public interest element of the statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

Page 3 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

    1. Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and

    2. If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee waiver or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

<u>See also</u> 34 C.F.R. § 5.64(b)(3).

For your information, the Department does not customarily grant blanket waivers, but rather considers each waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to provide sufficient information to justify the Department's grant of a fee waiver. You state that, "[t]he subject of this request concerns the operations of the federal government, and the disclosure will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way." Although not entirely clear from the information provided, the Department assumes, for the sake of argument, that the responsive materials for items 1 through 3 of your request meet the first two elements of the public interest prong of the statutory requirement for a fee waiver because they presumably relate to the Department's administration of the Reading First program. However, it is clear that you have not satisfied the burden with regard to the third and fourth elements of the public interest prong of the statutory requirement.

As stated above, the third factor of the public interest analysis requires that the disclosure contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons. In order to satisfy this element of the public interest prong, the public must derive the benefit from the disclosure of this information, and not the personal benefit that may be derived from the requester, or a narrow segment of the population. <u>Mells v. Internal Revenue Service</u>, 2002 U.S. Dist. LEXIS 24275 (D.D.C. Nov. 21, 2002). In this regard, the identity of the requester will be considered so that an agency may determine whether the requester is in a position to contribute to the public understanding through the disclosure of the requested materials. <u>Burriss v. CIA</u>, 524 F. Supp. 448 (M.D. Tenn. 1981). As part of this analysis, the Department will consider whether the requester has the expertise in the subject area, and a demonstrated ability and intent to disseminate the information to the general public. <u>Id.</u> Additionally, while not for profit organizations are often capable of disseminating information, they do not automatically qualify for a waiver or reduction of fees because of their non-profit status. <u>VoteHemp, Inc. v. DEA</u>, 237 F. Supp. 2d 55 (D.D.C. 2002); <u>see also</u> <u>McClain v. U.S. Dep't of Justice</u>, 13 F.3d 220, 221 (7th Cir. 1993).

In your request you have indicated that "CREW will disseminate any documents it acquires from this request to the public .... [through] an interactive website where members of the public can analyze and comment on public documents[.] ... Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests." While this statement does demonstrate that you intend to disseminate the information, it does not demonstrate how the potentially responsive documents in this case will contribute to the "understanding of the public at large." Based upon your letter, it appears that members of the public would have to individually "analyze" the data to reach any possible understanding of the information. Consequently, you have failed to meet the third prong of the public interest analysis.

Page 4 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The fourth element of the public interest prong of the statutory requirement for a fee waiver requires that the disclosure must "contribute significantly" to public understanding of government operations or activities. For this element, an agency is required to determine whether the disclosure of the information will make a significant contribution to the public's understanding of the operations or activities of government. D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development, 85 F.Supp.2d 46, 49 (D.D.C. 2000). "Significance" is measured by a likely enhancement of the public's understanding of the subject at issue as a result of the disclosure, compared to the public's level of understanding of that same issue prior to disclosure. Id.; see also Judicial Watch v. U.S. Department of Justice, 185 F.Supp.2d 54, 62 (D.D.C. 2002).

In your letter, you stated "the disclosures [of the information] will likely contribute to a better understanding of relevant government procedures by … the general public in a significant way", and specifically, refer to "the public's understanding of the extent of White House involvement in the administration of the Reading First program[.]" It is interesting to note that you refer to an article on the very issue that you contend is unclear. Accordingly, information regarding this issue already exists in the public domain. Consequently, you have failed to show how the disclosure of the requested information will significantly enhance the public's understanding of the Reading First program beyond the information that already exists in the public domain. Carney v. U.S. Dep't of Justice, 19 F.3d 807, 815 (2d Cir. 1994).

In sum, the Department's denies your request for a fee waiver in the present case.

Fees are charged for searching/reviewing and duplication for responsive records. The fee is calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge and the duplication costs are ten cents per photocopied page. Our regulations, 34 CFR § 5.61 require us to allow you to modify your request if the cost is more than $25.00. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is to be greater than $250.00, the requester must pay in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Your appeal should be received by the FOIA office on or before
Mary 24, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

### Appeal Address:

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: FOIA Appeals
Washington, DC 20202-4500

Page 5 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request.  Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

Enclosures

**EXHIBIT D**

## Dan Roth

**From:** Dan Roth
**Sent:** Friday, May 11, 2007 6:31 PM
**To:** 'EDFOIAManager@ed.gov'
**Subject:** No. 07-00517-F, Informal Fee Waiver Appeal

Dear Ms. Arrington,

Thank you again for setting up the call this past Wednesday to help CREW narrow our March 28, 2007 FOIA request to the Department of Education. As we discussed during that call, I am following up with an informal appeal of the Department's denial of fee waiver contained in Ms. Cueva's letter dated April 16, 2007.

First of all, the Department suggests that because certain information already exists in the public domain on Reading First, CREW's request would not contribute significantly to the public's understanding of the issues involved. (Letter from M. Cueva, p. 4). As CREW's request makes clear, there are significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education. The records CREW seeks would clarify the public record one way or another with respect to Secretary Spellings and anyone else in the White House. With respect to items 2 and 3 of CREW's request, relating to contacts with educational publishers, very little is known about this topic beyond an email discussed by Title I Monitor and included on the CD provided to CREW in response to item 4 of our request. For these reasons, and because Reading First has garnered so much attention from the public, Congress, and the press, it can hardly be said that the records CREW seeks would only contribute to the understanding of a narrow segment of the population, as the Department's letter denying the fee waiver claims.

