# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    Civil Action No. 1:07-cv-00963 (RMU) |
| | : |
| U.S. DEPARTMENT OF EDUCATION, | : |
| | : |
| | : |
| Defendant. | : |
| _____ | : |

## **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") brought this lawsuit under the Federal Records Act ("FRA") after it was denied access to agency records that were created by agency employees using outside email accounts. The U.S. Department of Education ("Education") has now moved to dismiss this FRA count, arguing that plaintiff lacks standing to sue.

Defendant's Motion is premised on a mis-characterization of Education's actual practices with respect to employees' use of personal emails to conduct official business as well as a mis-characterization of governing case law and it application here. Contrary to its assertions in support of this motion, Education employees twice told CREW's counsel that they sometimes use private email addresses to conduct official business and that this issue had arisen in the past in the context of other FOIA requests. See Declaration of Dan Roth, CREW Counsel ("Roth Decl.") at ¶ 9. At no time did defendant ever claim that the issue regarding the use of personal email accounts referred to outside consultants, vendors, publishers, or members of the public, as

the agency now claims.  Id. at ¶ 10.

Not only is Education's re-invention of the facts in order to skirt its responsibilities under the FRA incredible (if not deeply disturbing), but its claim that the issue of whether an organization such as CREW that seeks access to government records under FOIA has standing to file litigation under the FRA is a question never before decided by the Court is patently incorrect.  CREW's injury is precisely the type of injury alleged by organizational plaintiffs found to have standing in a number of cases, including American Friends Service Committee v. Webster, 720 F.2d 29, 46 (D.C. Cir. 1983), on which defendant relies.  Nor is there any merit in defendant's claim that CREW is solely responsible for its claimed injuries.  CREW's injury is a direct result of Education's conduct: the agency failed to provide information responsive to CREW's FOIA request because of the agency's failure to preserve and store the information for retrieval and processing through the FOIA process.

## FACTUAL BACKGROUND

On March 28, 2007, CREW sent a FOIA request to Education seeking records, regardless of format and including electronic records and information, of communications and other contacts concerning the Reading First Program from January 21, 2001 to the present, including communications between Education employees and the White House, educational publishers, and documents previously disclosed under the FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*.  Complaint, ¶ 15 and Exhibit A to Roth Decl., ¶ 2.

On May 9, 2007, at the suggestion of Education Supervisory IT Specialist Angela Arrington, CREW's counsel Daniel C. Roth participated in a conference call with Education employees to discuss CREW's FOIA request.  Roth Decl. at ¶¶ 6-7.  Education officials --

including representatives from the agency's FOIA office, its Office of the General Counsel and its Office of Elementary and Secondary Education -- advised Mr. Roth that the agency could not search for email pertaining to any particular subject matter without having the identity of a specific recipient or sender.  Id.  In addition, Education official Marcella Goodridge advised Mr. Roth that Education personnel "often use private email addresses" and that Education "wouldn't have access to that."  Id. at ¶ 9.  Education officials confirmed that agency personnel use private email accounts for official business and that this issue had arisen in the past in the context of other FOIA requests.  Id.

During this same conference call, Mr. Roth suggested that Education employees' use of private email accounts to conduct official business would violate the Federal Records Act.  Roth Decl. at ¶ 9.  At no time did any of the Education officials assert that Education employees did not use private email accounts in order to conduct official business or suggest that Mr. Roth's understanding was incorrect.  Id. at ¶ 10.

Mr. Roth also discussed and raised issues concerning Education's denial of CREW's fee waiver request.  Id. at ¶ 11.  He was then asked to draft an informal appeal of Education's fee waiver denial, which he prepared and sent by email to Ms. Arrington on May 11, 2007.  Id.

In a follow-up telephone call on May 14, 2007, Ms. Arrington confirmed to Mr. Roth that Education employees sometimes use private email addresses to conduct official business, that such material would not be included in the agency's response to CREW's FOIA request and that this issue had come up in the past.  Roth Decl. at ¶ 14.  Mr. Roth then sent an email to Ms. Arrington memorializing his conversation with her.  Id.  Mr. Roth further confirmed in his confirming email that "email communications on personal email accounts would not be covered

by such a search [subject matter or keyword search] (which is an issue that has arisen in the past)." Id. Mr. Roth did not receive any response to his email, nor did Ms. Arrington dispute his understanding of Education employees' use of personal email accounts to conduct official business. Id. at ¶ 15.

Mr. Roth's email further requested that Education provide CREW with an estimate of time it would take to process the FOIA request as drafted and a second estimate as to the time it would take to process the same request within only the Office of the Secretary and Office of Elementary and Secondary Education. Roth Decl. at ¶ 15. Mr. Roth requested that he be notified if the estimate could not be completed before May 19, 2007. Id. He never received a response to his email. Id.

In light of this information, on May 15, 2007, CREW sent a letter to Education's Inspector General, requesting that he commence an immediate investigation "to assess the extent and duration" of Education's practice of using outside email accounts to conduct official business, "the amount of official correspondence that has been lost or destroyed, and the effect of this practice on all records requests to the Department of Education." Complaint, ¶ 18. CREW's letter also pointed out that in addition to CREW's FOIA request, reporters have also been requesting agency documents under the FOIA, as has Rep. George Miller, Chairman of the House Committee on Education and Labor. Id. at ¶ 19.