The Department's letter also mistakenly asserts that the public would be required to do its own analysis of the requested documents to "reach any possible understanding of the information." (Letter from M. Cueva, p. 3). On page 3 of our March 28 FOIA request, it clearly states that "CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases." Moreover, the press, the House Education and Labor Committee, the Department's Inspector General, and most recently Senator Kennedy, have given the public ample background information with which to understand the information CREW seeks. Secretary Spellings herself stated at yesterday's hearing that Senator Kennedy's report left her "deeply concerned." That report focused on individuals who were instrumental in Reading First from its inception and their financial ties to educational publishers.

In sum, CREW is seeking information that will add significantly to the public's understanding of the administration of a six billion dollar federal program aimed at helping some of the most vulnerable members of our society. CREW does not seek these records for any private gain, and has both the intent and the capability to distribute the information it receives widely, and to analyze that information for the public. For all of the reasons discussed, and for the reasons initially stated in CREW's FOIA request, the Department should grant CREW's request for a fee waiver in this matter.

Again, I appreciate your time, and look forward to your response regarding CREW's request for a fee waiver and the Department's initial denial of that request.

Sincerely,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

---

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

**EXHIBIT E**

# Dan Roth

**From:** Dan Roth

**Sent:** Monday, May 14, 2007 1:28 PM

**To:** 'EDFOIAManager@ed.gov'

**Subject:** No. 07-00517-F Narrowing Discussion

Dear Ms. Arrington,

As we discussed earlier today, I am writing to memorialize our conversation about narrowing CREW's March 28, 2007 FOIA request.

As I understand it from last Wednesday's telephone conversation, the Department's key concern with respect to our FOIA is that CREW is seeking records from "any Department office, including any and all field offices." Ms. Marcela Goodridge stated that the Department's FOIA technology does not allow for subject matter or keyword searches throughout the email system, so a search undertaken pursuant to the original terms of our request would require individual searches of each of the Department's approximately 4,500 employee email accounts. Additionally, Ms. Goodridge noted that email communications on personal email accounts would not be covered by such a search (which is an issue that has arisen in the past).

In order to aid CREW in the narrowing process, we request the following information from the Department:

1) An estimate of the time it would take to process CREW's request if we do not narrow it further
2) An estimate of the time it would take to process our request if we narrow and request communications only within the a) Office of the Secretary and b) Office of Elementary and Secondary Education.

If these time estimates will not be available before May 19 (this coming Friday), please let me know.

In addition, you affirmed that it would be helpful for CREW to limit the list of publishers in items 2 and 3 to the seven publishers already listed. We are considering a limitation along those lines (which would eliminate the phrase "includes, but is not limited to " in items 2 and 3 of the March 28 request) but have not yet made a decision.

CREW will formalize any narrowing language in a letter to the Department as soon as we receive the requested information.

Finally, I neglected to ask on the phone whether a copy of the Title I Monitor FOIA would be forthcoming soon, but I'll renew my request for it here.

Again, I greatly appreciate your time and assistance with this request. Please contact me any time.

Best Regards,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

**EXHIBIT F**

## Dan Roth

**From:** Dan Roth
**Sent:** Monday, May 21, 2007 3:18 PM
**To:** 'EDFOIAManager@ed.gov'
**Subject:** 07-00517-F Proposed Narrowing Terms

Dear Ms. Arrington,

As we discussed on May 9 and May 14, CREW is seeking to aid the Department in its search for responsive records by narrowing the terms of our March 28, 2007 FOIA request, No. 07-00517-F. Though our request sufficiently describes the records we seek, you and others at the Department have advised us that technological limitations of the Department's email search technology would require the Department to search approximately 4,500 email accounts unless the request is narrowed further. Accordingly, we suggest the following narrowed terms for the search in response to Request No. 07-00517-F:

Any and all documents and records from January 20, 2001, to the present, in the offices of: 1) The Secretary, 2) Senior Counselor, 3) Chief of Staff, 4) Deputy Secretary, 5) Management Improvement Team, 6) Elementary and Secondary Education, 7) Institute of Education Sciences, 8) Planning Evaluation and Policy Development, 9) Civil Rights, 10) Innovation and Improvement, 11) Special Education and Rehabilitative Services, 12) Management, 13) Chief Financial Officer and 14) Communications and Outreach, in the following categories:

1.  All communications of the above-listed offices to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR" or DIBELS.

2.  All communications of the above-listed offices, including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.

3.  All communications of the above-listed offices, including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited, to Randy Best), Cambium Learning, Sopris West, and Intellitools.

Apart from Item 4 of CREW's original request, to which the Department has already responded in the form of a CD containing documents previously disclosed to the *Title I Monitor* and received by CREW on April 23, 2007, all other language in CREW's original request (pages 2-4) remains unchanged. We also note that it is not only emails, but "all communications," that CREW requested.

Thank you for your time and attention to this matter.

Dan Roth
Counsel
CREW – Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

**EXHIBIT G**

1 of 1 DOCUMENT

USA TODAY

April 16, 2007 Monday
FINAL EDITION

# Textbook scandal reaches Congress;
# Democrats will spell out possible conflict-of-interest case in program

**BYLINE:** Greg Toppo

**SECTION:** LIFE; Pg. 5D

**LENGTH:** 708 words

A slow-motion scandal surrounding a federal multibillion-dollar reading program has its first congressional hearing this week, but it remains to be seen whether the scrutiny will shed any new light on a complex, contradictory tale of textbooks, tests and allegations of federal arm-twisting.

A key part of President Bush's efforts to remake public education, Reading First was launched in 2002, giving schools $1 billion a year to improve reading in early elementary grades. Five years later, early evidence suggests that it may be helping. But investigators say a handful of advisers have railroaded schools into buying textbooks and other materials that they and associates developed.