On May 21, 2007, having not received a response to his May 14, 2007 email requesting time estimates of various searches, Mr. Roth sent Ms. Arrington an email acknowledging Education's technological search limitations and proposing a narrowed search. Roth Decl. at ¶ 17. Specifically, Mr. Roth narrowed the scope of FOIA request Item I from the entire

Department to a list of 14 of the 33 offices listed on Education's online Coordinating Structure Chart.  Id. at ¶ 18.  Mr. Roth chose these offices based on his judgment of where records responsive to CREW's FOIA request might be located.  Id.

In addition, FOIA request Item I sought records mentioning or relating to several enumerated reading programs and terms and "any other issue related to reading instruction or education."  Exhibit A to Complaint.  In response to concerns raised by Education officials during the May 9, 2007 conference call, Mr. Roth narrowed this item further by deleting that phrase and requesting records related to "Early Reading First" and "Science-Based Reading Research."  Roth Decl. at ¶ 19.

Also in response to the agency's concerns expressed on May 9, 2007, Mr. Roth narrowed Items ii and iii of CREW's FOIA request for contacts with and regarding all educational publishers to an enumerated list of seven publishers.  Id. at ¶ 20.

By letter dated June 8, 2007, Ms. Cueva notified CREW that its fee waiver request had been denied.  Id. at ¶ 22.  On June 21, 2007, CREW appealed the fee waiver denial.  Id.

Education never responded to CREW's narrowing proposal set forth in Mr. Roth's letter of May 21, 2007.  Roth Decl. at ¶ 23.

## STATUTORY BACKGROUND

### The Federal Records Act

The FRA is a series of statutes that govern the creation, management and disposal of federal records.  See 44 U.S.C. §§ 2101-2118, 3101-3107 and 3301-3324.  Among other things, the FRA ensures "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," as well as "judicious preservation and disposal of records."  44 U.S.C. §

2902.

To fulfill this purpose, the FRA requires the head of each agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency." Id. at § 3101. Under the statute, each agency must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," id. at § 3102, and must "establish safeguards against the removal or loss of records" the agency head determines are necessary and required by regulations of the Archivist. Id. at § 3105.

The FRA also prescribes the exclusive mechanism for the disposal of federal records, which it defines to include:

> all books, papers, maps, photographs, machine readable materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency . . as evidence of the organization, functions, policies, decisions, procedures operations, or other activities of the Government or because of the informational value of data in them.

44 U.S.C. § 3301. No records may be "alienated or destroyed" except pursuant to the disposal provisions of the FRA. Id. at § 3314.

An agency wishing to dispose of records must first submit to the archivist either lists of records the agency head determines "are not needed by it in the transaction of its current business," 44 U.S.C. § 303a(2), or "schedules proposing the disposal after the lapse of specified periods of time of records of a specified form or character" that the agency head determines will not have "sufficient administrative, legal, research, or other value to warrant their further

preservation by the Government." Id. at § 3303a(3).  Upon receipt of such a request, the

archivist must issue a notice requesting public comment on the agency's proposal and the

archivists's staff must conduct its own assessment of the value of the records the agency is

proposing to destroy.  Id. at § 3303a(a).  The archivist is free to accept or reject an agency's

proposal.  Id.

## ARGUMENT

I.    **CREW HAS STANDING TO BRING THIS FRA LAWSUIT CHALLENGING EDUCATION'S FAILURE TO PRESERVE AGENCY RECORDS RESPONSIVE TO CREW'S FOIA REQUESTS.**

To invoke the Court's jurisdiction under Article III standing of the Constitution, a

plaintiff must demonstrate, as an "irreducible constitutional minimum," Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560 (1992), an injury-in-fact that is "fairly traceable" to the challenged

act and "likely to be redressed by the requested relief."  Allen v. Wright, 468 U.S. 737, 751

(1984).  CREW's injury, an inability to obtain through the FOIA information necessary to

accomplish CREW's mission, is directly traceable to Education's improper document retention

procedures.  Accordingly, CREW has standing to sue here.

### A.    **Plaintiff's Injury is Sufficient to Confer Standing**

CREW has met its burden of establishing an injury-in-fact for Article III purposes.

CREW is an organization dedicated to informing and educating the public about the conduct of

public officials.  Toward that end, CREW uses the FOIA to gather relevant information.

Here, CREW filed a FOIA request with Education for documents that would reflect,

among other things, the degree to which the Reading First Program has been influenced by

political and other outside interests.[1]  Education's policy of knowingly permitting agency

employees to use outside email accounts when conducting agency business deprived CREW of

access to documents responsive to its FOIA request but not maintained by Education because

they were not stored on agency servers.