The result: a conflict-of-interest case that took two years to jell as investigators in the Education Department connected the dots. To date, no criminal charges have been filed, but Democrats, now in control of Congress, promise to give the case a full airing.

"The purpose of Reading First is to help schoolchildren learn to read, not feather the nests of a select group of well-connected individuals and organizations," says Rep. George Miller, D-Calif., who chairs the House Committee on Education and Labor.

Miller and Sen. Edward Kennedy, D-Mass., are conducting probes. Kennedy plans hearings later this spring.

Miller will preside at the first hearing Friday, which brings together Chris Doherty, the program's former director, and three top advisers.

Atop the witness list: John Higgins, the Education Department's inspector general, who has issued six reports detailing how Reading First leaders and contractors looked the other way at possible conflicts of interest among advisers and others -- several of whom authored textbooks. He also found that Doherty and others strong-armed states and school districts into choosing from a small selection of materials that stress phonics.

In one e-mail Higgins cited, Doherty said of a publisher whose books downplayed phonics, "They are trying to crash our party, and we need to beat the (expletive) out of them in front of all the other would-be party crashers who are standing on the front lawn waiting to see how we welcome these dirtbags."

Doherty quit in September after the report's release.

Higgins also found that a 2002 conference for educators focused too exclusively on a few programs, creating what investigators said was a perception that there was an "approved list" of texts.

A related probe last month by the Government Accountability Office found that officials from 10 states complained that the Education Department told them to eliminate reading programs or tests that they didn't endorse. Federal rules prohibit the department from endorsing any curriculum.

Education Secretary Margaret Spellings, who until 2005 was a White House domestic policy adviser, says the troubles occurred before her move to the Education Department. But Mike Petrilli, a former associate deputy secretary under Spellings' predecessor, Rod Paige, says Spellings "micromanaged the implementation of Reading First from her West Wing office." She already has told lawmakers she is beefing up oversight of the program.

But even a few critics cautiously concede that the program has been a boon to schools. The Center on Education Policy, a Washington think tank that has criticized Bush's education programs, in September said Reading First is having "a significant impact" in schools.

A five-year, $30.5 million evaluation, begun in 2003, should produce complete results next year.

Cindy Cupp, a Savannah, Ga., educator, was among the first to complain in 2005, after Reading First schools in Georgia passed over her homegrown phonics program. Cupp compiled a huge dossier outlining the links between publishers, federal advisers, universities and the Bush administration. In findings issued last January, Higgins largely upheld her complaint.

She says it's irrelevant whether Reading First works: "To rationalize breaking the law by saying the program has been effective is just that -- a rationalization."

She also notes that part of the evaluation bid went to RMC Research Corp., which Higgins cited for turning a blind eye to conflicts of interest among three top advisers it hired. All three are scheduled to testify Friday.

**LOAD-DATE:** April 16, 2007

**LANGUAGE:** ENGLISH

**GRAPHIC:** PHOTO, B/W, Photos by Heather Wines, GNS
PHOTO, B/W

**DOCUMENT-TYPE:** EDUCATION

**PUBLICATION-TYPE:** NEWSPAPER

Copyright 2007 Gannett Company, Inc.
All Rights Reserved

**EXHIBIT H**

1 of 1 DOCUMENT

The New York Times

March 15, 2007 Thursday
Late Edition - Final

# Oversight Is Set for Beleaguered U.S. Reading Program

**BYLINE:** By DIANA JEAN SCHEMO

**SECTION:** Section A; Column 1; National Desk; Pg. 25

**LENGTH:** 810 words

**DATELINE:** WASHINGTON, March 14

Under attack for improprieties uncovered in its showcase literacy program for low-income children, the Department of Education will convene an outside advisory committee to oversee the program, known as Reading First, Education Secretary Margaret Spellings said Wednesday.

Facing tough questions at a hearing before a Senate subcommittee considering appropriations for the Bush administration's signature education law, known as No Child Left Behind, Ms. Spellings also promised to clean up the reading program in other ways.

In about a half dozen reports in recent months, the department's inspector general detailed irregularities in the program, which awards $1 billion a year in grants to states to buy reading materials and teacher training. The reports also found that federal officials overlooked conflicts of interest among private contractors who advised states applying for the grants. Ms. Spellings said her office's general counsel would examine the records of contractors accused of conflicts of interest, and remove those with actual conflicts from any role in the program.

Her promises came as Reading First faces growing attacks while heading for reauthorization. Representative David R. Obey, Democrat of Wisconsin and chairman of the House Appropriations Committee, said this week that the problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is a part.

Acknowledging that "there's certainly room for improvement" in Reading First, Ms. Spellings told the Senate panel Wednesday that her department had removed the program's leaders; expanded its staff to seven employees from two, to reduce its reliance on so many private contractors with the potential for conflicts; and accepted all the recommendations of the department's inspector general.

"I'd hate to throw the baby out with the bathwater," the secretary said, adding that despite the problems, the program was improving reading among poor children.

At Wednesday's hearing, Senator Tom Harkin, the Iowa Democrat who is the subcommittee's chairman, said he, too, was disturbed by the accusations against Reading First. "It has an odor that I don't like," Mr. Harkin said. But he said he was not considering eliminating financing.

After Ms. Spellings left the hearing, Robert Slavin of Johns Hopkins University, whose Success for All reading program was shut out of many states under Reading First, said he did not think the secretary's promises went far enough. "I haven't seen the slightest glimmer of even intention to change," Dr. Slavin said.

Because schools had already chosen their readng curriculums, promises to clean up Reading First now meant little, he said. He compared them to finding eight innings into a baseball game with a score of 23 to 0 that the opposing team had been playing with cork bats.