Because of Education's record-keeping policies, CREW was frustrated in achieving its

mission when it sought and was denied the requested information.  Defendant's refusal to

comply with the requirements of the FRA has hindered CREW's ability to report and publish

information in furtherance of its programmatic activities.[2]  Compare Spann v. Colonial Village,

Inc., 899 F.2d 24, 27 (D.C. Cir. 1990) ("if an organization points to a concrete and demonstrable

injury to its activities . . .the organization passes through the first [standing] gateway").  Article

III requires nothing more.

In arguing to the contrary, defendant misapplies American Friends Service Committee v.

Webster, 720 F.2d 29, 46 (D.C. Cir. 1983), and mis-characterizes CREW as like those plaintiffs

the Webster Court found were "questionable" for standing purposes.  In Webster, various

individuals and organizations challenged the FBI's records destruction program as contrary to

law, including the FRA.  Id.  The Court in Webster recognized three categories of plaintiffs: (1) a

---

[1]Ironically, Education accuses CREW of seeking documents for "political purposes."
See e.g. Defendant's Motion to Dismiss at 11.  Defendant's wholly gratuitous and ad hominem
remarks, however, are not only untrue (CREW is a 501(c)(3) organization and does not engage
in political activity), but have no relevance to the legal question of whether CREW has standing
to sue.

[2]As noted in its complaint, CREW uses a combination of research, litigation, advocacy
and public education to expose unethical and illegal conduct by those involved in government.
Complaint ¶ 4.  CREW has been "harmed by Education's failure to comply with the FRA
because that failure has denied CREW access to documents that are a critical part of the record
concerning the Reading First Program."  Id. at ¶ 24.

group that included individuals and organizations whose need for documents arose out of their professions, and "had in the past made FOIA requests . . . had other requests pending, and intended to request FBI files in the future"; (2) a group that consisted of individuals who were subjects of FBI investigations or alleged victims of FBI activities; and (3) a group that included organizations seeking to further civil liberties and civil rights who argued that the destruction of the documents deprived them of research materials that they could disseminate.  Id.

Here, Education argues that CREW is most analogous to this third group of plaintiffs. Unlike this group, however, CREW has made FOIA requests in the past, has FOIA requests pending with Education, and intends to request documents in the future.  This distinction dictates here, as in Webster, that CREW has standing to bring this FRA lawsuit.

Like the first group of plaintiffs in Webster, CREW uses the documents it seeks through its FOIA requests, not for political purposes as Education carelessly argues, but to share information with the public through memoranda, reports, or press releases.  See Armstrong v. Bush, 924 F.2d 282, 288 (D.C. Cir. 1991) (finding plaintiffs that were researchers and historians who made extensive use of government documents were within the zone of interests of the records creation and management provisions of the FRA).   For example, on June 27, 2007, CREW released a report, *The Best Laid Plans: The Story of How the Government Ignored its own Gulf Coast Hurricane Plan*, about the problems with the federal government's response to Hurricane Katrina victims that relied significantly on documents CREW obtained through a FOIA request to the Department of State.

CREW has used and will continue to use the FOIA to gain access to agency records that relate to the propriety of government activity.  By adopting a policy whereby Education

employees use outside email accounts to conduct official business with the knowledge that electronic records created as a result of that use were and continue to be sought under the FOIA, Education has denied CREW access to requested records.  This policy is arbitrary, capricious, and contrary to law because it results in the failure to preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures and essential transactions of the agency.  44 U.S.C. § 3101.  And for any future request, CREW is at the complete mercy of Education's document policy.

This information sought by CREW has an undeniable effect upon CREW's ability to inform and to educate the public, which it does on a continuing, ongoing basis.  As frequent FOIA users, CREW is within the zone of interests of the FRA disposal provisions.

CREW's organizational interests and allegations of the adverse impact upon its activities resulting from Education's actions are not unlike other nonprofit organizations that have been found to have established the necessary adverse effect for Article III standing.  For example, in Action Alliance of Senior Citizens v. Heckler, 789 F.2d 931 (D.C. Cir. 1986), vacated on other grounds, 494 U.S. 1001 (1990), the plaintiffs were four organizations that through information, counseling, referral, and other services endeavored to improve the lives of elderly citizens.  Their complaint challenged both the content of Department of Health and Human Services-specific regulations and the Secretary of the Department of Health and Human Services' failure to act on regulations proposed by other agencies.  Id. at 935.  The challenged regulations denied the plaintiff organizations access to information and avenues of redress they wished to use in their routine information-dispensing, counseling and referral activities.  Finding that the plaintiff organizations adequately alleged inhibition of their daily operations by reason of the agency's

decisions, the D.C. Circuit stated that "injury in fact will not suffice if it is too speculative, but it need not be large or intense; an identifiable trifle. . .is sufficient to meet the constitutional minimum."  Id. at 937 citing United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14 (1973).

Thus, CREW's inability to obtain information it seeks through its FOIA request for Education documents would lead to "concrete damage" to CREW's mission.  Through this impairment, CREW has met its burden of establishing an injury-in-fact for Article III standing purposes.