"Then they say, 'From now on, we're using honest bats.' " Dr. Slavin said. "I'm sorry, it's 23 to nothing. You can't just say, 'From now on.' "

Reading First was required by law to finance only reading programs backed by "scientifically based reading research," and the Education Department was prohibited from mandating or even endorsing specific curriculums. But the program has been plagued by accusations that states were steered toward a handful of commercial reading programs and testing instruments.

With only two Education Department employees in charge of the vast program, the administration relied largely on private contractors to advise states on their applications for grants, screen products for scientific validity and weigh applications. The inspector general found that several of these contractors wrote reading programs and testing instruments that were competing for money, and that they gave preference to products to which they had ties.

Ms. Spellings has maintained, and said again under questioning Wednesday, that the problems with Reading First occurred before she became education secretary.

She denied accusations from a former political appointee at the department, Michael Petrilli, who said she had essentially run Reading First from her post as domestic policy adviser at the White House. Mr. Petrilli is now a vice president at a nonprofit education research foundation. Asked about Madison, Wis., where educators gave up $2 million in Reading First money because they would have had to drop a so-called balanced literacy reading program that they said had been successful for the district, Ms. Spellings said she was unfamiliar with the particulars of Madison's reading program. But she defended Reading First's ground rules under her predecessor, Rod Paige, saying the program did not exclude specific reading curriculums, but intended only to ensure that they were backed by research.

**URL:** http://www.nytimes.com

**LOAD-DATE:** March 15, 2007

**LANGUAGE:** ENGLISH

**GRAPHIC:** Photo: Education Secretary Margaret Spellings spoke yesterday with Senator Arlen Specter at a hearing. (Photo by Doug Mills/The New York Times)

**PUBLICATION-TYPE:** Newspaper

Copyright 2007 The New York Times Company

**EXHIBIT I**

2 of 2 DOCUMENTS

Education Week

October 4, 2006

# Scathing Report Casts Cloud Over `Reading First';
Federal officials encouraged use of specific programs, inspector general finds.

**SECTION:** Pg. 1 Vol. 26 No. 6

**LENGTH:** 2098 words

The findings of a scathing report on the federal Reading First program continued to reverberate last week following its Sept. 22 release, fueling debates in Congress, on the Internet, and among professionals in the field about their gravity and potential impact.

Critics of the program's implementation said the conclusions drawn in the report by the U.S. Department of Education's inspector general validate complaints that federal officials may have steered the grant-application process to ensure that particular reading programs and instructional approaches were widely used by participating schools, and that others were essentially shut out.

Some supporters of the program characterized the findings as overblown and charged that they constituted a personal attack on department personnel, rather than a verdict on the $1 billion-a-year program itself, which was rolled out 4½ years ago as part of the No Child Left Behind Act.

Many educators and observers said the blistering review of the implementation and management of Reading First, though justified, could damage a program that is showing initial signs of effectiveness.

"There really needs to be a good, hard look at the program ... and a renewed focus on solid, research-based instruction," said Alan J. Farstrup, the executive director of the International Reading Association, in Newark, Del. "Reading First can be a more solid program."

The long-awaited evaluation, which includes excerpts from internal Education Department e-mail marked confidential and sometimes containing vulgar language, concludes that:

Department officials may have intended to "stack" the panels of grant reviewers with those who favored a particular teaching methodology, and their method of screening the panelists for conflicts of interest was ineffective;

Requirements for receiving grants under the program were expanded beyond what the law requires; and

Federal education officials may also have overstepped provisions of the No Child Left Behind Act that prohibit them from influencing or dictating the curricula, assessments, or instructional approaches used by schools or districts.

Reading First, which has already handed out nearly $5 billion in grants to some 1,700 districts and 5,600 schools, is designed to improve reading instruction in the nation's most disadvantaged schools through the use of research-based methods.

**Potential Conflicts**

The inspector general's findings correspond with charges leveled over the past several years by critics of the program, as well as by many reading experts and state officials.

*Education Week* has reported since 2002 many of the concerns among researchers and educators that the program favored only a handful of consultants and commercial products, and the potential financial conflicts between them. In an extensive analysis of documents and e-mail correspondence obtained through state and federal open-records requests, as well as interviews with state officials, the newspaper reported last fall a pattern of behavior that suggested federal employees and their representatives had directed or even pressured states to choose specific assessments, consultants, and certain kinds of texts as conditions for getting funding under Reading First. ("States Pressed to Refashion Reading First Grant Designs," Sept. 7, 2005.)

Cindy Cupp, a former state education official and the publisher of a little-known reading series, filed formal complaints in May 2005 with the Georgia and federal education departments. Shortly afterward, the Success for All Foundation in Baltimore and the Reading Recovery Foundation of North America, based in Columbus, Ohio, lodged similar complaints with the federal department's inspector general.

Investigators for Inspector General John P. Higgins Jr. found that Reading First's director, Christopher J. Doherty, nominated review panelists with professional connections to the Reading Mastery program associated with the Direct Instruction teaching method. Mr. Doherty had spent part of his career promoting the use of the program before joining the Education Department in 2001 under the Bush administration. Those panelists reviewed 23 Reading First state applications.

"The Reading First director took direct action to ensure that a particular approach to reading instruction was represented on the expert review panel," the report says.

The inspector general also found potential conflicts of interest among members of an assessment committee that reviewed tests suitable for use of Reading First in schools. Committee members themselves had produced five of those assessments.

Although Direct Instruction and Success for All are backed by the most scientific evidence of any reading programs, neither method has gotten a boost under Reading First. Reading Recovery, an intensive one-on-one tutoring program for struggling readers, which has also presented evidence of its effectiveness, was named in several of Mr. Doherty's e-mails in which he suggested that officials should try to discourage its use among grant recipients.