**B.     CREW Narrowed its Original FOIA Request While Education Had Already Begun Processing Its FOIA and is Therefore Not Responsible for its Injury**

Education's attempt to depict CREW as failing to narrow the scope of its FOIA request and therefore causing its own injury is disingenuous at best, and misleading at worst.  Defendant argues that it is unable to respond to CREW's FOIA request because CREW failed to narrow the request.  To the contrary, CREW did attempt to narrow its request but never received a response or other guidance from Education.  See Roth Decl. ¶ 23.

Moreover, defendant has begun to process CREW's request, although it suggests to the contrary.  On the one hand, Education Official Arrington admits that, "by letter dated April 16, 2007, the Department released to the requester, Mr. Daniel C. Roth, Counsel, CREW, a CD containing 421 pages of documents responsive to item 4 of the March 28, 2007 request."  See Arrington Decl. ¶ 8.  Inexplicable, however, the defendant also contends that "the Department has not begun to process Plaintiff's requests for communications between the Department and educational publishers;"and that "Plaintiff was advised *before this lawsuit was filed* that the Department would not begin processing its request until Plaintiff clarified the records sought and

11

resolved the issue of fees." See Defendant's Motion to Dismiss at 11-12 (emphasis in original). This claim, however, is completely at odds with Education's release to CREW of 421 pages of responsive documents on April 16, 2007.

Further, Education fails to explain why it never responded to CREW's attempt to narrow its FOIA request on May 21, 2007. To cover up its own inaction, Education argues here for the first time that CREW's efforts at narrowing were insufficient. This unsubstantiated claim, however, is not enough to defeat plaintiff's injury-in-fact. As the record makes clear, CREW attempted to narrow its FOIA request and properly appealed its fee waiver denial, participated in a conference call it neither suggested nor directed, followed up after the conference call by telephone and email in a further attempt to narrow its FOIA request, and ultimately sent a narrowed FOIA request without any response by the defendant at all. Under these circumstances, plaintiff's injury is traceable exclusively to defendant's conduct.

## II.    CREW's CLAIMS ARE RIPE FOR ADJUDICATION

Finally, Education argues that CREW's claims are so "shapeless" as to be unripe. Defendant's Motion to Dismiss at 13-14. According to the defendant, the current record "is wholly inadequate for an informed decision." Id. at 14.

To the contrary, CREW has alleged sufficient facts within its Complaint for the Court to make an informed decision about Education's violation of the FRA. These allegations regarding Education's arbitrary, capricious and illegal policy relate to agency employees' use of outside email accounts to conduct official business with the result that Education is not preserving agency records. See Complaint, ¶¶ 16-17. As such, CREW's claims are not based on "contingent future events that may not occur as anticipated, or indeed may not occur at all," nor

are they based on some "abstract disagreements" of policy.  See Worth v. Jackson, 451 F.3d 854,

861 (D.C. Cir. 2006).  The allegations in CREW's Complaint which are detailed and specific

enough for the Court to ascertain the contours for purposes of judicial review, are based on

Education's articulated policy and its inability to produce documents responsive to CREW's

FOIA as a direct result of that policy.

### CONCLUSION

For the foregoing reasons, CREW respectfully requests that the Court deny defendants'

motion to dismiss.

Respectfully submitted,


    /s/
Anne L. Weismann
(D.C. Bar No. 298190)
Kimberly D. Perkins
(D.C. Bar No. 481460)
Citizens for Responsibility and Ethics
    In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
Phone: (202) 408-5565
Attorneys for Plaintiff

Dated: August 24, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | : : : | |
| Plaintiff, | : : | |
| v. | : : | Civil Action No. 1:07-cv-00963 (RMU) |
| U.S. DEPARTMENT OF EDUCATION, | : : : | |
| Defendant. | : : | |

<u>**DECLARATION OF DANIEL C. ROTH**</u>

I, Daniel C. Roth, hereby declare as follows:

1.  I serve as Counsel to Citizens for Responsibility and Ethics in Washington ("CREW"),

a nonprofit watchdog organization in Washington, D.C.

2.  On March 28, 2007, I sent and faxed to the Department of Education ("Education") a

Freedom of Information Act ("FOIA") request on behalf of CREW seeking "any and all

Department documents and records dating from January 21, 2001, to the present, in the following

categories" (attached as Exhibit A):

i.      All communications from any Department office, including any and all field
        offices, to, from, or referencing any member of the White House staff, including,
        but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention
        or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS,
        or any other issue related to reading instruction or education.

ii.     All Department contacts or communications, including calendar references and
        meeting notes, with educational publishers, their executives, employees,
        consultants, or contractors. The list of educational publishers and/or their
        subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill,
        Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and
        IntelliTools.

iii.  All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

iv.  To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*.  See Andrew Brownstein & Travis Hicks, <u>Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close</u>, Title I Monitor (undated) (Attached as Exhibit 1).  As these documents have been already culled and processed for disclosure, we expect production of these records in short order.  As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

3.  I also requested that all fees associated with the processing of the FOIA request be waived.

4.  On April 23, 2007, I received a letter from Education FOIA officer Maria-Teresa Cueva dated April 16, 2007, stating that CREW's FOIA request did not reasonably describe the records sought and thus could not be processed "without further clarification."  Letter from Maria-Teresa Cueva to Daniel C. Roth (Apr. 16, 2007) (attached as Exhibit B).  Specifically, Education wrote that "In an effort to process your request as expeditiously as possible, we need clarification for items 1 through 3 of your request."  Those items, the letter continued, "encompass a large volume of information on broad topics related to individuals in the Department and 'White House staff', without identifying specific individuals, offices, or subjects." The letter also erroneously stated that "your request does not specify any relevant time frames." Education also denied CREW's request for a fee waiver.