Also implicated in the report for their roles in setting requirements for the program were Susan B. Neuman, who served as the department's assistant secretary for elementary and secondary education from March 2001 until January 2003 and G. Reid Lyon, who directed the branch of the National Institute of Child Health and Human Development that supports reading research.

Ms. Neuman returned to her job as a reading researcher at the University of Michigan, in Ann Arbor. Mr. Lyon now works for Best Associates in Dallas.

In an interview, Ms. Neuman said she was not included in what she described as closed-door discussions between Mr. Doherty, other staff members, and consultants as they drafted guidance for the program and advised state officials on their grant proposals.

Mr. Lyon said his role was simply to explain and clarify what the research says is effective in reading instruction.

It is Mr. Doherty's role in directing the grant-application process that is outlined in detail in the report, including e-mail exchanges that express in sharp wording his disdain for what he viewed as insufficiently rigorous instructional materials. Just days before the report was released, Mr. Doherty announced that he would be leaving his position with the department Oct. 1 for work in the private sector. He could not be reached for comment.

The handful of remaining Reading First staff members have been reassigned within the Education Department, according to spokesman Chad Colby.

In past interviews with *Education Week*, Mr. Doherty has maintained that the department only pressed state and local officials to meet the law's demand for research-based materials, assessments, and practices, and provided counsel on how they could do that.

"In fact, what we've said about Reading First is that there is no approved list of programs or assessment, truthfully," Mr. Doherty said in an interview last year.

## Beyond the Law?

Some education experts said the Education Department had no choice but to push hard for states to change their approach to reading instruction. Many states, they said, wanted to continue using failed approaches or programs with no evidence of effectiveness.

In spring 2002, an *Education Week* survey found that most state officials were generally satisfied with their existing reading initiatives and planned to use Reading First money to expand, enhance, or supplement them without making wholesale changes.

Federal officials, however, said that simply tweaking existing approaches would not satisfy the rigorous demands of the new program. ("Federal Program Will Test States' Reading Policies," June 19, 2002.)

"In my view, Reading First is starting to get results, not in spite of the aggressive approach of the department, but because of it," said Michael J. Petrilli, a former official at the Education Department during the current administration. Mr. Petrilli, now the vice president for national programs and policy at the Washington-based Thomas B. Fordham Foundation, said the inspector general's report does not point to any illegal activity but chronicles how department employees pressed to ensure the law's intent was followed.

The inspector general, however, suggests that officials went beyond the law, which prohibits federal employees from influencing or directing states' decisions on curricula, tests, or instructional methods.

Some observers agree.

"The issue is that here are these folks who saw an opportunity to really, fundamentally move the debate on reading instruction," said Andrew J. Rotherham, a co-founder and the director of the Washington-based think tank Education Sector. "That doesn't allow them to deviate from what the law allows."

The inspector general's office is conducting five other audits related to Reading First. The reports could be completed by the end of the year, according to Mary Mitchelson, who serves as counsel to the inspector general.

In a statement, Secretary of Education Margaret Spellings said some of the actions described in the report "reflect individual mistakes" by federal employees. She added that she was "moving swiftly to enact all of the inspector general's recommendations."

The inspector general has recommended that the department review the structure and management of the Reading First office, establish guidelines to ensure staff members understand the prohibitions in the NCLB law, and set up greater oversight of programs as they are implemented.

## Spellings' Involvement

Mr. Petrilli, Mr. Rotherham, and others question Ms. Spellings' claims that the program was implemented without her input. Although she became education secretary in early 2005, after many of the practices outlined in the report occurred, she was closely involved in the establishment of the No Child Left Behind program overall, and Reading First, while she served at the White House as President Bush's chief domestic-policy aide during his first term, Mr. Petrilli said.

"Margaret Spellings was involved in this from day one in her role as domestic-policy adviser, and that's something she should have been proud of because it's one of the most successful education programs in the history of the department," he said.

"Instead of defending it and hailing its success, she's hanging one of her most loyal lieutenants out to dry," Mr. Petrilli said, referring to Mr. Doherty.

Ms. Spellings has not yet responded to those allegations.

State and local education officials have generally praised the program for focusing needed resources on professional development and materials in reading. And many are reporting that those efforts are having a positive bearing on student achievement. But those successes have not been linked to the curriculum and assessment decisions made by those states. It is also not known whether a greater choice of instructional program, combined with the additional resources for teacher professional development and support services provided to Reading First schools, would have had a similar outcome.

The program's results do not appease some officials who say the process may have hindered their ability to serve more children.

"The process we had to go through was so excruciating," said Lisa Y. Gross, a spokeswoman for the Kentucky education department. Kentucky had to revise its Reading First application at least three times, and officials said they gained approval only after buckling to Mr. Doherty's demands to change the assessment portion of the plan. Despite the benefits of the program, Ms. Gross said, "still we believe if we had gotten our first proposal accepted, we could have provided many more services for students or at least gotten started a lot sooner."

On Capitol Hill, meanwhile, Rep. George Miller, D-Calif., urged Republican members of the House Education and the Workforce Committee to hold hearings on the inspector general's findings.

"This was a concerted effort to corrupt the process on behalf of partisan supporters, and taxpayers and schoolchildren are the ones who got harmed by it," Rep. Miller, the committee's ranking Democrat, said in a statement. He was among a bipartisan group that initiated a separate investigation of the program by the Government Accountability Office. That report is due out in January

Sen. Richard G. Lugar, R-Ind., responded to the report in a letter to Ms. Spellings last month. The report "seemed to suggest that the department mismanagement was even worse than expected," he wrote. But, the senator added, that her promise to implement the inspector general's recommendations was "a good start."