5.  Enclosed along with the letter was a CD-ROM containing 421 pages of documents responsive to Item number iv of the March 28, 2007 FOIA request.

2

6.  On May 4, 2007, I attempted to call the phone number listed in the letter, but the number was incorrect.  I emailed Ms. Cueva to inform her that I had tried and failed to reach her by telephone, and that I was interested in addressing the issues raised in her April 16, 2007 letter.

7.  Some time between May 4, 2007, and May 9, 2007, Ms. Angela Arrington responded to my email by telephone and provided me with the correct phone number.  Ms. Arrington also stated that the Departed wanted to have a conference call with me in order to discuss narrowing CREW's request, which we scheduled for May 9, 2007.  I did not request the conference call.  I expected to engage in the narrowing process with a FOIA officer such as Ms. Arrington, as I have done with other agencies in the context of past FOIA requests.

8.  On May 9, 2007, I participated in a conference call with Ms. Arrington, Ms. Cueva, Education Office of General Counsel attorneys Ms. Marcella Goodridge and Mr. Dennis Koeppel, and Mr. James Butler of the Office of Elementary and Secondary Education.  We discussed the ways in which the request could be narrowed, as well as the fee waiver denial.

9.  Ms. Goodridge and Ms. Arrington, who did most of the talking for Education, explained that Education's search capabilities were limited and that, in order to fulfill CREW's request, each of the 4,500 Education employees' email accounts would have to be searched.  I was told that the more information I could provide to aid the search, the better.

10.  While discussing the narrowing of FOIA request Item ii regarding Education contacts with persons associated with educational publishers, I was informed that if I did not supply a list of Education personnel whose files should be searched for responsive records, each Education email account would have to be searched individually.  Ms. Goodridge further stated that "people often use private email addresses," and "we wouldn't have access to that."  I immediately sought

clarification of that statement, asking whether outside accounts would be used for official business. Ms. Goodridge replied that they would, and stated that the issue had arisen in the past. I suggested that such a practice would violate the Federal Records Act. None of the five Education officials on the call clarified, disputed or corrected Ms. Goodridge's statement in any way.

11. Despite Ms. Arrington's contentions, at no time did anyone from Education claim that the issue of private email use was limited to individuals associated with publishers, private contractors, or the public, and not Education employees. That is, no one ever stated that "an electronic search would not capture these same executives, employees, consultants, or contractors if they chose to contact Education employees using private e-mail accounts." Arrington Declaration, at ¶ 9. Nor did anyone state that "it is not unheard of for members of the public to contact Education employees using private e-mail accounts." Id.

12. During the conference call, we also spoke about the fee waiver denial. I raised several issues, including Education's incorrect statement that the request did not include a relevant time-frame. I noted that we sought records from January 21, 2001, to the present. I was asked to draft an informal appeal including this and other information relating to the fee waiver issue.

13. Later that afternoon, I sent an email to Ms. Arrington expressing my intent to send a fee waiver appeal by the end of the week.

14. On Friday, May 11, 2007, I emailed Ms. Arrington an informal fee waiver appeal as requested by Education officials during the conference call.

15. On Monday, May 14, 2007, I called Ms. Arrington to further discuss the narrowing

4

process and to confirm several details of the May 9, 2007 conference call. The email I wrote to memorialize that conversation included the following:

> As I understand it from last Wednesday's telephone conversation, the Department's key concern with respect to our FOIA is that CREW is seeking records from 'any Department office, including any and all field offices.' Ms. Marcel[l]a Goodridge stated that the Department's FOIA technology does not allow for subject matter or keyword searches throughout the email system, so a search undertaken pursuant to the original search terms of our request would require individual searches of each of the Department's approximately 4,500 employee email accounts. Additionally, Ms. Goodridge noted that email communications on personal email accounts would not be covered by such a search (which is an issue that has arisen in the past).

Email from Dan Roth to Angela Arrington (May 14, 2007) (attached as Exhibit C). Ms. Arrington did not provide any clarification regarding the use of outside email accounts during our May 14, 2007 phone conversation or after receiving this email. Ms. Arrington did not suggest that "if [I] wanted the Department to proceed with searching private email addresses, [I] would need to provide Education with a list of the private email addresses [I] would like for the Department to include in its search," nor do my notes of the conversation reflect that such a statement was made.

16. The email further requested that Education provide me with an estimate of time it would take to process the FOIA request as drafted and a second estimate as to the time it would take to process the same request within only the Office of the Secretary and Office of Elementary and Secondary Education. I requested that I be notified if this estimate could not be completed before May 19, 2007. I never received a response to this email.