**LOAD-DATE:** June 13, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2006 Editorial Projects in Education, Inc
All Rights Reserved

**EXHIBIT J**

1 of 1 DOCUMENT

US Fed News

September 28, 2006 Thursday 4:38 AM EST

# SEN. HARKIN CALLS ON DEPARTMENT OF EDUCATION SECRETARY SPELLINGS TO DISCLOSE INVOLVEMENT IN READING FIRST SCANDAL

**BYLINE:** US Fed News

**LENGTH:** 533 words

**DATELINE:** WASHINGTON

The office of Sen. Tom Harkin, D-Iowa, issued the following press release:

Sen. Tom Harkin (D-IA) today called on Department of Education Secretary Margaret Spellings to disclose her involvement in the Reading First scandal following a blistering report from the department's Inspector General released last week shows significant misconduct by senior officials. Harkin is the ranking Democrat on the subcommittee that funds education initiatives.

The IG's findings indicate senior employees mismanaged the billion-dollar-a-year initiative, steered school contracts to publishers they favored and away from others; and flagrantly ignored federal laws on maintaining local and state control of school curricula. Over the past five years, Congress has allocated nearly $5 billion to the Reading First program.

"Secretary Spellings responded to the report by blaming other department employees and noting that the events occurred before she took over the Department," Harkin said. "However, as President Bush's domestic policy adviser, she exerted enormous control over Department activities. A former Department official, Michael Petrilli, said this week that 'she micromanaged the implementation of Reading First from her West Wing office.' "

"If so, it's hard to imagine that Secretary Spellings didn't know anything about the abuses described in the Inspector General report," Harkin added. "Instead of making others take the fall for what happened, she needs to stand up and say whether she had any knowledge of or involvement in these activities when she worked at the White House."

As described by the Department of Education, Reading First focuses on "putting proven methods of early reading instruction in classrooms." Through the program, states and districts receive funding to apply "scientifically based reading research-and the proven instructional and assessment tools consistent with this research-to ensure that all children learn to read well by the end of third grade."

The IG report singled out a number of states for problems, including Massachusetts. There, the Reading First Director called a state official to say he had concerns about certain reading programs that four of Massachusetts' districts were using, all of which had already gone through the appropriate approval process. Following the call, three districts dropped the programs in question and continued to receive Reading First funding; the one that continued with its program had its Reading First funding stripped.

These and other actions highlighted in the IG report could be in violation of existing law, considering the statute that established the Education Department states:

"No provision of a program administered by the Secretary or by any other officer of the Department shall be construed

to authorize the Secretary or any such officer to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system...over the selection or content of?textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law."

**LOAD-DATE:** October 1, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newswire

Copyright 2006 HT Media Ltd.
All Rights Reserved

**EXHIBIT K**

RE:                                                                      Page 1 of 2

184

Nonresponsive

**From:** Bryan, Beth Ann
**Sent:** Thursday, January 30, 2003 9:48 AM
**To:** 'Lyon, Reid G. (NIH/NICHD)'
**Subject:** RE:

poifect

----Original Message----
**From:** Lyon, Reid G. (NIH/NICHD) [mailto:lyonr@exchange.nih.gov]
**Sent:** Thursday, January 30, 2003 9:41 AM
**To:** 'Bryan, Beth Ann'
**Subject:** RE:

I will be there about 10 to 4 - is that ok

# G. Reid Lyon, PhD
*Chief*
Child Development & Behavior Branch
National Institute of Child Health & Human Development
National Institutes of Health
6100 Executive Boulevard
Room 4B05 - MSC 7510
Bethesda, MD  20892
[for federal express use: Rockville, MD 20852-7510]
**Web site:** http://www.nichd.nih.gov/crmc/cdb/cdb.htm
  **Phone:** (301) 496-9849
    **Fax:** (301) 480-0230
  **E-mail:** rl60a@nih.gov


    ----Original Message----
    **From:** Bryan, Beth Ann [mailto:BethAnn.Bryan@ed.gov]
    **Sent:** Thursday, January 30, 2003 9:35 AM
    **To:** Lyon, Reid G. (NIH/NICHD)
    **Subject:** RE:

    PS - Don't be late if you can.   BA

    ----Original Message----
    From: Lyon, Reid G. (NIH/NICHD) [mailto:lyonr@exchange.nih.gov]
    Sent: Thursday, January 30, 2003 8:34 AM
    To: 'bethann.bryan@ed.gov'
    Subject: Fw:

    FROM A MAJOR PUBLISHER. CAN YOU FORWARD TO MARGARET. WE HAVE TO DISCUSS
    PUBLISHERS TODAY WITH MARGARET. WE HAVE BEEN MEETING WITH SOME CEOs FROM

THE
INDUSTRY AND THEY WANT TO PLAY BALL. BUT WE ARE NOT HELPING THEM VERY MUCH.
I WILL PROVIDE SPECIFICS.


R

-------------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)



-----Original Message-----
From: Maureen_DiMarco@hmco.com <Maureen_DiMarco@hmco.com>
To: Lyon, Reid G. (NIH/NICHD) <lyonr@exchange.nih.gov>; rl60a@hmco.com <rl60a@hmco.com>
Sent: Wed Jan 29 22:27:32 2003
Subject:

First, I hear that Brent Staples at the New York Times is going to run an editorial very critical of the actions in New York City Schools on curriculum. Hurrah!