17. On May 15, 2007, CREW Executive Director Melanie Sloan sent a letter to Department of Education Inspector General John Higgins requesting an investigation into the use

of private email accounts by Education officials.

18.  On May 21, 2007, having not received a response to my May 14, 2007 email requesting time estimates of various searches, I sent Ms. Arrington an email acknowledging Education's technological search limitations and proposing a narrowed search.  Email from Daniel Roth to Angela Arrington (May 21, 2007) (attached as Exhibit D).

19.  Specifically, I narrowed the scope of FOIA request Item i from the entire Department to a list of 14 of the 33 offices listed on Education's online Coordinating Structure Chart.  I chose these offices based on my judgment of where records responsive to our FOIA request might be located.

20.  In addition, FOIA request Item i sought records mentioning or relating to several enumerated reading programs and terms and "any other issue related to reading instruction or education."  In response to concerns raised by Education officials during the May 9, 2007 conference call, I narrowed this item further by deleting that phrase and replacing it with records related to "Early Reading First" and "Science-Based Reading Research."

21.  Also in response to the agency's concerns expressed on May 9, 2007, I narrowed Items ii and iii of CREW's FOIA request for contacts with and regarding all educational publishers to an enumerated list of seven publishers.

22.  Ms. Arrington states in her declaration that Item iii "borders on the nonsensical" because it "essentially seeks records of 'contacts … that …relate to contacts…'"  The sentence in the original March 28, 2007 request to which Ms. Arrington refers reads: "All Department contacts or communications that *mention or relate to* contacts with educational publishers, their

6

executives, or employees." (emphasis in original). As I believe is quite clear, the language was drafted to include intra-departmental communications regarding contacts with publishers.

23. By letter dated June 8, 2007, Ms. Cueva notified me that our fee waiver request had been denied. On June 21, 2007, I sent Education a formal appeal of the fee waiver denial.

24. Education never responded to my May 21, 2007 narrowing proposal. The first time anyone at CREW was notified that the proposal was considered inadequate was when Education filed its Motion to Dismiss.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 24th day of August 2007 in Washington, D.C.

Daniel C. Roth
Counsel
Citizens for Responsibility
    and Ethics in Washington

# EXHIBIT A



March 28, 2007

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**By fax, (202) 245-6623, and First Class mail**

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department) regulations, 34 CFR §§ 5.6 *et. seq.*

Specifically, CREW seeks any and all Department documents and records dating from January 20, 2001, to the present, in the following categories:

1.  All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2.  All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors.  The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

3.  All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees.  The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4.    To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*.  See Andrew Brownstein & Travis Hicks, <u>Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close</u>, Title I Monitor (undated) (Attached as Exhibit 1).  As these documents have been already culled and processed for disclosure, we expect production of these records in short order.  As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

Please search responsive records regardless of format, medium, or physical characteristics.  Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM.  We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs.  Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), <u>cert. denied</u>, 415 U.S. 977 (1972).  As you are aware, a <u>Vaughn</u> index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." <u>Founding Church of Scientology v. Bell</u>, 603 F.2d 945, 949 (D.C. Cir. 1979).  Moreover, the <u>Vaughn</u> index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." <u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added).  Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" <u>Id</u>. at 224 (citing <u>Mead Data Central v. U.S. Dep't of the Air Force</u>, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records.  See 5 U.S.C. § 552(b).  If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document.  <u>Mead Data Central</u>, 566 F.2d at 261.  Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a <u>Vaughn</u> index.  If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

2

## Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program, an issue on which the public record is unclear. For example, recently disclosed emails and statements by a former Department appointee appear to contradict statements by Secretary Spellings that she was not involved in Reading First until she became Secretary in January 2005. See Brownstein & Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated).

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Attachment

4

**EXHIBIT 1**

-->



THOMPSON
Insight you trust.

Home | My page | Search | News Desk | Support | Resources | Contact us

*TitleIonline*

### Congress Grills Spellings On Reading First Program
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**

"I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller,D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers … but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

## Jumping Through Hoops

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*…[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*…"[my] Department is on the line here"… and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes…as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

## A Strong Firewall

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

## Bias and Objectivity

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

http://www.thompson.com/libraries/titleionline/news_desk/tio070321...

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

**Honor System for Consultants?**

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries, "she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

**Pressure on DIBELS**

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

**Two Complaints**

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

## Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

## SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

**EXHIBIT B**



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

ASSISTANT SECRETARY

April 16, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter is in response to your fax dated March 28, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on March 29, 2007. You asked for the following information:

1.  All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS or any other issue related to reading instruction or education.

2.  All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools.

3.  All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4.  To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated).

Enclosed is a CD containing 421 pages of documents responsive to item 4 of your request. The documents provided are: documents regarding the Reading First program that were previously disclosed under FOIA to the Title I Monitor.

Page 2 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

In an effort to process your request as expeditiously as possible, we need clarification for items 1 through 3 of your request. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Items 1 through 3 of your request encompass a large volume of information on broad topics related to individuals in the Department and "White House staff", without identifying specific individuals, offices, or subjects. In addition, your request does not specify any relevant time frames. Consequently, your request does not reasonably describe the records sought, and the Department is unable to process your request regarding items 1 through 3 without further clarification. See Dale v. Internal Revenue Service, 238 F.Supp.2d 99 (D.D.C. 2002).