Second, I hear that you may be getting some heat for your comments. If that is true I am not only outraged since all you did was speak the truth...but also extremely alarmed. As I told you when we talked weeks ago, we are putting together an entire operation to insure the research base quality of all of our instructional materials. This is a major commitment of attitude and money. The actions in New York City have put an enormous chill on our people. They feel they have invested huge amounts of money and effort and have become educated to be true believers.....but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it. This is a watershed moment for SBR and NCLB. Your speaking up was essential....for more than New York City. I hope someone there knows this.

Third, I hope to hell that Rod did NOT tell NYC that their plan sounded fine!

**EXHIBIT L**

Advertisement

1000 PLUS nights and weekends $39.99/mo Stay connected for less.
Whenever minutes



**PRINT THIS**

Powered by Clickability

Click to Print

SAVE THIS | EMAIL THIS | Close

# More conflicts disclosed in Reading First program

**By Nancy Zuckerbrod, AP Education Writer**

WASHINGTON — Officials who gave states advice on which teaching materials to buy under a federal reading program had deep financial ties to publishers, according to a congressional report Wednesday.

The report, compiled by Senate Education Committee Chairman Edward Kennedy, D-Mass., details how officials contracted by the government to help run the program were at the same time drawing pay from publishers that benefited from the reading initiative.

Kennedy's report added new detail to a conflict-of-interest investigation by the Education Department's inspector general, John Higgens, who earlier had found that the Reading First Program favored some programs over others and that federal officials and contractors didn't guard against conflicts.

The new report focused on four contractors who headed centers that guided states in choosing reading programs aimed at kindergartners through third graders.

It found the contractors "had substantial financial ties to publishing companies while simultaneously being responsible for providing technical assistance to states and school districts." That damaged the program's integrity and illustrated the need for Congress to head off future conflicts, the report concluded.

The report zeroed in on four people who directed the program's regional Technical Assistance Centers:

—Edward Kame'enui, who headed the western technical assistance center based at the University of Oregon. Between 2002 and 2004, while holding positions in which he was evaluating Reading First assessment programs and giving state education agencies technical assistance, Kame'enui entered into three different contracts with the publisher Pearson/Scott Foresman, the report said.

"Due largely to his contracts with Pearson/Scott Foresman, Dr. Kame'enui's income soared in the period following the implementation of the Reading First program," the report said, adding that the majority of his royalties were derived from products used by states and districts in conjunction with Reading First.

Kame'enui, who now works as a commissioner at the Education Department's research arm, earned hundreds of thousands of dollars in royalties from Pearson/Scott Foresman between 2001 and 2006, the report said. He also received tens of thousands of dollars in consulting fees from Voyager, another publisher of products used by states under Reading First from 2000 to 2003.

Scott Foresman also tapped Kame'enui to travel to education conferences and workshops on the company's behalf while he was the western center director, the report said. Kame'enui did not respond to requests for comment.

Douglas Carnine, who replaced Kame'enui as the western center's director in 2005, when Kame'enui left to take up his federal position. Previously Carnine had other roles related to Reading First.

Even as he headed the western center, Carnine worked with and continues to work with numerous publishers, the report said.

Advertisement

**Mortgage Rates Fall Again!**

*I want a*

$525,000

*Mortgage for Under*

$1,849 /Month!



**Calculate New Payment**

**Click Your State**
Alabama

**Click Your Rate**
3.00% - 3.99%

**Click Credit Type**
Good

Refi Now!

LowerMyBills.com

He earned hundreds of thousands of dollars in royalties from publishers that did well under Reading First, such as Houghton Mifflin Company from 2002 to 2006.

However, Carnine said in an interview Wednesday that his royalties from Houghton Mifflin and other publishers were for educational programs that had nothing to do with K-3 reading, the focus of Reading First.

Joseph Torgesen, who directed the eastern regional district at Florida State University from 2003 until the present. Torgesen is co-author of a McGraw Hill reading program that can be used under Reading First. The study found that from 2002 to 2006, Torgesen earned thousands of dollars in royalties and other payments from companies such as McGraw Hill and Pearson and Sopris West, which later was acquired by Cambium Learning.

In one internal e-mail, Torgesen questioned whether he should seek special permission from the department to review the new Scott Foresman curriculum for Maine. "I had a discussion with some folks in Washington yesterday who rightly pointed out that we might want to think about rewarding Pearson (Scott Foresman) for significantly strengthening their program," Torgesen wrote.

Torgesen, in an interview Wednesday, said a review for the state of Florida had initially identified a Scott Foresman reading program as weak. However, Torgesen said Scott Foresman subsequently made significant improvements to the program, after which education officials in Maine asked Torgesen's center to review the program again.

"That prompted my e-mail to the folks in Washington, who suggested perhaps we might make an exception to re-reviewing Scott Foresman, since they had worked so diligently to improve their program," Torgesen said.

Sharon Vaughn headed the central technical assistance center at the University of Texas-Austin from 2003 to 2005. She received tens of thousands of dollars in royalties from Pearson Education Inc. and "other income" from Voyager Expanded learning, two programs used under Reading First.

Vaughn's lawyer, Gaines West, said it was noteworthy that the report did not say that Vaughn was improperly influenced by her relationship with publishers while she was the center's director.

The report concluded by recommending that Congress adopt new restrictions to safeguard against financial conflicts in federal education programs.

"Individuals serving on advisory committees or in the peer review process for the department should be prohibited from maintaining significant financial interests in related educational products or activities," the report said.

Education Secretary Margaret Spellings is scheduled to testify in Congress on Thursday on the Reading First program and problems in the student loan industry.

Spellings said in an Associated Press interview Wednesday that she had not yet thoroughly reviewed Kennedy's report but that any new findings of wrongdoing would be addressed by the department.