Fee Waiver
In addition, you have requested a fee waiver for your request. The requester bears the burden of justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S. Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the information must be in the public interest because the information primarily benefits the general public and is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) disclosure of the information must not be primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the narrow public interest cognizable under the FOIA, the Department must consider the following four (4) factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government";
2. In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested information must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the Department conclude that a requester has satisfied the first prong of the public interest element of the statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

Page 3 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

1.  Does the request involve any "commercial interest of the requester" (if not, the requester
    satisfies the second prong of the statutory fee waiver test); and
2.  If so, the agency must balance the requester's commercial interest against the identified public
    interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee
    waiver or reduction may be granted only where the public interest in disclosure is greater in
    magnitude than the requester's commercial interest.

See also 34 C.F.R. § 5.64(b)(3).

For your information, the Department does not customarily grant blanket waivers, but rather considers each
waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to provide sufficient
information to justify the Department's grant of a fee waiver. You state that, "[t]he subject of this request
concerns the operations of the federal government, and the disclosure will likely contribute to a better
understanding of relevant government procedures by CREW and the general public in a significant way."
Although not entirely clear from the information provided, the Department assumes, for the sake of
argument, that the responsive materials for items 1 through 3 of your request meet the first two elements of
the public interest prong of the statutory requirement for a fee waiver because they presumably relate to the
Department's administration of the Reading First program. However, it is clear that you have not satisfied
the burden with regard to the third and fourth elements of the public interest prong of the statutory
requirement.

As stated above, the third factor of the public interest analysis requires that the disclosure contribute to the
"understanding of the public at large," as opposed to that of the individual requester or a narrow segment
of interested persons. In order to satisfy this element of the public interest prong, the public must derive
the benefit from the disclosure of this information, and not the personal benefit that may be derived from
the requester, or a narrow segment of the population. Mells v. Internal Revenue Service, 2002 U.S. Dist.
LEXIS 24275 (D.D.C. Nov. 21, 2002). In this regard, the identity of the requester will be considered so
that an agency may determine whether the requester is in a position to contribute to the public
understanding through the disclosure of the requested materials. Burriss v. CIA, 524 F. Supp. 448 (M.D.
Tenn. 1981). As part of this analysis, the Department will consider whether the requester has the expertise
in the subject area, and a demonstrated ability and intent to disseminate the information to the general
public. Id. Additionally, while not for profit organizations are often capable of disseminating information,
they do not automatically qualify for a waiver or reduction of fees because of their non-profit status.
VoteHemp, Inc. v. DEA, 237 F. Supp. 2d 55 (D.D.C. 2002); see also McClain v. U.S. Dep't of Justice, 13
F.3d 220, 221 (7th Cir. 1993).

In your request you have indicated that "CREW will disseminate any documents it acquires from this
request to the public .... [through] an interactive website where members of the public can analyze and
comment on public documents[.] ... Currently, this site contains links to thousands of pages of documents
CREW acquired from multiple FOIA requests." While this statement does demonstrate that you intend to
disseminate the information, it does not demonstrate how the potentially responsive documents in this case
will contribute to the "understanding of the public at large." Based upon your letter, it appears that
members of the public would have to individually "analyze" the data to reach any possible understanding
of the information. Consequently, you have failed to meet the third prong of the public interest analysis.

Page 4 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The fourth element of the public interest prong of the statutory requirement for a fee waiver requires that
the disclosure must "contribute significantly" to public understanding of government operations or
activities. For this element, an agency is required to determine whether the disclosure of the information
will make a significant contribution to the public's understanding of the operations or activities of
government.  D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development, 85 F.Supp.2d
46, 49 (D.D.C. 2000).  "Significance" is measured by a likely enhancement of the public's understanding
of the subject at issue as a result of the disclosure, compared to the public's level of understanding of that
same issue prior to disclosure.  Id.; see also Judicial Watch v. U.S. Department of Justice, 185 F.Supp.2d
54, 62 (D.D.C. 2002).

In your letter, you stated "the disclosures [of the information] will likely contribute to a better
understanding of relevant government procedures by … the general public in a significant way", and
specifically, refer to "the public's understanding of the extent of White House involvement in the
administration of the Reading First program[.]"  It is interesting to note that you refer to an article on the
very issue that you contend is unclear.  Accordingly, information regarding this issue already exists in the
public domain.  Consequently, you have failed to show how the disclosure of the requested information
will significantly enhance the public's understanding of the Reading First program beyond the information
that already exists in the public domain.  Carney v. U.S. Dep't of Justice, 19 F.3d 807, 815 (2d Cir. 1994).

In sum, the Department's denies your request for a fee waiver in the present case.