She said, however, that it would be impossible to run department programs without relying on some people with ties to the private sector. "We want and need expertise as we make policy and do this work," she said.

*Copyright 2007 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

**Find this article at:**
http://www.usatoday.com/news/education/2007-05-09-reading-first-program_n.htm

🖨 Click to Print

☐ Check the box to include the list of links referenced in the article.

SAVE THIS | EMAIL THIS | Close

Copyright 2007 USA TODAY, a division of Gannett Co. Inc.

**EXHIBIT M**

MAJORITY MEMBERS:

GEORGE MILLER, CALIFORNIA, Chairman

DALE E. KILDEE, MICHIGAN, Vice Chairman
DONALD M. PAYNE, NEW JERSEY
ROBERT E. ANDREWS, NEW JERSEY
ROBERT C. "BOBBY" SCOTT, VIRGINIA
LYNN C. WOOLSEY, CALIFORNIA
RUBÉN HINOJOSA, TEXAS
CAROLYN McCARTHY, NEW YORK
JOHN F. TIERNEY, MASSACHUSETTS
DENNIS J. KUCINICH, OHIO
DAVID WU, OREGON
RUSH D. HOLT, NEW JERSEY
SUSAN A. DAVIS, CALIFORNIA
DANNY K. DAVIS, ILLINOIS
RAÚL M. GRIJALVA, ARIZONA
TIMOTHY H. BISHOP, NEW YORK
LINDA T. SÁNCHEZ, CALIFORNIA
JOHN P. BARBANEL, MARYLAND
JOE SESTAK, PENNSYLVANIA
DAVID LOEBSACK, IOWA
MAZIE HIRONO, HAWAII
JASON ALTMIRE, PENNSYLVANIA
JOHN A. YARMUTH, KENTUCKY
PHIL HARE, ILLINOIS
YVETTE D. CLARKE, NEW YORK
JOE COURTNEY, CONNECTICUT
CAROL SHEA-PORTER, NEW HAMPSHIRE



**COMMITTEE ON EDUCATION AND LABOR**
U.S. HOUSE OF REPRESENTATIVES
2181 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6100

MAJORITY – 202-225-3725
MINORITY – 202-225-4527
http://edlabor.house.gov

MINORITY MEMBERS:

HOWARD "BUCK" McKEON, CALIFORNIA,
Senior Republican Member

THOMAS E. PETRI, WISCONSIN
PETER HOEKSTRA, MICHIGAN
MICHAEL N. CASTLE, DELAWARE
MARK E. SOUDER, INDIANA
VERNON J. EHLERS, MICHIGAN
JUDY BIGGERT, ILLINOIS
TODD RUSSELL PLATTS, PENNSYLVANIA
RIC KELLER, FLORIDA
JOE WILSON, SOUTH CAROLINA
JOHN KLINE, MINNESOTA
CATHY McMORRIS RODGERS, WASHINGTON
KENNY MARCHANT, TEXAS
TOM PRICE, GEORGIA
LUIS G. FORTUÑO, PUERTO RICO
CHARLES W. BOUSTANY, JR., LOUISIANA
VIRGINIA FOXX, NORTH CAROLINA
JOHN R. "RANDY" KUHL, JR., NEW YORK
ROB BISHOP, UTAH
DAVID DAVIS, TENNESSEE
TIMOTHY WALBERG, MICHIGAN
DEAN HELLER, NEVADA

May 1, 2007

<u>**VIA FACSIMILE- 202-401-0596**</u>
The Honorable Margaret Spellings
Secretary
U.S. Department of Education
400 Maryland Avenue, SW, Rm. 7W301
Washington, DC 20202

Dear Secretary Spellings:

Over the past few weeks, the Committee on Education and Labor has held investigative hearings that produced evidence of unethical practices in the student loan industry and of pervasive mismanagement and conflicts of interest in the Reading First program. The Committee's ongoing investigations into these two multi-billion-dollar programs have uncovered significant lapses in oversight among senior level White House and Department of Education officials responsible for their stewardship.

For several years, the Administration has been aware of the unethical practices among lenders and schools participating in the federal student loan programs, yet has to act to protect the integrity of the $85 billion-a-year programs. Recent news accounts have cited formal warnings dating back to at least 2001 that highlighted the dangers of inducements and other prohibited activities if left unchecked. Similarly, warnings raised years ago about the overall mismanagement of the Reading First program – and of the failure to mitigate conflicts of interest in the program – were ignored by the Administration. This consistent failure to act in the interests of our nation's students raises significant questions about why such warnings have been ignored.

Given the preliminary results of our ongoing investigations and the daily public reporting of unethical practices in programs within the Education Department, I seek additional information about the Department of Education's stewardship of the government's student loan and Reading First programs.

I ask that you provide me with the details of all senior-level Department of Education communications regarding the unethical practices among student lenders and schools (e.g., prohibited inducements) and the design and implementation of the Reading First program beginning January 20, 2001, through the receipt of this request. Specifically, I request the communications of former Secretary of Education Rodney Paige; former Senior Advisor to Secretary Paige, Beth Ann Bryan; former Deputy Secretary William Hansen; former Under Secretary and Deputy Secretary Eugene Hickok; present Chief of Staff to the Secretary David Dunn; and any other senior-level staff with responsibilities for the student loan and Reading First programs. I am sending a similar request to the White House.

I respectfully request your written response within 10 days of receiving this letter. I further ask that your staff coordinate the production of the requested information with Michael Zola, Chief Investigative Counsel, House Education and Labor Committee at (202) ███-████.

Sincerely,


**GEORGE MILLER**
Chairman

cc: Senior Republican Member Howard "Buck" McKeon


Enclosure:  Information Request Supplemental Instructions