Fees are charged for searching/reviewing and duplication for responsive records.  The fee is calculated in
accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61.  The
search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge
and the duplication costs are ten cents per photocopied page.  Our regulations, 34 CFR § 5.61 require us to
allow you to modify your request if the cost is more than $25.00.  In addition, in accordance with 34 CFR
§ 5.62(a)(2), if the cost is to be greater than $250.00, the requester must pay in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter.  Your
appeal should be received by the FOIA office on or before
Mary 24, 2007.  Your appeal should be accompanied by a copy of your initial letter of request and this
denial letter, and should contain any evidence or argument you wish the Department to consider in making
an administrative determination on your appeal.

**Appeal Address:**

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: FOIA Appeals
Washington, DC  20202-4500

Page 5 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request. Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS


Enclosures

**EXHIBIT C**

## Dan Roth

| | |
|---|---|
| **From:** | Dan Roth |
| **Sent:** | Monday, May 14, 2007 1:28 PM |
| **To:** | 'EDFOIAManager@ed.gov' |
| **Subject:** | No. 07-00517-F Narrowing Discussion |

Dear Ms. Arrington,

As we discussed earlier today, I am writing to memorialize our conversation about narrowing CREW's March 28, 2007 FOIA request.

As I understand it from last Wednesday's telephone conversation, the Department's key concern with respect to our FOIA is that CREW is seeking records from "any Department office, including any and all field offices." Ms. Marcela Goodridge stated that the Department's FOIA technology does not allow for subject matter or keyword searches throughout the email system, so a search undertaken pursuant to the original terms of our request would require individual searches of each of the Department's approximately 4,500 employee email accounts. Additionally, Ms. Goodridge noted that email communications on personal email accounts would not be covered by such a search (which is an issue that has arisen in the past).

In order to aid CREW in the narrowing process, we request the following information from the Department:

1) An estimate of the time it would take to process CREW's request if we do not narrow it further
2) An estimate of the time it would take to process our request if we narrow and request communications only within the a) Office of the Secretary and b) Office of Elementary and Secondary Education.

If these time estimates will not be available before May 19 (this coming Friday), please let me know.

In addition, you affirmed that it would be helpful for CREW to limit the list of publishers in items 2 and 3 to the seven publishers already listed. We are considering a limitation along those lines (which would eliminate the phrase "includes, but is not limited to " in items 2 and 3 of the March 28 request) but have not yet made a decision.

CREW will formalize any narrowing language in a letter to the Department as soon as we receive the requested information.

Finally, I neglected to ask on the phone whether a copy of the Title I Monitor FOIA would be forthcoming soon, but I'll renew my request for it here.

Again, I greatly appreciate your time and assistance with this request. Please contact me any time.

Best Regards,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

------------------------------------------------------------------------------------------------------------------------
-----------------------------------------------------------------
This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

**EXHIBIT D**

# Dan Roth

| | |
|---|---|
| **From:** | Dan Roth |
| **Sent:** | Monday, May 21, 2007 3:18 PM |
| **To:** | 'EDFOIAManager@ed.gov' |
| **Subject:** | 07-00517-F Proposed Narrowing Terms |

Dear Ms. Arrington,

   As we discussed on May 9 and May 14, CREW is seeking to aid the Department in its search for responsive records by narrowing the terms of our March 28, 2007 FOIA request, No. 07-00517-F. Though our request sufficiently describes the records we seek, you and others at the Department have advised us that technological limitations of the Department's email search technology would require the Department to search approximately 4,500 email accounts unless the request is narrowed further. Accordingly, we suggest the following narrowed terms for the search in response to Request No. 07-00517-F:

   Any and all documents and records from January 20, 2001, to the present, in the offices of: 1) The Secretary, 2) Senior Counselor, 3) Chief of Staff, 4) Deputy Secretary, 5) Management Improvement Team, 6) Elementary and Secondary Education, 7) Institute of Education Sciences, 8) Planning Evaluation and Policy Development, 9) Civil Rights, 10) Innovation and Improvement, 11) Special Education and Rehabilitative Services, 12) Management, 13) Chief Financial Officer and 14) Communications and Outreach, in the following categories:

1. All communications of the above-listed offices to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR" or DIBELS.

2. All communications of the above-listed offices, including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.

3. All communications of the above-listed offices, including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited, to Randy Best), Cambium Learning, Sopris West, and Intellitools.

   Apart from Item 4 of CREW's original request, to which the Department has already responded in the form of a CD containing documents previously disclosed to the *Title I Monitor* and received by CREW on April 23, 2007, all other language in CREW's original request (pages 2-4) remains unchanged. We also note that it is not only emails, but "all communications," that CREW requested.

   Thank you for your time and attention to this matter.

Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

---

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND | : | |
| ETHICS IN WASHINGTON, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:07-cv-00963 (RMU) |
| | : | |
| U.S. DEPARTMENT OF EDUCATION, | : | |
| | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**[PROPOSED] ORDER**

Upon consideration of Defendant's Motion to Dismiss, Plaintiff's Opposition thereto and

the entire record herein, and for the reasons explained in the Memorandum Opinion issued on

this date, it is hereby

**ORDERED** that Defendant's motion to dismiss be, and hereby is, **DENIED**.

Dated: _____                                            _____
                                                               RICARDO M. URBINA
                                                               United States District Court Judge