## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND | : |
| ETHICS IN WASHINGTON | : |
| 1400 Eye Street, N.W., Suite 450, | : |
| Washington, D.C.  20005 | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| U.S. DEPARTMENT OF EDUCATION | : |
| 400 Maryland Avenue, S.W. | : |
| Washington, D.C. 20202, | : |
| | : |
| MARGARET SPELLINGS, | : |
| SECRETARY OF EDUCATION | : |
| (in her official capacity) | : |
| U.S. DEPARTMENT OF EDUCATION | : |
| 400 Maryland Avenue, S.W. | : |
| Washington, D.C. 20202 | : |
| | : |
| THE NATIONAL ARCHIVES AND | : |
|    RECORDS ADMINISTRATION | : |
| 8601 Adelphi Road | : |
| College Park, MD 20740 | : |
| | : |
| DR. ALLEN WEINSTEIN, ARCHIVIST | : |
|    OF THE UNITED STATES (in his | : |
| official capacity) | : |
| 8601 Adelphi Road | : |
| College Park, MD 20740 | : |
| | : |
| Defendants. | : |

Civil Action No. 1:07-cv-00963 (RMU)

_____:

## MOTION TO AMEND COMPLAINT AND MEMORANDUM IN SUPPORT

Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") hereby moves

to file the attached Amended Complaint pursuant to Rule 15(a) of the Federal Rules of Civil

Procedure.  As ground for this motion, Plaintiff states as follows:

1.  On May 23, 2007, CREW filed its complaint against defendant Department of

Education ("Education"), under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 and

the Federal Records Act ("FRA"), 44 U.S.C. §§ 2101 et seq., 2901 et seq., 3010 et seq., and

3301 et seq., which includes the Disposal of Records Act, 44 U.S.C. §§ 3301-3314, challenging

as contrary to law the knowing failure of Education to preserve copies of electronic records of

official Education business created by agency employees through the use of outside (i.e., non-

governmental) email accounts.

2. On May 23, 2007, CREW also sent a letter to Education Secretary Margaret Spellings

advising her that it had filed a lawsuit against Education challenging its failure to preserve copies

of electronic records of official Education business created by agency employees through the use

of non-governmental email accounts.  CREW further requested that Secretary Spellings, with the

assistance of the Archivist, initiate action to prevent further removal or destruction of the

electronic records, as required by 44 U.S.C. § 3106.

3. On May 15, 2007, prior to filing this lawsuit, CREW sent a letter to Education's

Inspector General requesting that he commence an immediate investigation to assess the extent

and duration of Education's practice of using outside email accounts to conduct official business,

and the effect of this practice on all of the records requests to the Department of Education.

CREW copied the Archivist in its letter to the Inspector General.

4. On July 23, 2007, Education filed a motion to dismiss CREW's lawsuit for lack of

standing.  CREW opposed Education's motion on August 24, 2007.  Education filed a reply on

September 10, 2007, CREW filed a Motion for leave to file a Surreply and filed its Surreply on

September 10, 2007.

5. CREW has not received any response to its May 23, 2007 letter to Secretary Spellings

requesting that she initiate some action to prevent the further destruction of electronic records of official Education business created by agency employees through the use of non-governmental email accounts. Nor has CREW received any response to its May 15, 2007 letter requesting an investigation into Education's use of outside email accounts from Education's Inspector General or the Archivist.

6. If the Archivist learns of "any actual, impending, or threatened unlawful removal . . . or destruction of records in the custody of [an] agency," the Archivist is required to notify the head of the agency and assist the agency head in initiating an action for the recovery of records wrongfully removed. 44 U.S.C. § 2905(a). If the agency head does not initiate such action, the Archivist "shall request the Attorney General to initiate such action, and shall notify the Congress when such a request has been made." Id.

7. Since CREW has not been made aware of either the Secretary of Education or the Archivist initiating any such action to prevent the further destruction of electronic records by Education employees, or any action to recover records wrongfully removed, CREW is under the belief that this practice continues within Education.

8. CREW also has not received any additional information responsive to its March 28, 2007 FOIA, other than Education's initial response to CREW's FOIA request item number four. CREW has exhausted all of its administrative remedies as to its FOIA request.

9. On September 6, 2007, Education affirmed its denial of CREW's second fee waiver appeal of June 21, 2007. CREW has exhausted all of its administrative remedies as to its fee waiver request from Education.

10. Based on this information, CREW seeks to amend its May 23, 2007 complaint

3

against Education, to add Secretary Spellings, NARA and the Archivist, as defendants to its FRA

claim.  CREW further seeks to amend its original complaint to add claims under FOIA, 5 U.S.C.

§§ 552(a)(3)(A), 552(a)(4)(B), for Education's failure to release agency records to CREW, and 5

U.S.C. § 552(a)(4)(A)(iii) and agency regulations, 34 CFR § 5.64(a), for Education's violation of

FOIA's mandate to grant CREW a fee waiver.

11.  Education will not be prejudiced by this amendment given that the Secretary of

Education received a letter on May 23, 2007 requesting that she investigate and initiate an action

to prevent the further destruction of electronic records within Education, and the other claims as

set forth in the Amended Complaint arise from the same facts as the original Complaint.  The

defendant, therefore, has been on notice of the basis for these claims since May 23, 2007.

12.  Under these circumstances, the Court should grant CREW leave to amend its

complaint.  See Hill v. The Federal Judicial Center, 2007 U.S. App. LEXIS 11901 (D.C. Cir.,

May 14, 2007) (Generally, the court will grant a party leave to amend a complaint in the absence

of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure

deficiencies or futility).

13.  Counsel for Education has represented that Education and NARA oppose the

granting of this motion.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this motion be granted.

Respectfully submitted,

_____/s/_____

Anne L. Weismann
(D.C. Bar No. 298190)
Kimberly D. Perkins
(D.C. Bar No. 481460)
Melanie Sloan
(D.C. Bar No. 434584)

4

Citizens for Responsibility and Ethics
 In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone:  (202) 408-5565
Attorneys for Plaintiff

Dated: September 20, 2007

Anne L. Weismann
D.C. Bar No. 298190
Kimberly D. Perkins
D.C. Bar No. 481460
Melanie Sloan
D.C. Bar No. 434584
Citizens for Responsibility
   and Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, D.C.  20005
202-408-5565

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON 1400 Eye Street, N.W., Suite 450, Washington, D.C.  20005           Plaintiff,       v. U.S. DEPARTMENT OF EDUCATION 400 Maryland Avenue, S.W. Washington, D.C. 20202, MARGARET SPELLINGS, SECRETARY OF EDUCATION (in her official capacity) U.S. DEPARTMENT OF EDUCATION 400 Maryland Avenue, S.W. Washington, D.C. 20202 THE NATIONAL ARCHIVES AND RECORDS ADMINISTRATION 8601 Adelphi Road College Park, MD 20740 DR. ALLEN WEINSTEIN, ARCHIVIST OF THE UNITED STATES (in his official capacity) | Civil Action No. 1:07-cv-00963 (RMU) |

8601 Adelphi Road                          :
College Park, MD 20740                     :
                                           :
                    Defendants.            :
_____ :

## AMENDED COMPLAINT FOR
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1.  This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706,

and the Federal Records Act ("FRA"), 44 U.S.C. §§ 2101 et seq., 2901 et seq., 3010 et seq., and

3301 et seq., which includes the Disposal of Records Act, 44 U.S.C. §§ 3301-3314, challenging

as contrary to law the knowing failure of the U.S. Department of Education ("Education") to

preserve copies of electronic records of official Education business created by agency employees

through the use of outside (i.e., non-governmental) email accounts, and the failure of the

Secretary of Education and the Archivist to take enforcement action to ensure adequate

preservation of all agency records.

2.  This is also an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §

552, as amended, as well as agency FOIA regulations challenging the failure of Education to

fulfill the request of Plaintiff for documents relating to communications between officials at

Education concerning the Reading First and Early Reading First programs.

3.  This case seeks declaratory relief that Education's record-keeping guidelines and

directives are arbitrary, capricious, and contrary to the FRA because they fail to ensure

preservation of electronic records created in the conduct of agency business.  In addition,

plaintiff seeks injunctive relief requiring the Archivist to fulfill his mandatory statutory duty to

notify Congress and ask the Attorney General to initiate legal action to ensure that Education

complies fully with its obligations under the FRA.

2

4.  Plaintiff also seeks declaratory relief that the Secretary and Archivist's failure to seek the initiation of an enforcement action by the Attorney General is arbitrary, capricious and in violation of their responsibilities under the FRA.  In addition, plaintiff seeks injunctive relief requiring the Archivist to fulfill his mandatory duty to notify Congress and ask the Attorney General to initiate legal action to ensure Education complies fully with its obligations under the FRA and to ensure the preservation and recovery of the electronic records of Education employees.

5.  This case also seeks declaratory relief that defendant Education is in violation of the FOIA for failing to fulfill plaintiff's request for records and failing to grant plaintiff's request for a waiver of fees, in violation of the FOIA and agency regulations; and injunctive relief that defendant immediately and fully comply with plaintiff's request under the FOIA.

## JURISDICTION AND VENUE

6.  This Court has both subject matter jurisdiction and personal jurisdiction over this action pursuant to 5 U.S.C. § 702, which gives the Court jurisdiction over agency actions where an aggrieved party has suffered wrong within the meaning of a "relevant statute," here the FRA. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B).  Venue lies in this district under 5 U.S.C. § 703, 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

## PARTIES

7.  Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code.  CREW is committed to protecting the right of citizens to be informed about the activities of government

officials and to ensuring the integrity of government officials.  CREW is dedicated to

empowering citizens to have an influential voice in government decisions and in the

governmental decision-making process.  To advance its mission, CREW uses a combination of

research, litigation, and advocacy.  As part of its research, CREW uses government records made

available to it under the Freedom of Information Act ("FOIA").

     8.  CREW has invested considerable organizational resources in pushing the U.S.

government to take ethics issues seriously.  CREW monitors closely the laws and rules

applicable to government agencies.

     9.  CREW has sought records from Education under the FOIA in the past and intends to

seek similar records in the future, given their usefulness in identifying the actual policies and

practices of Education.

     10.  CREW is harmed by Education's failure to adopt and comply with record-keeping

guidelines and directives mandated by the FRA, because that failure has denied CREW access to

records that are a critical part of the evidentiary record concerning Education's implementation

of the Reading First Program and other aspects of the No Child Left Behind Act -- information

that is "in the public interest."  44 U.S.C. § 3303(a)(c)(3); see also American Friends Service

Comm. v. Webster, 720 F.2d 29 (D.C. Cir. 1983).

     11.  CREW is harmed by the Archivist's and Secretary's failure to fulfill their mandatory

statutory duty to seek redress for Education's failure to preserve the electronic records of agency

employees because that failure has placed Education records beyond CREW's reach under the

FOIA and deprived CREW and the public of important historical evidence.

     12.  CREW is further harmed by Education's failure to comply with the FOIA, because

4

that failure harms CREW's ability to provide full, accurate and current information to the public. 5 U.S.C. § 552(a)(6)©).

13. Defendant Education is an agency within the meaning of 5 U.S.C. § 702 and 5 U.S.C. § 552(f). Education has adopted a record-keeping policy that has resulted in the agency's failure to preserve agency records and is responsible for the harm done to CREW's ability to obtain and make public those records. See 44 U.S.C. §§ 3301, et seq.; 5 U.S.C. § 702. Defendant is also the federal agency with possession and control of the request records and is responsible for fulfilling plaintiff's FOIA request.

14. Defendant Margaret Spellings is the Secretary of the Department of Education. As agency head, she has mandatory statutory duties to submit schedules to the Archivist for the disposition of all Education records, to maintain safeguards to prevent the removal of Education records, to provide adequate training in records management, to issue orders sufficient to enforce regulations issued by the Archivist of the United States, to notify the Archivist of any threatened destruction or removal of Education records and to initiate enforcement actions through the Attorney General to recover unlawfully removed records. 44 U.S.C. §§ 3101, 3301.

15. Defendant National Archives and Records Administration ("NARA") is the primary agency responsible for assisting federal agencies in maintaining adequate and proper documentation of policies and transactions of the Federal Government. NARA is tasked with appraising records, regulating and approving the disposition of federal records, operating Federal Records Centers and preserving permanent records.

16. Defendant Archivist of the United States ("Archivist") supervises and directs NARA. 44 U.S.C. § 2102. The Archivist is responsible for the preservation of both federal records and

presidential records.  Under the Federal Records Act, federal records may be disposed of only

with authorization from the Archivist.  If the Archivist discovers any actual or impending

destruction of federal records, the Archivist is under a statutory obligation to initiate action

through the Attorney General to restore the records.

## STATUTORY FRAMEWORK

### The Federal Records Act

17.  The FRA is a collection of statutes that governs the creation, management and

disposal of federal records.  See generally 44 U.S.C. §§ 2101 et seq., 2901 et seq., 3010 et seq.,

and 3301 et seq.  Among other things, the FRA ensures "[a]ccurate and complete documentation

of the policies and transactions of the Federal Government," as well as "judicious preservation

and disposal of records."  44 U.S.C. § 2902.

18.  To fulfill this purpose, the FRA requires the head of each agency to "make and

preserve records containing adequate and proper documentation of the organization, functions,

policies, decisions, procedures, and essential transactions of the agency."  Id. at § 3101.  Under

the statute, each agency must also "establish and maintain an active, continuing program for the

economical and efficient management of the records of the agency," id. at § 3102, and must

"establish safeguards against the removal or loss of records" the agency head determines are

necessary and required by regulations of the Archivist.  Id. at § 3105.

19.  The FRA also prescribes the exclusive mechanism for the disposal of federal records,

which it defines to include:

> all books, papers, maps, photographs, machine readable
> materials, regardless of physical form or characteristics,
> made or received by an agency of the United States
> Government under Federal law or in connection with

6

> the transaction of public business and preserved or
> appropriate for preservation by that agency . . as evidence
> of the organization, functions, policies, decisions, procedures
> operations, or other activities of the Government or because
> of the informational value of data in them.

44 U.S.C. § 3301.  No records may be "alienated or destroyed" except pursuant to the disposal

provisions of the FRA.  Id. at § 3314.

20.  The Archivist administers the provisions of the FRA and may authorize an agency to

dispose of records that the agency no longer needs and that do not have "sufficient

administrative, legal, research, or other value to warrant their continued preservation by the

Government."  44 U.S.C. § 3303a(a).  Only if the Archivist determines that agency records do

not have administrative, legal, research, or other value can the Archivist authorize their disposal.

Id. at §§ 3303a(a), (d), and (e).

21.  An agency wishing to dispose of records must first submit to the Archivist either lists

of records the agency head determines "are not needed by it in the transaction of its current

business," 44 U.S.C. § 3303a(2), or "schedules proposing the disposal after the lapse of specified

periods of time of records of a specified form or character" that the agency head determines will

not have "sufficient administrative, legal, research, or other value to warrant their further

preservation by the Government."  Id. at § 3303a(3).  Upon receipt of such a request, the

Archivist must issue a notice requesting public comment on the agency's proposal and the

Archivist's staff must conduct its own assessment of the value of the records the agency is

proposing to destroy.  Id. at § 3303a(a).  The Archivist is free to accept or reject an agency's

proposal.  Id.

22.  If the Archivist learns of "any actual, impending, or threatened unlawful removal . . .

or destruction of records in the custody of [an] agency," the Archivist is required to notify the head of the agency and assist the agency head "in initiating action through the Attorney General for the recovery of records wrongfully removed and for other redress provided by law." 44 U.S.C. § 2905(a). If the agency head does not initiate such action, the Archivist "shall request the Attorney General to initiate such action, and shall notify the Congress when such a request has been made." Id.

23. The FRA places a similar and independent duty on the head of each federal agency to "initiate action through the Attorney General for the recovery of records he knows or has reason to believe have been transferred to his legal custody." 44 U.S.C. § 3106. If the agency head refuses to pursue legal remedies him or herself, the Archivist, again, must request that the Attorney General take action and must inform Congress that he has made this request. 44 U.S.C. § 3106.

## The Freedom of Information Act

24. The FOIA, 5 U.S.C. § 552, requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.

25. An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination whether or not to fulfill the request, and of the requester's right to appeal the agency's determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

26. An agency must respond to a FOIA appeal within 20 working days, notifying the appealing party of the agency's determination to either release the withheld records or uphold the denial. 5 U.S.C. § 552(a)(6)(A)(ii).

27. This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

28. The FOIA provides a mechanism for disciplinary action against agency officials who have acted inappropriately in withholding records. Specifically, when requiring the release of improperly withheld records, if the Court makes a written finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously," a disciplinary investigation is triggered. 5 U.S.C. § 552(a)(4)(F).

29. The FOIA also requires each agency to promulgate regulations specifying a fee schedule for the processing of FOIA requests and establishing procedures and guidelines for the waiver or reduction of fees. 5 U.S.C. § 552(a)(4)(A). Defendant Education's fee waiver regulations are found at 34 CFR § 5.64. Both the FOIA and Education regulations provide that documents should be produced at no charge to the requester or at a reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); 34 CFR § 5.64(a).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

30. On March 28, 2007, CREW sent a FOIA request to Education seeking records, regardless of format and including electronic records and information, of communications and other contacts concerning the Reading First program. Letter from Daniel C. Roth to U.S. Department of Education, Office of Management, March 28, 2007 (attached as Exhibit A).

31. On April 16, 2007, Education sent CREW a letter acknowledging CREW's FOIA

9

request, enclosing a CD containing 421 pages of documents in response to item 4 of the FOIA request, seeking clarification for items 1 through 3 of the FOIA and denying CREW's fee waiver request.  See Letter from Maria-Teresa Cueva to Daniel C. Roth, April 16, 2007 (attached as Exhibit B).

32.    On May 9, 2007, CREW's counsel participated in a conference call with Education about CREW's FOIA request.  Education officials -- who included representatives from the agency's FOIA office, its Office of the General Counsel and its Office of Elementary and Secondary Education -- advised CREW that the agency could not search for email pertaining to any particular subject matter without having the identity of a specific recipient or sender.  In addition, a Department official advised CREW that Education personnel "often use private email addresses" and that Education "wouldn't have access to that."  Education officials confirmed that agency personnel use private email accounts for official business and that this issue had arisen in the past in the context of other FOIA requests.  See Letter from Melanie Sloan, Executive Director, CREW to John P. Higgins, Jr., Inspector General, Education, May 15, 2006 (attached as Exhibit C).

33.    On May 11, 2007, CREW sent an email to Education appealing its denial of CREW's fee waiver request.  Email from Daniel C. Roth to Angela Arrington, May 11, 2007 (attached as Exhibit D).

34.    In a follow-up telephone call on May 14, 2007, an Education FOIA officer confirmed to CREW's counsel that Education employees sometimes use private email addresses to conduct official business, that such material would not be included in the agency's response to CREW's FOIA request and that this issue had come up in the past.

10

35.  In light of this information, CREW sent a letter to Education's Inspector General dated May 15, 2007, requesting that he commence an immediate investigation "to assess the extent and duration" of Education's practice of using outside email accounts to conduct official business, "the amount of official correspondence that has been lost or destroyed, and the effect of this practice on all records requests to the Department of Education."  Letter from Melanie Sloan, Executive Director, CREW to John P. Higgins, Jr., Inspector General, Education, May 15, 2006 (attached as Exhibit C).

36.  CREW's May 15 letter also pointed out that in addition to CREW's FOIA request, reporters have also been requesting agency documents under the FOIA, as has Rep. George Miller, Chairman of the House Committee on Education and Labor.  Id.

37.  On May 21, 2007, CREW sent an email to Education narrowing its FOIA request in order to aid Education in its search for records responsive to the request.  Email from Dan Roth to Angela Arrington, May 21, 2007 (attached as Exhibit E).

38.  On May 23, 2007, CREW sent a letter to Secretary Spellings advising her that it had filed a lawsuit against the Department of Education challenging the failure of the agency to preserve copies of electronic records of official Education business created by agency employees through the use of non-governmental email accounts.  CREW further requested that Secretary Spellings, with the assistance of the Archivist, initiate action to prevent the further removal or destruction of the electronic records.  See Letter from Melanie Sloan, Executive Director, CREW to Secretary of Education Margaret Spellings, May 23, 2007 (attached as Exhibit C).

39.  Neither the Secretary nor the Archivist has initiated any action to prevent the further removal or destruction of electronic records.

40.  On June 8, 2007, Education sent CREW a letter responding to CREW's May 11, 2007 email appealing Education's initial denial of CREW's request for a fee waiver.  In its letter, Education affirmed its denial of CREW's request for a fee waiver.  See Letter from Maria Teresa Cueva to Daniel C. Roth, June 8, 2007 (attached as Exhibit F).

41.  On June 21, 2007, CREW sent Education another letter appealing Education's denial of CREW's fee waiver request. See Letter from Daniel C. Roth to Office of Management, June 21, 2007 (attached as Exhibit G).  CREW's letter outlined all of the previous communications between it and Education, including CREW's narrowing of its FOIA request.  The letter also discussed, in detail, how CREW satisfied the two-prong statutory test for a fee waiver.  Id.

42.  On August 23, 2007, Education sent a letter responding to CREW's May 11, 2007 email that narrowed its original FOIA request.  See Letter from Maria-Teresa Cueva to Daniel C. Roth, August 23, 2007 (attached as Exhibit H).

43.  On September 6, 2007, Education affirmed its denial of CREW's second fee waiver appeal of June 21, 2007.  See Letter from Michell Clark to Daniel C. Roth, September 6, 2007 (attached as Exhibit I).

44.  To date, CREW has not received copies of any emails responsive to its March 28, 2007 FOIA request that were sent or received by Education employees using outside email accounts.

45.  The statutory time limit for Education to respond to CREW's FOIA request has run out and Plaintiff has constructively exhausted its administrative remedies.  5 U.S.C. § 552(a)(6)(c).

46.  CREW has also exhausted its administrative remedies with respect to its request for a

waiver of fees associated with the processing of CREW's FOIA request.  See, e.g., Oglesby v. U.S. Dep't. of Army, 920 F.2d 57, 65 (D.C. Cir. 1990).

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE
**(Policy to Fail to Maintain Records Subject to the FRA)**
**(Against Defendant Education and Secretary Spellings)**

47.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

48.  The electronic records that Education creates when it uses outside email accounts to conduct official business are records within the meaning of the Federal Records Act, 44 U.S.C. § 3314.  Accordingly, any agency policy regarding preservation of these records must conform to the requirements of the FRA.

49.  The policy of Education to permit agency employees to use outside email accounts to conduct official business with the knowledge that electronic records created as a result of that use were and continue to be sought under the FOIA is arbitrary, capricious, and contrary to law because it results in the failure to preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency.  44 U.S.C. § 3101.

50.  As a result of Education's unlawful policy in violation of the FRA, plaintiff was denied a right of access to information in the public interest, including evidence concerning how Education has implemented the Reading First program.

### CLAIM TWO
**(Policy to Destroy Records Subject to the FRA)**
**(Against Defendant Education and Secretary Spellings)**

51.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

52.  The electronic records that Education creates when it uses outside email accounts to conduct official business are records within the meaning of the Federal Records Act, 44 U.S.C. § 3314.  Accordingly, any agency policy that permits or authorizes disposal or non-preservation of these records must conform to the requirements of the FRA.

53.  The policy of Education to permit agency employees to use outside email accounts to conduct official business and then to dispose of any electronic records created by that use is arbitrary, capricious and contrary to law because it permits the disposal of records that have administrative, legal, research, or other value and because it permits the disposal of records that have not been subject to a disposition schedule that has been subject to notice and public comment and approved by the Archivist.  Id. at  §§ 3303(a), (d) and (e).

54.  As a result of Education's unlawful policy in violation of the FRA, plaintiff was denied a right of access to information in the public interest, including evidence of how Education has implemented the Reading First program.

55.  As a result of Education's unlawful policy, plaintiff was denied its right to notice and the opportunity to comment on the proposed destruction of agency records.

## CLAIM THREE
### (Refusal to Take Enforcement Action)
### (Against Defendant Archivist and Secretary Spellings)

56.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

57.  Under the Federal Records Act, the Archivist has a mandatory duty to assist the head of an agency, after notice to that head, in initiating an action through the Attorney General to prevent the actual, threatened or impending removal or destruction of records in the agency's custody.  44 U.S.C. § 2905(a).  If the agency head fails to act, the Archivist is required to

directly request the Attorney General to initiate an enforcement action and to notify Congress upon such a request.  Id.

58.  The Archivist has violated his mandatory, non-discretionary duty since May 15, 2007, when he was put on notice in a letter CREW sent to Inspector General Higgins requesting that the Inspector General commence an immediate investigation to assess the extent and duration of Education's practice of using outside email accounts to conduct official business.

59.  Education Secretary Spellings has violated her mandatory, non-discretionary duty to maintain safeguards to prevent the removal of Education records, to issue orders sufficient to enforce regulations issued by the Archivist, to notify the Archivist of any threatened destruction or removal of Education records and to initiate enforcement actions through the Attorney General to recover unlawfully removed records.

60.  Plaintiff and the public are harmed by the Archivist's failure to seek the initiation of an enforcement action through the Attorney General, as this failure threatens to keep from public access important documents with administrative, legal, research or other value.

61.  Plaintiff is entitled by law to access the records requested under the FOIA, unless defendant makes an explicit and justified statutory exemption claim.

62.  Therefore, defendant violated FOIA's mandate to release agency records to the public by failing to release the records as plaintiff specifically requested.  5 U.S.C. §§ 552(a)(3)(A), 552(a)(4)(B).

**CLAIM FOUR**
**(Failure to Produce Records)**

**(Against Defendant Education)**

63.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

64.  Plaintiff properly asked for records within Education's control.

65.  Plaintiff is entitled by law to access to the records requested under the FOIA, unless defendant makes an explicit and justified statutory exemption claim.

66.  Therefore, defendant violated FOIA's mandate to release agency records to the public by failing to release the records as Plaintiff specifically requested.  5 U.S.C. §§ 552(a)(3)(A), 552(a)(4)(B).

**CLAIM FIVE**
**(Improper Denial of Fee Waiver)**
**(Against Defendant Education)**

67.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

68.  Plaintiff has demonstrated that it is entitled to a waiver of fees associated with processing its FOIA request, because disclosure of responsive records will likely contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the plaintiff.

69.  Therefore, defendant violated FOIA's mandate to grant plaintiff a fee waiver and defendant's own regulations when it denied plaintiff's administrative appeals and upheld defendant's initial determination that plaintiff is not entitled to a waiver of fees.  5 U.S.C. § 552(a)(4)(A)(iii); 34 CFR § 5.64(a).

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court:

(1) Declare that Education's policy of  permitting agency employees to use outside email

16

accounts to conduct official business with the knowledge that electronic records created as a result of that use are not being preserved as agency records is arbitrary, capricious and contrary to law;

(2) Declare that Education's policy of knowingly permitting agency employees to destroy electronic records created by agency employees in the conduct of agency business through the use of outside email accounts is arbitrary, capricious and contrary to law;

(3) Declare that Education has violated the Freedom of Information Act by failing to lawfully satisfy plaintiff's narrowed FOIA request of May 21, 2007;

(4) Declare that Education violated the Freedom of Information Act and agency regulations when it determined that plaintiff is not entitled to a waiver of fees associated with the processing of its FOIA request and declare that plaintiff is entitled to a fee waiver;

(5) Declare that the Archivist and Secretary have breached their statutory duties to take enforcement action to prevent Education from destroying records in contravention of the FRA and to recover and preserve the electronic records of employees using outside email accounts.

(6) Order the Archivist and Secretary to fulfill their mandatory statutory duties to ask the Attorney General to initiate legal action to ensure that Education complies fully with its obligations under the FRA with corresponding notice to Congress.

(7) Order Education to release immediately all records responsive to plaintiff's FOIA request at no cost to plaintiff;

(8) Award plaintiff reasonable attorney fees and litigation costs in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

(9) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,


_____/s/_____

Anne L. Weismann
(D.C. Bar No. 298190)
Kimberly D. Perkins
(D.C. Bar No. 481460)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (20) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

September 20, 2007

# EXHIBIT A



CREW | citizens for responsibility and ethics in washington

March 28, 2007

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**By fax, (202) 245-6623, and First Class mail**

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department") regulations, 34 CFR §§ 5.6 *et. seq.*

Specifically, CREW seeks any and all Department documents and records dating from January 20, 2001, to the present, in the following categories:

1.    All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2.    All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

3.    All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4.    To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*.  See Andrew Brownstein & Travis Hicks, <u>Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close</u>, Title I Monitor (undated) (Attached as Exhibit 1).  As these documents have been already culled and processed for disclosure, we expect production of these records in short order.  As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

Please search responsive records regardless of format, medium, or physical characteristics.  Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM.  We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs.  Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), <u>cert</u>. <u>denied</u>, 415 U.S. 977 (1972).  As you are aware, a <u>Vaughn</u> index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." <u>Founding Church of Scientology v. Bell</u>, 603 F.2d 945, 949 (D.C. Cir. 1979).  Moreover, the <u>Vaughn</u> index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." <u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added).  Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" <u>Id</u>. at 224 (citing <u>Mead Data Central v. U.S. Dep't of the Air Force</u>, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records.  See 5 U.S.C. § 552(b).  If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. <u>Mead Data Central</u>, 566 F.2d at 261.  Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a <u>Vaughn</u> index.  If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

2

### Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program, an issue on which the public record is unclear. For example, recently disclosed emails and statements by a former Department appointee appear to contradict statements by Secretary Spellings that she was not involved in Reading First until she became Secretary in January 2005. See Brownstein & Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated).

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

### Conclusion

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

3

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Attachment

4

**EXHIBIT 1**

Congress Grills Spellings On Reading Fi\. rogram                 http://www.thomp\_son.com/libraries/titleionline/news_desk/tio070321...

-->



Home · | My page | Search | News Desk | Support | Resources | Contact us



**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**

"I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller, D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

### Jumping Through Hoops

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

### A Strong Firewall

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

### Bias and Objectivity

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

### Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries," she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

### Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

### Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

### Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

### SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

# EXHIBIT B



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF MANAGEMENT

ASSISTANT SECRETARY

April 16, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter is in response to your fax dated March 28, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on March 29, 2007. You asked for the following information:

1. All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS or any other issue related to reading instruction or education.

2. All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools.

3. All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4. To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated).

Enclosed is a CD containing 421 pages of documents responsive to item 4 of your request. The documents provided are: documents regarding the Reading First program that were previously disclosed under FOIA to the Title I Monitor.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-4500
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

Page 2 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

In an effort to process your request as expeditiously as possible, we need clarification for items 1 through 3 of your request. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Items 1 through 3 of your request encompass a large volume of information on broad topics related to individuals in the Department and "White House staff", without identifying specific individuals, offices, or subjects. In addition, your request does not specify any relevant time frames. Consequently, your request does not reasonably describe the records sought, and the Department is unable to process your request regarding items 1 through 3 without further clarification. See Dale v. Internal Revenue Service, 238 F.Supp.2d 99 (D.D.C. 2002).

Fee Waiver
In addition, you have requested a fee waiver for your request. The requester bears the burden of justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S. Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the information must be in the public interest because the information primarily benefits the general public and is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) disclosure of the information must not be primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the narrow public interest cognizable under the FOIA, the Department must consider the following four (4) factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government";
2. In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested information must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the Department conclude that a requester has satisfied the first prong of the public interest element of the statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

Page 3 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

> 1. Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and
> 2. If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee waiver or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

See also 34 C.F.R. § 5.64(b)(3).

For your information, the Department does not customarily grant blanket waivers, but rather considers each waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to provide sufficient information to justify the Department's grant of a fee waiver. You state that, "[t]he subject of this request concerns the operations of the federal government, and the disclosure will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way." Although not entirely clear from the information provided, the Department assumes, for the sake of argument, that the responsive materials for items 1 through 3 of your request meet the first two elements of the public interest prong of the statutory requirement for a fee waiver because they presumably relate to the Department's administration of the Reading First program. However, it is clear that you have not satisfied the burden with regard to the third and fourth elements of the public interest prong of the statutory requirement.

As stated above, the third factor of the public interest analysis requires that the disclosure contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons. In order to satisfy this element of the public interest prong, the public must derive the benefit from the disclosure of this information, and not the personal benefit that may be derived from the requester, or a narrow segment of the population. Mells v. Internal Revenue Service, 2002 U.S. Dist. LEXIS 24275 (D.D.C. Nov. 21, 2002). In this regard, the identity of the requester will be considered so that an agency may determine whether the requester is in a position to contribute to the public understanding through the disclosure of the requested materials. Burriss v. CIA, 524 F. Supp. 448 (M.D. Tenn. 1981). As part of this analysis, the Department will consider whether the requester has the expertise in the subject area, and a demonstrated ability and intent to disseminate the information to the general public. Id. Additionally, while not for profit organizations are often capable of disseminating information, they do not automatically qualify for a waiver or reduction of fees because of their non-profit status. VoteHemp, Inc. v. DEA, 237 F. Supp. 2d 55 (D.D.C. 2002); see also McClain v. U.S. Dep't of Justice, 13 F.3d 220, 221 (7th Cir. 1993).

In your request you have indicated that "CREW will disseminate any documents it acquires from this request to the public .... [through] an interactive website where members of the public can analyze and comment on public documents[.] ... Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests." While this statement does demonstrate that you intend to disseminate the information, it does not demonstrate how the potentially responsive documents in this case will contribute to the "understanding of the public at large." Based upon your letter, it appears that members of the public would have to individually "analyze" the data to reach any possible understanding of the information. Consequently, you have failed to meet the third prong of the public interest analysis.

Page 4 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The fourth element of the public interest prong of the statutory requirement for a fee waiver requires that the disclosure must "contribute significantly" to public understanding of government operations or activities. For this element, an agency is required to determine whether the disclosure of the information will make a significant contribution to the public's understanding of the operations or activities of government. D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development, 85 F.Supp.2d 46, 49 (D.D.C. 2000). "Significance" is measured by a likely enhancement of the public's understanding of the subject at issue as a result of the disclosure, compared to the public's level of understanding of that same issue prior to disclosure. Id.; see also Judicial Watch v. U.S. Department of Justice, 185 F.Supp.2d 54, 62 (D.D.C. 2002).

In your letter, you stated "the disclosures [of the information] will likely contribute to a better understanding of relevant government procedures by … the general public in a significant way", and specifically, refer to "the public's understanding of the extent of White House involvement in the administration of the Reading First program[.]" It is interesting to note that you refer to an article on the very issue that you contend is unclear. Accordingly, information regarding this issue already exists in the public domain. Consequently, you have failed to show how the disclosure of the requested information will significantly enhance the public's understanding of the Reading First program beyond the information that already exists in the public domain. Carney v. U.S. Dep't of Justice, 19 F.3d 807, 815 (2d Cir. 1994).

In sum, the Department's denies your request for a fee waiver in the present case.

Fees are charged for searching/reviewing and duplication for responsive records. The fee is calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge and the duplication costs are ten cents per photocopied page. Our regulations, 34 CFR § 5.61 require us to allow you to modify your request if the cost is more than $25.00. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is to be greater than $250.00, the requester must pay in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Your appeal should be received by the FOIA office on or before
Mary 24, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

### **Appeal Address:**

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: FOIA Appeals
Washington, DC 20202-4500

Page 5 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request. Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

Enclosures

# EXHIBIT C

# CREW | citizens for responsibility and ethics in washington

May 15, 2007

John P. Higgins, Jr.
Inspector General
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-1500

**BY FAX:** 202-245-7628

Dear Inspector General Higgins:

Citizens for Responsibility and Ethics in Washington ("CREW") respectfully requests that you investigate the extent to which Department of Education employees have been using non-governmental e-mail accounts for official business -- with the full knowledge of the Department's Office of General Counsel -- in violation of federal law.

On March 28, 2007, CREW filed a Freedom of Information Act ("FOIA") request with the Department of Education, seeking records related to the Reading First program. The Department's FOIA office and CREW's counsel, Dan Roth, arranged a conference call on May 9, 2007, to discuss the Department's response. In addition to Mr. Roth, participating in the call were Angela Arrington and Maria-Teresa Cueva from the FOIA office, Marcella Goodridge and Dennis Koeppel from the Office of the General Counsel, and James Butler from the Office of Elementary and Secondary Education.

During the course of the telephone conference, the FOIA officers and Ms. Goodridge explained to Mr. Roth the difficulties in searching Department emails. Specifically, Department officials told Mr. Roth that without identifying a specific recipient or sender, it is impossible to search for email pertaining to any particular subject matter. Without prompting, Ms. Goodridge then stated that Department personnel "often use private email addresses," and that the Department "wouldn't have access to that." Mr. Roth asked whether private email accounts were used for official business and Ms. Goodridge replied that they were, adding that this issue has arisen in the past in reference to other FOIA requests.

On May 14, 2007, Mr. Roth called Ms. Arrington for clarification on several issues. During the course of that conversation, Mr. Roth asked if he had understood Ms. Goodridge correctly to state that because Department of Education employees sometimes use private email addresses for official business, such material would not be included in the Department's response to CREW's FOIA and that this issue had come up in the past. Ms. Arrington confirmed Ms. Goodridge's statements.

The Federal Records Act ("FRA"), 44 U.S.C. §§ 3301 et seq., governs the preservation and disposal of federal records. Among other things, the FRA ensures "[a]ccurate and complete

Mr. John P. Higgins, Jr.
May 15, 2007
Page 2

documentation of the policies and transactions of the Federal Government," as well as "judicious preservation and disposal of records." 44 U.S.C. § 2902. To fulfill this purpose, the FRA requires the head of each agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency." Id. § 3101. Under the statute, each agency must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," id. § 3102, and must "establish safeguards against the removal or loss of records" the agency head determines are necessary and required by regulations of the Archivist. Id. § 3105.

The FRA also prescribes the exclusive mechanism for disposal of federal records, which it defines to include:

> all books, papers, maps, photographs, machine readable materials,
> regardless of physical form or characteristics, made or received
> by an agency of the United States Government under Federal law
> or in connection with the transaction of public business and
> preserved or appropriate for preservation by that agency . . . as
> evidence of the organization, functions, policies, decisions,
> procedures, operations, or other activities of the Government or
> because of the informational value of data in them.

44 U.S.C. § 3301. No records may be "alienated or destroyed" except pursuant to the disposal provisions of the FRA. Id. at § 3314.

If, as Ms. Goodridge represented, Department of Education employees are using or have used outside, non-governmental email addresses for government business and have not retained copies of those records on the Department's files, the Department is failing to "accurate[ly] and complete[ly] document[] the policies and transactions of the Federal Government," by failing to retain and/or properly dispose of federal records in violation of the FRA. 44 U.S.C. § 2902. Similarly, the failure to search for records in response to FOIA requests would also be unlawful. See 5 U.S.C. § 552, et. seq.

As you know, the administration of the Reading First program has been the subject of intense scrutiny following the issuance of your office's six reports on the program. In addition to CREW's FOIA request, press accounts indicate that reporters also have been requesting related Department documents under the FOIA. See e.g. Andrew Brownstein & Travis Hicks, Congress Grills Spellings on Reading First Progam; OIG Investigation Draws to a Close, Title I Monitor (undated) (attached as Exhibit 1). Similarly, on May 1, 2007, Rep. George Miller (D-CA), Chairman of the House Committee on Education and Labor, requested documents from Secretary

Mr. John P. Higgins, Jr.
May 15, 2007
Page 3

Spellings on Reading First and the student loan industry. Letter from Rep. George Miller to Hon. Margaret Spellings, Secretary, U.S. Department of Education (May 1, 2007) (attached as Exhibit 2).

In order for the Department to respond to these and all other requests in accordance with federal law, all responsive departmental records must be searched. If, however, employees are regularly using private email accounts to send official email and the Department neither tracks nor stores such email, the full complement of responsive records clearly will not be produced to any requesters.

By failing to maintain all departmental communications as federal records, the Department of Education is likely operating in violation of the Federal Records Act, and appears to have been doing so for some time. In addition, the use of private email accounts to conduct official Department business raises serious concerns about the adequacy of Department searches in response to FOIA requests. As a result, CREW respectfully requests that you commence an immediate investigation to assess the extent and duration of this disturbing practice, the amount of official correspondence that has been lost or destroyed, and the effect of this practice on all records requests to the Department of Education.

Thank you for your attention to this matter.

Sincerely,

Melanie Sloan
Executive Director

Encls.

cc:     Honorable Edward M. Kennedy, Chairman
        Honorable Michael B. Enzi, Ranking Member
        U.S. Senate Committee on Health, Education, Labor and Pensions

        Honorable George Miller, Chairman
        Honorable Howard P. "Buck" McKeon, Ranking Member
        U.S. House Committee on Education and Labor

Mr. John P. Higgins, Jr.
May 15, 2007
Page 4

     Honorable Henry Waxman, Chairman
     Honorable Thomas M. Davis, Ranking Member
     Ranking Member, U.S. House Committee on Oversight and Government Reform

     Dr. Allen Weinstein
     Archivist of the United States

# EXHIBIT 1

-->



## ⋔ THOMPSON
Insight you trust.

| Home | My page | Search | News Desk | Support | Resources | Contact us |

**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**

"I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller,D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

### Jumping Through Hoops

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*"...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*"..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*"The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

### A Strong Firewall

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

### Bias and Objectivity

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

### Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries, "she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

### Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

### Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...if, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

### Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

### SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

**EXHIBIT 2**

MAJORITY MEMBERS.

GEORGE MILLER, CALIFORNIA, Chairman

DALE E. KILDEE, MICHIGAN, Vice Chairman
DONALD M. PAYNE, NEW JERSEY
ROBERT E. ANDREWS, NEW JERSEY
ROBERT C. "BOBBY" SCOTT, VIRGINIA
LYNN C. WOOLSEY, CALIFORNIA
RUBÉN HINOJOSA, TEXAS
CAROLYN McCARTHY, NEW YORK
JOHN F. TIERNEY, MASSACHUSETTS
DENNIS J. KUCINICH, OHIO
DAVID WU, OREGON
RUSH D. HOLT, NEW JERSEY
SUSAN A. DAVIS, CALIFORNIA
DANNY K. DAVIS, ILLINOIS
RAUL M. GRIJALVA, ARIZONA
TIMOTHY H. BISHOP, NEW YORK
LINDA T. SÁNCHEZ, CALIFORNIA
JOHN P. BARBANEB, MARYLAND
JOE SESTAK, PENNSYLVANIA
DAVID LOEBSACK, IOWA
MAZIE HIRONO, HAWAII
JASON ALTMIRE, PENNSYLVANIA
JOHN A. YARMUTH, KENTUCKY
PHIL HARE, ILLINOIS
YVETTE D. CLARKE, NEW YORK
JOE COURTNEY, CONNECTICUT
CAROL SHEA-PORTER, NEW HAMPSHIRE



**COMMITTEE ON EDUCATION AND LABOR**

U.S. HOUSE OF REPRESENTATIVES

2181 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6100

MAJORITY – 202-225-3725
MINORITY – 202-225-4527
http://edlabor.house.gov

MINORITY MEMBERS.

HOWARD "BUCK" McKEON, CALIFORNIA,
Senior Republican Member

THOMAS E. PETRI, WISCONSIN
PETER HOEKSTRA, MICHIGAN
MICHAEL N. CASTLE, DELAWARE
MARK E. SOUDER, INDIANA
VERNON J. EHLERS, MICHIGAN
JUDY BIGGERT, ILLINOIS
TODD RUSSELL PLATTS, PENNSYLVANIA
RIC KELLER, FLORIDA
JOE WILSON, SOUTH CAROLINA
JOHN KLINE, MINNESOTA
CATHY McMORRIS RODGERS, WASHINGTON
KENNY MARCHANT, TEXAS
TOM PRICE, GEORGIA
LUIS G. FORTUÑO, PUERTO RICO
CHARLES W. BOUSTANY, JR., LOUISIANA
VIRGINIA FOXX, NORTH CAROLINA
JOHN R. "RANDY" KUHL, JR., NEW YORK
ROB BISHOP, UTAH
DAVID DAVIS, TENNESSEE
TIMOTHY WALBERG, MICHIGAN
DEAN HELLER, NEVADA

May 1, 2007

**VIA FACSIMILE- 202-401-0596**
The Honorable Margaret Spellings
Secretary
U.S. Department of Education
400 Maryland Avenue, SW, Rm. 7W301
Washington, DC 20202

Dear Secretary Spellings:

Over the past few weeks, the Committee on Education and Labor has held investigative hearings that produced evidence of unethical practices in the student loan industry and of pervasive mismanagement and conflicts of interest in the Reading First program. The Committee's ongoing investigations into these two multi-billion-dollar programs have uncovered significant lapses in oversight among senior level White House and Department of Education officials responsible for their stewardship.

For several years, the Administration has been aware of the unethical practices among lenders and schools participating in the federal student loan programs, yet has to act to protect the integrity of the $85 billion-a-year programs. Recent news accounts have cited formal warnings dating back to at least 2001 that highlighted the dangers of inducements and other prohibited activities if left unchecked. Similarly, warnings raised years ago about the overall mismanagement of the Reading First program – and of the failure to mitigate conflicts of interest in the program – were ignored by the Administration. This consistent failure to act in the interests of our nation's students raises significant questions about why such warnings have been ignored.

Given the preliminary results of our ongoing investigations and the daily public reporting of unethical practices in programs within the Education Department, I seek additional information about the Department of Education's stewardship of the government's student loan and Reading First programs.

I ask that you provide me with the details of all senior-level Department of Education communications regarding the unethical practices among student lenders and schools (e.g., prohibited inducements) and the design and implementation of the Reading First program beginning January 20, 2001, through the receipt of this request. Specifically, I request the communications of former Secretary of Education Rodney Paige; former Senior Advisor to Secretary Paige, Beth Ann Bryan; former Deputy Secretary William Hansen; former Under Secretary and Deputy Secretary Eugene Hickok; present Chief of Staff to the Secretary David Dunn; and any other senior-level staff with responsibilities for the student loan and Reading First programs. I am sending a similar request to the White House.

I respectfully request your written response within 10 days of receiving this letter. I further ask that your staff coordinate the production of the requested information with Michael Zola, Chief Investigative Counsel, House Education and Labor Committee at (202) ███-███.

Sincerely,


**GEORGE MILLER**
Chairman

cc: Senior Republican Member Howard "Buck" McKeon


Enclosure:  Information Request Supplemental Instructions

# EXHIBIT D

# Dan Roth

**From:** Dan Roth

**Sent:** Friday, May 11, 2007 6:31 PM

**To:** 'EDFOIAManager@ed.gov'

**Subject:** No. 07-00517-F, Informal Fee Waiver Appeal

Dear Ms. Arrington,

Thank you again for setting up the call this past Wednesday to help CREW narrow our March 28, 2007 FOIA request to the Department of Education. As we discussed during that call, I am following up with an informal appeal of the Department's denial of fee waiver contained in Ms. Cueva's letter dated April 16, 2007.

First of all, the Department suggests that because certain information already exists in the public domain on Reading First, CREW's request would not contribute significantly to the public's understanding of the issues involved. (Letter from M. Cueva, p. 4). As CREW's request makes clear, there are significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education. The records CREW seeks would clarify the public record one way or another with respect to Secretary Spellings and anyone else in the White House. With respect to items 2 and 3 of CREW's request, relating to contacts with educational publishers, very little is known about this topic beyond an email discussed by Title I Monitor and included on the CD provided to CREW in response to item 4 of our request. For these reasons, and because Reading First has garnered so much attention from the public, Congress, and the press, it can hardly be said that the records CREW seeks would only contribute to the understanding of a narrow segment of the population, as the Department's letter denying the fee waiver claims.

The Department's letter also mistakenly asserts that the public would be required to do its own analysis of the requested documents to "reach any possible understanding of the information." (Letter from M. Cueva, p. 3). On page 3 of our March 28 FOIA request, it clearly states that "CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases." Moreover, the press, the House Education and Labor Committee, the Department's Inspector General, and most recently Senator Kennedy, have given the public ample background information with which to understand the information CREW seeks. Secretary Spellings herself stated at yesterday's hearing that Senator Kennedy's report left her "deeply concerned." That report focused on individuals who were instrumental in Reading First from its inception and their financial ties to educational publishers.

In sum, CREW is seeking information that will add significantly to the public's understanding of the administration of a six billion dollar federal program aimed at helping some of the most vulnerable members of our society. CREW does not seek these records for any private gain, and has both the intent and the capability to distribute the information it receives widely, and to analyze that information for the public. For all of the reasons discussed, and for the reasons initially stated in CREW's FOIA request, the Department should grant CREW's request for a fee waiver in this matter.

Again, I appreciate your time, and look forward to your response regarding CREW's request for a fee waiver and the Department's initial denial of that request.

Sincerely,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

---
This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

5/11/2007

# EXHIBIT E

## Dan Roth

**From:**  Dan Roth

**Sent:**  Monday, May 21, 2007 3:18 PM

**To:**  'EDFOIAManager@ed.gov'

**Subject:**  07-00517-F Proposed Narrowing Terms

Dear Ms. Arrington,

As we discussed on May 9 and May 14, CREW is seeking to aid the Department in its search for responsive records by narrowing the terms of our March 28, 2007 FOIA request, No. 07-00517-F. Though our request sufficiently describes the records we seek, you and others at the Department have advised us that technological limitations of the Department's email search technology would require the Department to search approximately 4,500 email accounts unless the request is narrowed further. Accordingly, we suggest the following narrowed terms for the search in response to Request No. 07-00517-F:

Any and all documents and records from January 20, 2001, to the present, in the offices of: 1) The Secretary, 2) Senior Counselor, 3) Chief of Staff, 4) Deputy Secretary, 5) Management Improvement Team, 6) Elementary and Secondary Education, 7) Institute of Education Sciences, 8) Planning Evaluation and Policy Development, 9) Civil Rights, 10) Innovation and Improvement, 11) Special Education and Rehabilitative Services, 12) Management, 13) Chief Financial Officer and 14) Communications and Outreach, in the following categories:

1.  All communications of the above-listed offices to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR" or DIBELS.

2.  All communications of the above-listed offices, including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.

3.  All communications of the above-listed offices, including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited, to Randy Best), Cambium Learning, Sopris West, and Intellitools.

Apart from Item 4 of CREW's original request, to which the Department has already responded in the form of a CD containing documents previously disclosed to the *Title I Monitor* and received by CREW on April 23, 2007, all other language in CREW's original request (pages 2-4) remains unchanged. We also note that it is not only emails, but "all communications," that CREW requested.

Thank you for your time and attention to this matter.

Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

--------------------------------------------------------------------------------------------------------------------------------------------------------
-----------------------------------------------------------------

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

.

# EXHIBIT F



## UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

June 8, 2007

Daniel C. Roth, Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter responds to your May 11, 2007 e-mail. In a letter dated April 16, 2007, the Department denied your request for a fee waiver submitted in connection with your March 28, 2007 fax requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.[1]

On May 9, 2007, Department staff conferred with you by telephone and agreed to allow you to submit additional information, and to reconsider your fee waiver request in light of this supplemental information. Your May 11, 2007 e-mail represents the supplemental information you wish the Department to consider in support of your fee waiver request.

The Department notes initially that, because you received information responsive to item number 4 of your March 28, 2007 request, your request for a fee waiver is deemed to concern only the items numbered 1, 2 and 3 of your March 28, 3007 request.

---

1 In your March 28, 2007 fax, you requested access to the following information: "(1) All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, 'Science Based Reading Research'/'SBRR,' DIBELS or any other issue related to reading instruction or education; (2) All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools; (3) All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools; and (4) To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated)." Included with our April 16, 2007, in response to item number 4 above, the Department provided you with a CD containing 430 pages of documents regarding the Reading First program that were previously disclosed to the Title I Monitor in response to a FOIA request.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

Page 2 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The Department has reviewed all of the information you submitted in support of your fee waiver and denies the request because it fails to provide sufficient information to justify the grant of a fee waiver. This denial represents the Department's decision regarding your request for a fee waiver in connection with FOIA Request No. 07-00517-F. The reasons for the denial are set forth below.

The Department's April 16, 2007 letter to you outlined in detail the legal standard for analyzing fee waiver requests and assessing whether a waiver or reduction of fees is appropriate; that standard is referred to and incorporated by reference herein.

As previously stated in our April 16, 2007 letter, the Department assumes, for the sake of argument, that the documents responsive to items 1 through 3 of your FOIA request meet the first two elements of the public interest prong of the fee waiver analysis because they are presumed to relate to the Department's administration of the Reading First program. The Department has also concluded that, based upon the information contained in your May 11, 2007 e-mail, items 1 through 3 of your request meet the third element of the public interest prong of the fee waiver analysis. Nevertheless, the Department finds that you have not met your burden with regard to the fourth element of the public interest prong of the fee waiver analysis, i.e., the requirement that disclosure of the records in question "contribute significantly" to public understanding of government operations or activities. "Significance" is measured by the likely enhancement of the public's understanding of the subject at issue as a result of disclosure, compared to the public's level of understanding of that same issue prior to disclosure. D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development, 85 F. Supp. 2d 46, 49 (D.D.C. 2000); see also Judicial Watch v. U.S. Department of Justice, 185 F.Supp.2d 54, 62 (D.D.C. 2002).

Your fee waiver request generally stated: "[T]he disclosures [of the information] will likely contribute to a better understanding of relevant government procedures by ... the general public in a significant way," and specifically, "[contribute] to the public's understanding of the extent of White House involvement in the administration of the Reading First program[.]" Your May 11, 2007 e-mail states: "[T]here are significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education. The records CREW seeks would clarify the public record. .... [R]elating to contracts with educational publishers, very little is known about the topic beyond an e-mail discussed by Title I Monitor and included on the CD provided to CREW in response to item 4 of our request." For a number of reasons, discussed below, the Department does not find your arguments persuasive.

First, we note that the language of your request is extremely broad in that it seeks voluminous records concerning a wide range of Department contacts and/or communications with the White House, educational publishers, their executives, employees, consultants, or contractors, and documents mentioning or relating to such contacts, concerning not only Reading First but also such subjects as Science Based Reading Research/SBRR, DIBELS, and any other issue related to reading instruction and education. As it is apparent that many of the documents responsive to items 1 through 3 of your FOIA request – implicating contacts and communications on a range of educational topics – have nothing to do with the Reading First program, it is equally clear that the disclosure of such materials could in no way enhance public understanding of the Department's administration of that program, much less do so significantly.

Page 3 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Your May 11, 2007 e-mail also states that the records you seek would clarify the public record because of alleged "significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education." However, you have failed both to identify the nature or extent of such inconsistencies, and to articulate in what way disclosure of the documents responsive to items 1 through 3 of your request would be likely to inform the public's understanding of such matters. Without any such evidence, there is no nexus between the alleged inconsistencies and the requested records, and no evidence of how the records you seek would add anything of significance to the public's understanding of the Reading First program. See Carney v. U.S. Dep't of Justice, 19 F.3d 807 (2d Cir. 1994).

You also state that very little is known about the topic of the Department's contacts with educational publishers. Contrary to your assertions, there are several sources of information on this topic, including, but not limited to information found at the following web sites:
http://www.cnn.com/2007/EDUCATION/05/09/reading.conflicts.ap/index.html;
http://www.usatoday.com/news/education/2007-05-09-reading-first-program_N.htm;
http://kennedy.senate.gov/newsroom/press_release.cfm?id=3CC1E674-CB51-42C2-A4F9-90395A0DC291

For these reasons, the Department denies your request for a fee waiver in connection with FOIA Request No. 07-00517-F.

Fees are charged for searching, reviewing and duplication of responsive records, and are calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The Department calculates search and review fees based on the employee's hourly rate of pay, plus a 16% administrative charge, and charges ten cents ($0.10) per photocopied page for duplication. Our regulations, at 34 CFR § 5.61, require us to allow a requester to modify his/her request if fees of more than $25.00 are anticipated. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is expected to be greater than $250.00, the requester must pay in advance.

As the Department indicated during the May 9, 2007 conference call, the broad scope of your request would require significant time and resources to search for and review responsive records. Under the circumstances, we encourage you to narrow the scope of your request so that we may provide you with the requested information as expeditiously as possible.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Please submit your appeal to the FOIA office on or before July 13, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

### Appeal Address:

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: Appeals Office
Washington, DC 20202-4500

Page 4 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

# EXHIBIT G



**CREW** | citizens for responsibility and ethics in washington

June 21, 2007

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: Appeals Officer
Washington, D.C. 20202-4500

**By first class mail**

**Re: Freedom of Information Act Appeal (No. 07-00517-F)**

Dear Sir/Madam:

By letter dated June 8, 2007, Maria-Teresa Cueva, FOIA Public Liaison, Office of Management, U.S. Department of Education ("the Department"), advised Citizens for Responsibility and Ethics in Washington ("CREW") that our request for a fee waiver for our Freedom of Information Act ("FOIA") request of March 28, 2007 (attached as Exhibit A), was denied. See Letter from Maria-Teresa Cueva, FOIA Public Liaison, U.S. Department of Education, to Dan Roth (June 8, 2007) (attached as Exhibit B). CREW's fee waiver request was initially denied by letter dated April 16, 2007 (attached as Exhibit C). CREW appealed that denial via email on May 11, 2007 (attached as Exhibit D), pursuant to an arrangement made with Education officials in a phone conversation on May 9, 2007. CREW hereby appeals the June 8 denial and requests that you reverse it for the reasons set forth below.

## Background

CREW's March 28, 2007 FOIA request sought all Department records dating from January 20, 2001, to the present, in four categories:

1. All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2. All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill,

Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

3.    All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

As indicated in the Department's June 8 letter, this fee waiver appeal concerns only Items 1-3 of CREW's request, as the Department has already responded to Item 4 (requesting documents previously released under FOIA to the *Title I Monitor*). See Exhibit B at 1.

CREW also sought a waiver of fees associated with the processing of its request. See Exhibit A at 3. As CREW explained, the records sought would "likely contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program," particularly because the public record on this issue contains inconsistent statements by current and former Department officials. As examples of these inconsistencies, CREW pointed out that 1) statements by former Education appointee Michael Petrilli directly contradict Secretary Margaret Spellings statements that she was not involved with Reading First during her tenure as White House Domestic Policy Advisor and 2) emails referencing then-Advisor Spellings contradict her account, as well. Id. CREW included the article documenting these examples as Exhibit 1 to its FOIA request.

By letter dated April 16, 2007, the Department denied CREW's fee waiver, stating that CREW had failed to show both that disclosure of documents to CREW would contribute to the understanding of the public at large and that the disclosure would contribute significantly to the public's understanding of government operations. See Exhibit C at 2-4.

On May 9, 2007, at the Department's request, CREW discussed the possibility of narrowing the scope of its request and the fee waiver issue in a teleconference with Department officials. CREW sent an email on May 14 requesting more information from the Department to aid in the narrowing process (attached as Exhibit E), but never received a response. On May 21, CREW sent an email proposing to narrow the records sought to those

... in the offices of: 1) The Secretary, 2) Senior Counselor, 3) Chief of Staff, 4) Deputy Secretary, 5) Management Improvement Team, 6) Elementary and Secondary Education, 7) Institute of Education Sciences, 8) Planning Evaluation and Policy Development, 9) Civil Rights, 10) Innovation and Improvement, 11) Special Education and Rehabilitative Services, 12) Management, 13) Chief Financial Officer and 14) Communications and Outreach, in the following categories:

1.    All communications of the above-listed offices to, from, or referencing any member of the White House staff, including, but not limited to, then-

-2-

Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR" or DIBELS.

2.    All communications of the above-listed offices, including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.

3.    All communications of the above-listed offices, including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited, to Randy Best), Cambium Learning, Sopris West, and Intellitools.

(Exhibit F). The Department never responded to this email.

CREW's initial March 28, 2007 FOIA request fully satisfies the two-prong statutory test for a fee waiver: 1) "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government" and 2) "is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

The Department concedes that this request is not in CREW's commercial interest, but has now twice denied CREW's fee waiver request based on the Department's contention that CREW has failed to provide sufficient information to show how the requested records will contribute "significantly" to the public understanding. See Exhibit B. According to the Department, there are two alleged deficiencies in CREW's fee waiver request: 1) that parts of CREW's FOIA request do not describe the records CREW seeks with enough specificity to show how disclosure of those records would contribute to the public understanding of Department operations, and 2) that CREW has not shown that the information sought will contribute "significantly" enough to merit a fee waiver. Id. at 2-3.

## I. Specificity and Relation to Operations of the Federal Government

The Department's June 8 fee waiver denial is based on its conclusion that many of the records responsive to CREW's request "have nothing to do with the Reading First program," and

thus "disclosure of such materials could in no way enhance public understanding of the Department's administration of that program, much less do so significantly." Id. at 2. The Department relies in part on language from CREW's March 28 FOIA request, including the phrase "any other issue related to reading instruction or education" Id.

The Department's analysis fails to take into account CREW's request as narrowed on May 21, 2007, which dropped this broad phrase and replaced it with more specific, revised language. See Exhibit F. Having requested that CREW narrow its request, the Department cannot legitimately rely on the original, pre-narrowed language to deny CREW a fee waiver.

The Department cannot and does not argue that the records sought will not enhance the public's understanding of the operations of the federal government. This is all that the fee waiver provision of the FOIA requires of a requester that has shown that the information sought is not primarily in its commercial interest. See 5 U.S.C. § 552(a)(4)(A)(iii). The records CREW seeks are particularly significant to the public interest given that the No Child Left Behind Act is scheduled to be re-authorized this fiscal year. As discussed at length below, the records CREW seeks all relate to public controversies regarding Department operations, programs and officials, the White House and educational publishers.

### II. Significance of the Records CREW Seeks

The Department's June 8 fee waiver denial is based on its finding that CREW has failed to identify and provide examples of the significant inconsistencies in the public record with respect to Secretary Spellings' involvement in Reading First prior to her tenure as Secretary. See Exhibit B. To the contrary, Exhibit 1 to CREW's FOIA request (an article published in the *Title I Monitor*) documents at least some of these inconsistencies. As reported in the *Title I Monitor*, during the Secretary's testimony before the Senate education appropriations subcommittee

> Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked [Secretary Spellings] about claims by Michael Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

> "Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

*    *    *

> Despite Spellings' attempts to distance herself from the controversy, previously released emails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

-4-

Andrew Brownstein & Travis Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated).

This is just one of many publications that document serious inconsistencies between how Secretary Spellings has described her involvement in Reading First during her White House tenure and the observations of other at the Department. Additional examples include the following:

Education Secretary Margaret Spellings, who until 2005 was a White House domestic policy adviser, says the troubles occurred before her move to the Education Department. But Mike Petrilli, a former associate deputy secretary under Spellings' predecessor, Rod Paige, says Spellings "micromanaged the implementation of Reading First from her West Wing office." Greg Toppo, Textbook scandal reaches Congress; Democrats will spell out possible conflict-of-interest case in program, USA Today, Apr. 16, 2007 (attached as Exhibit G).

[Secretary Spellings] denied accusations from a former political appointee at the department, Michael Petrilli, who said she had essentially run Reading First from her post as domestic policy adviser at the White House. Mr. Petrilli is now a vice president at a nonprofit education research foundation. Diana J. Schemo, Oversight Is Set for Beleaguered U.S. Reading Program, N.Y. Times, Mar. 15, 2007 (attached as Exhibit H).

"Margaret Spellings was involved in [Reading First] from day one in her role as domestic-policy adviser," ... Ms. Spellings has not yet responded to those allegations. Scathing Report Casts Cloud Over 'Reading First'; Federal officials encouraged use of specific programs, inspector general finds, Education Week, Oct. 4, 2006 (attached as Exhibit I).

"Secretary Spellings responded to the report by blaming other department employees and noting that the events occurred before she took over the Department," Harkin said. "However, as President Bush's domestic policy adviser, she exerted enormous control over Department activities. A former Department official, Michael Petrilli, said this week that 'she micromanaged the implementation of Reading First from her West Wing office.'" SEN. HARKIN CALLS ON DEPARTMENT OF EDUCATION SECRETARY SPELLINGS TO DISCLOSE INVOLVEMENT IN READING FIRST SCANDAL, U.S. Fed News, Sept. 28, 2006 (Attached as Exhibit J).

As these examples indicate, there is an ongoing dispute between Mr. Petrilli and Secretary Spellings's accounts of her involvement with Reading First. The only documentary evidence so far released to the public, quoted in Exhibit 1 to CREW's March 28, 2007 FOIA request, suggests that Secretary Spellings, at the very least, was involved in discussions regarding publishers interested in Reading First programs in New York City. The released email states "CAN YOU FORWARD TO MARGARET? WE HAVE TO DISCUSS PUBLISHERS

TODAY WITH MARGARET. WE HAVE BEEN MEETING WITH SOME CEOs FROM THE INDUSTRY AND THEY WANT TO PLAY BALL." Email from Reid Lyon, National Institutes of Child Health and Human Development, to Beth Ann Bryan, Senior Advisor to the Secretary, U.S. Department of Education (Jan. 30, 2003) (emphasis in original) (attached as Exhibit K); See also Exhibit 1 to FOIA Request. The email's author, Dr. Reid Lyon, has confirmed that the "Margaret" to whom he referred in the email is then-Domestic Policy Advisor Margaret Spellings. See Brownstein & Hicks, Title I Monitor (undated).

Department records and Mr. Petrilli's statements clearly conflict with Secretary Spellings's congressional testimony about her involvement in Reading First. CREW's fee waiver request and initial appeal, which relied explicitly on these articles and documentary evidence, described the issues it seeks to illuminate with "reasonable specificity" and is not based solely on "conclusory allegations." Judicial Watch v. U.S. Dep't of Energy, 310 F. Supp. 2d 271, 290-91 (D.D.C. 2004). Moreover, the records CREW seeks will go beyond the "he-said, she-said" that makes up the current public record on this subject by providing documentation illuminating the actual level of Secretary Spellings' involvement in Reading First during her White House tenure.[1]

Finally, the Department has challenged CREW's assertion that "little is known" about the Department's contacts with educational publishers, relying on three internet links to demonstrate that the Department's contacts with educational publishers has already been examined in the public sphere. The first link is expired, and the second and third links connect the reader to a recent report put out by Senator Edward Kennedy's office and a *USA Today* article covering that report. The Kennedy report focused on the financial interests of Reading First Technical Assistance Center ("TAC") employees and their ties to publishers during their service at the TACs. As stated clearly in the USA Today article: "The [Kennedy] report *zeroed in on four people who directed the program's regional Technical Assistance Centers*." Nancy Zuckerbrod, More conflicts disclosed in Reading First program, Associated Press, as published in USA Today, May 9, 2007 (emphasis added) (attached as Exhibit L). The Department contacts CREW seeks – with several companies not even mentioned in the Kennedy report – are categorically and obviously distinct from those cited and attached to the Kennedy report. Presenting this argument as a rationale for denying CREW's fee waiver request strains the bounds of good faith. CREW's FOIA request is vastly different in scope and focus from Senator Kennedy's report.

The records CREW seeks in items 2 and 3 will likely contribute significantly to the public's understanding of the extent to which publishers were in contact with Department and administration personnel during the Reading First development and grant process. Furthermore,

---

[1] CREW notes that on May 1, 2007, Rep. George Miller, Chairman of the House Committee on Education and Labor, also requested records of communications between the Department and the White House on Reading First and other matters. See Letter from Hon. George Miller, Chairman, to Hon. Margaret Spellings, Secretary, U.S. Department of Education (May 1, 2007) (attached as Exhibit M).

the public will likely gain significant knowledge about the extent and nature of the contacts between individuals like Ms. DiMarco and Department officials. Little is known about the Department's contacts with publishers with respect to the types of records CREW requested; to the extent these records go beyond Reading First, they will still shed light on the operations of the federal government, and therefore meet the public interest requirement for a fee waiver.

## CONCLUSION

The documents CREW has requested will amplify the information already in the public domain and help answer the remaining questions raised by the conflicting comments of Michael Petrilli and Secretary Spellings and the limited universe of emails thus far disclosed. Accordingly, disclosure of the information CREW seeks will contribute significantly to the public's understanding of how the Department of Education has operated the Reading First program, how the Department operates with respect to educational publishers, and related issues of literacy policy. As a court found recently under similar circumstances, CREW satisfies the criteria for a public interest fee waiver where, *inter alia*, it is able to explain "with reasonable specificity how [the documents sought] would increase public knowledge of the functions of government." CREW v. Dep't of Health and Human Services, No. 05-1127, 2006 U.S. Dist. LEXIS 95700, at *22 (D.D.C. Sept. 8, 2006). Here, CREW has met and exceeded that standard.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver. Accordingly, we request that you reverse the Department's determination to deny CREW a fee waiver.

Sincerely,

$\mathcal{D} \cdot \mathcal{Q} \, C \cdot \mathcal{R}oth$

Daniel C. Roth
Counsel
Citizens for Responsibility and
  Ethics in Washington
(202) 408-5565
droth@citizensforethics.org

-7-

**EXHIBIT A**



**CREW** | citizens for responsibility and ethics in washington

March 28, 2007

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**By fax, (202) 245-6623, and First Class mail**

### Re: Freedom of Information Act Request

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department) regulations, 34 CFR §§ 5.6 *et. seq.*

Specifically, CREW seeks any and all Department documents and records dating from January 20, 2001, to the present, in the following categories:

1.  All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2.  All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

3.  All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.



4.    To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*. See Andrew Brownstein & Travis Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated) (Attached as Exhibit 1). As these documents have been already culled and processed for disclosure, we expect production of these records in short order. As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

Please search responsive records regardless of format, medium, or physical characteristics. Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

2

## Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program, an issue on which the public record is unclear. For example, recently disclosed emails and statements by a former Department appointee appear to contradict statements by Secretary Spellings that she was not involved in Reading First until she became Secretary in January 2005. See Brownstein & Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated).

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

D-l C. Roth

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Attachment

4

# EXHIBIT 1

-->

## ᵇᵢ THOMPSON
Insight you trust.

| Home | My page | Search | News Desk | Support | Resources | Contact us |

**Title online**

**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**

"I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller,D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

### Jumping Through Hoops

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

### A Strong Firewall

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

### Bias and Objectivity

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

### Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries," she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

### Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

### Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

### Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

### SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

**EXHIBIT B**



## UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

June 8, 2007

Daniel C. Roth, Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter responds to your May 11, 2007 e-mail. In a letter dated April 16, 2007, the Department denied your request for a fee waiver submitted in connection with your March 28, 2007 fax requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.[1]

On May 9, 2007, Department staff conferred with you by telephone and agreed to allow you to submit additional information, and to reconsider your fee waiver request in light of this supplemental information. Your May 11, 2007 e-mail represents the supplemental information you wish the Department to consider in support of your fee waiver request.

The Department notes initially that, because you received information responsive to item number 4 of your March 28, 2007 request, your request for a fee waiver is deemed to concern only the items numbered 1, 2 and 3 of your March 28, 3007 request.

---

1 In your March 28, 2007 fax, you requested access to the following information: "(1) All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, 'Science Based Reading Research'/'SBRR,' DIBELS or any other issue related to reading instruction or education; (2) All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools; (3) All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools; and (4) To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated)." Included with our April 16, 2007, in response to item number 4 above, the Department provided you with a CD containing 430 pages of documents regarding the Reading First program that were previously disclosed to the Title I Monitor in response to a FOIA request.

Page 2 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The Department has reviewed all of the information you submitted in support of your fee waiver and denies the request because it fails to provide sufficient information to justify the grant of a fee waiver. This denial represents the Department's decision regarding your request for a fee waiver in connection with FOIA Request No. 07-00517-F. The reasons for the denial are set forth below.

The Department's April 16, 2007 letter to you outlined in detail the legal standard for analyzing fee waiver requests and assessing whether a waiver or reduction of fees is appropriate; that standard is referred to and incorporated by reference herein.

As previously stated in our April 16, 2007 letter, the Department assumes, for the sake of argument, that the documents responsive to items 1 through 3 of your FOIA request meet the first two elements of the public interest prong of the fee waiver analysis because they are presumed to relate to the Department's administration of the Reading First program. The Department has also concluded that, based upon the information contained in your May 11, 2007 e-mail, items 1 through 3 of your request meet the third element of the public interest prong of the fee waiver analysis. Nevertheless, the Department finds that you have not met your burden with regard to the fourth element of the public interest prong of the fee waiver analysis, i.e., the requirement that disclosure of the records in question "contribute significantly" to public understanding of government operations or activities. "Significance" is measured by the likely enhancement of the public's understanding of the subject at issue as a result of disclosure, compared to the public's level of understanding of that same issue prior to disclosure. D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development, 85 F. Supp. 2d 46, 49 (D.D.C. 2000); see also Judicial Watch v. U.S. Department of Justice, 185 F.Supp.2d 54, 62 (D.D.C. 2002).

Your fee waiver request generally stated: "[T]he disclosures [of the information] will likely contribute to a better understanding of relevant government;procedures by ... the general public in a significant way," and specifically, "[contribute] to the public's understanding of the extent of White House involvement in the administration of the Reading First program[.]" Your May 11, 2007 e-mail states: "[T]here are significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education. The records CREW seeks would clarify the public record. .... [R]elating to contracts with educational publishers, very little is known about the topic beyond an e-mail discussed by Title I Monitor and included on the CD provided to CREW in response to item 4 of our request." For a number of reasons, discussed below, the Department does not find your arguments persuasive.

First, we note that the language of your request is extremely broad in that it seeks voluminous records concerning a wide range of Department contacts and/or communications with the White House, educational publishers, their executives, employees, consultants, or contractors, and documents mentioning or relating to such contacts, concerning not only Reading First but also such subjects as Science Based Reading Research/SBRR, DIBELS, and any other issue related to reading instruction and education. As it is apparent that many of the documents responsive to items 1 through 3 of your FOIA request – implicating contacts and communications on a range of educational topics – have nothing to do with the Reading First program, it is equally clear that the disclosure of such materials could in no way enhance public understanding of the Department's administration of that program, much less do so significantly.

Page 3 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Your May 11, 2007 e-mail also states that the records you seek would clarify the public record because of alleged "significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education." However, you have failed both to identify the nature or extent of such inconsistencies, and to articulate in what way disclosure of the documents responsive to items 1 through 3 of your request would be likely to inform the public's understanding of such matters. Without any such evidence, there is no nexus between the alleged inconsistencies and the requested records, and no evidence of how the records you seek would add anything of significance to the public's understanding of the Reading First program. See Carney v. U.S. Dep't of Justice, 19 F.3d 807 (2d Cir. 1994).

You also state that very little is known about the topic of the Department's contacts with educational publishers. Contrary to your assertions, there are several sources of information on this topic, including, but not limited to information found at the following web sites:
http://www.cnn.com/2007/EDUCATION/05/09/reading.conflicts.ap/index.html;
http://www.usatoday.com/news/education/2007-05-09-reading-first-program_N.htm;
http://kennedy.senate.gov/newsroom/press_release.cfm?id=3CC1E674-CB51-42C2-A4F9-90395A0DC291

For these reasons, the Department denies your request for a fee waiver in connection with FOIA Request No. 07-00517-F.

Fees are charged for searching, reviewing and duplication of responsive records, and are calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The Department calculates search and review fees based on the employee's hourly rate of pay, plus a 16% administrative charge, and charges ten cents ($0.10) per photocopied page for duplication. Our regulations, at 34 CFR § 5.61, require us to allow a requester to modify his/her request if fees of more than $25.00 are anticipated. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is expected to be greater than $250.00, the requester must pay in advance.

As the Department indicated during the May 9, 2007 conference call, the broad scope of your request would require significant time and resources to search for and review responsive records. Under the circumstances, we encourage you to narrow the scope of your request so that we may provide you with the requested information as expeditiously as possible.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Please submit your appeal to the FOIA office on or before July 13, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

**Appeal Address:**

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: Appeals Office
Washington, DC 20202-4500

Page 4 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

**EXHIBIT C**



# UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

ASSISTANT SECRETARY

April 16, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter is in response to your fax dated March 28, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on March 29, 2007. You asked for the following information:

1. All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS or any other issue related to reading instruction or education.

2. All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools.

3. All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4. To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated).

Enclosed is a CD containing 421 pages of documents responsive to item 4 of your request. The documents provided are: documents regarding the Reading First program that were previously disclosed under FOIA to the Title I Monitor.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

Page 2 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

In an effort to process your request as expeditiously as possible, we need clarification for items 1 through 3 of your request. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Items 1 through 3 of your request encompass a large volume of information on broad topics related to individuals in the Department and "White House staff", without identifying specific individuals, offices, or subjects. In addition, your request does not specify any relevant time frames. Consequently, your request does not reasonably describe the records sought, and the Department is unable to process your request regarding items 1 through 3 without further clarification. See Dale v. Internal Revenue Service, 238 F.Supp.2d 99 (D.D.C. 2002).

Fee Waiver
In addition, you have requested a fee waiver for your request. The requester bears the burden of justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S. Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the information must be in the public interest because the information primarily benefits the general public and is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) disclosure of the information must not be primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the narrow public interest cognizable under the FOIA, the Department must consider the following four (4) factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government";
2. In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested information must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the Department conclude that a requester has satisfied the first prong of the public interest element of the statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

Page 3 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

1. Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and

2. If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee waiver or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

See also 34 C.F.R. § 5.64(b)(3).

For your information, the Department does not customarily grant blanket waivers, but rather considers each waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to provide sufficient information to justify the Department's grant of a fee waiver. You state that, "[t]he subject of this request concerns the operations of the federal government, and the disclosure will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way." Although not entirely clear from the information provided, the Department assumes, for the sake of argument, that the responsive materials for items 1 through 3 of your request meet the first two elements of the public interest prong of the statutory requirement for a fee waiver because they presumably relate to the Department's administration of the Reading First program. However, it is clear that you have not satisfied the burden with regard to the third and fourth elements of the public interest prong of the statutory requirement.

As stated above, the third factor of the public interest analysis requires that the disclosure contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons. In order to satisfy this element of the public interest prong, the public must derive the benefit from the disclosure of this information, and not the personal benefit that may be derived from the requester, or a narrow segment of the population. Mells v. Internal Revenue Service, 2002 U.S. Dist. LEXIS 24275 (D.D.C. Nov. 21, 2002). In this regard, the identity of the requester will be considered so that an agency may determine whether the requester is in a position to contribute to the public understanding through the disclosure of the requested materials. Burriss v. CIA, 524 F. Supp. 448 (M.D. Tenn. 1981). As part of this analysis, the Department will consider whether the requester has the expertise in the subject area, and a demonstrated ability and intent to disseminate the information to the general public. Id. Additionally, while not for profit organizations are often capable of disseminating information, they do not automatically qualify for a waiver or reduction of fees because of their non-profit status. VoteHemp, Inc. v. DEA, 237 F. Supp. 2d 55 (D.D.C. 2002); see also McClain v. U.S. Dep't of Justice, 13 F.3d 220, 221 (7th Cir. 1993).

In your request you have indicated that "CREW will disseminate any documents it acquires from this request to the public .... [through] an interactive website where members of the public can analyze and comment on public documents[.] ... Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests." While this statement does demonstrate that you intend to disseminate the information, it does not demonstrate how the potentially responsive documents in this case will contribute to the "understanding of the public at large." Based upon your letter, it appears that members of the public would have to individually "analyze" the data to reach any possible understanding of the information. Consequently, you have failed to meet the third prong of the public interest analysis.

Page 4 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The fourth element of the public interest prong of the statutory requirement for a fee waiver requires that the disclosure must "contribute significantly" to public understanding of government operations or activities. For this element, an agency is required to determine whether the disclosure of the information will make a significant contribution to the public's understanding of the operations or activities of government. <u>D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development</u>, 85 F.Supp.2d 46, 49 (D.D.C. 2000). "Significance" is measured by a likely enhancement of the public's understanding of the subject at issue as a result of the disclosure, compared to the public's level of understanding of that same issue prior to disclosure. <u>Id.</u>; <u>see also</u> <u>Judicial Watch v. U.S. Department of Justice</u>, 185 F.Supp.2d 54, 62 (D.D.C. 2002).

In your letter, you stated "the disclosures [of the information] will likely contribute to a better understanding of relevant government procedures by … the general public in a significant way", and specifically, refer to "the public's understanding of the extent of White House involvement in the administration of the Reading First program[.]" It is interesting to note that you refer to an article on the very issue that you contend is unclear. Accordingly, information regarding this issue already exists in the public domain. Consequently, you have failed to show how the disclosure of the requested information will <u>significantly</u> enhance the public's understanding of the Reading First program beyond the information that already exists in the public domain. <u>Carney v. U.S. Dep't of Justice</u>, 19 F.3d 807, 815 (2d Cir. 1994).

In sum, the Department's denies your request for a fee waiver in the present case.

Fees are charged for searching/reviewing and duplication for responsive records. The fee is calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge and the duplication costs are ten cents per photocopied page. Our regulations, 34 CFR § 5.61 require us to allow you to modify your request if the cost is more than $25.00. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is to be greater than $250.00, the requester <u>must pay</u> in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Your appeal should be received by the FOIA office on or before
Mary 24, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

## **Appeal Address:**

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: FOIA Appeals
Washington, DC 20202-4500

Page 5 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request. Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

Enclosures

**EXHIBIT D**

## Dan Roth

**From:** Dan Roth
**Sent:** Friday, May 11, 2007 6:31 PM
**To:** 'EDFOIAManager@ed.gov'
**Subject:** No. 07-00517-F, Informal Fee Waiver Appeal

Dear Ms. Arrington,

Thank you again for setting up the call this past Wednesday to help CREW narrow our March 28, 2007 FOIA request to the Department of Education. As we discussed during that call, I am following up with an informal appeal of the Department's denial of fee waiver contained in Ms. Cueva's letter dated April 16, 2007.

First of all, the Department suggests that because certain information already exists in the public domain on Reading First, CREW's request would not contribute significantly to the public's understanding of the issues involved. (Letter from M. Cueva, p. 4). As CREW's request makes clear, there are significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education. The records CREW seeks would clarify the public record one way or another with respect to Secretary Spellings and anyone else in the White House. With respect to items 2 and 3 of CREW's request, relating to contacts with educational publishers, very little is known about this topic beyond an email discussed by Title I Monitor and included on the CD provided to CREW in response to item 4 of our request. For these reasons, and because Reading First has garnered so much attention from the public, Congress, and the press, it can hardly be said that the records CREW seeks would only contribute to the understanding of a narrow segment of the population, as the Department's letter denying the fee waiver claims.

The Department's letter also mistakenly asserts that the public would be required to do its own analysis of the requested documents to "reach any possible understanding of the information." (Letter from M. Cueva, p. 3). On page 3 of our March 28 FOIA request, it clearly states that "CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases." Moreover, the press, the House Education and Labor Committee, the Department's Inspector General, and most recently Senator Kennedy, have given the public ample background information with which to understand the information CREW seeks. Secretary Spellings herself stated at yesterday's hearing that Senator Kennedy's report left her "deeply concerned." That report focused on individuals who were instrumental in Reading First from its inception and their financial ties to educational publishers.

In sum, CREW is seeking information that will add significantly to the public's understanding of the administration of a six billion dollar federal program aimed at helping some of the most vulnerable members of our society. CREW does not seek these records for any private gain, and has both the intent and the capability to distribute the information it receives widely, and to analyze that information for the public. For all of the reasons discussed, and for the reasons initially stated in CREW's FOIA request, the Department should grant CREW's request for a fee waiver in this matter.

Again, I appreciate your time, and look forward to your response regarding CREW's request for a fee waiver and the Department's initial denial of that request.

Sincerely,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

---

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

**EXHIBIT E**

## Dan Roth

**From:** Dan Roth

**Sent:** Monday, May 14, 2007 1:28 PM

**To:** 'EDFOIAManager@ed.gov'

**Subject:** No. 07-00517-F Narrowing Discussion

Dear Ms. Arrington,

As we discussed earlier today, I am writing to memorialize our conversation about narrowing CREW's March 28, 2007 FOIA request.

As I understand it from last Wednesday's telephone conversation, the Department's key concern with respect to our FOIA is that CREW is seeking records from "any Department office, including any and all field offices." Ms. Marcela Goodridge stated that the Department's FOIA technology does not allow for subject matter or keyword searches throughout the email system, so a search undertaken pursuant to the original terms of our request would require individual searches of each of the Department's approximately 4,500 employee email accounts. Additionally, Ms. Goodridge noted that email communications on personal email accounts would not be covered by such a search (which is an issue that has arisen in the past).

In order to aid CREW in the narrowing process, we request the following information from the Department:

1) An estimate of the time it would take to process CREW's request if we do not narrow it further
2) An estimate of the time it would take to process our request if we narrow and request communications only within the a) Office of the Secretary and b) Office of Elementary and Secondary Education.

If these time estimates will not be available before May 19 (this coming Friday), please let me know.

In addition, you affirmed that it would be helpful for CREW to limit the list of publishers in items 2 and 3 to the seven publishers already listed. We are considering a limitation along those lines (which would eliminate the phrase "includes, but is not limited to " in items 2 and 3 of the March 28 request) but have not yet made a decision.

CREW will formalize any narrowing language in a letter to the Department as soon as we receive the requested information.

Finally, I neglected to ask on the phone whether a copy of the Title I Monitor FOIA would be forthcoming soon, but I'll renew my request for it here.

Again, I greatly appreciate your time and assistance with this request. Please contact me any time.

Best Regards,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

---
---
This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

# EXHIBIT F

## Dan Roth

**From:** Dan Roth
**Sent:** Monday, May 21, 2007 3:18 PM
**To:** 'EDFOIAManager@ed.gov'
**Subject:** 07-00517-F Proposed Narrowing Terms

Dear Ms. Arrington,

As we discussed on May 9 and May 14, CREW is seeking to aid the Department in its search for responsive records by narrowing the terms of our March 28, 2007 FOIA request, No. 07-00517-F. Though our request sufficiently describes the records we seek, you and others at the Department have advised us that technological limitations of the Department's email search technology would require the Department to search approximately 4,500 email accounts unless the request is narrowed further. Accordingly, we suggest the following narrowed terms for the search in response to Request No. 07-00517-F:

Any and all documents and records from January 20, 2001, to the present, in the offices of: 1) The Secretary, 2) Senior Counselor, 3) Chief of Staff, 4) Deputy Secretary, 5) Management Improvement Team, 6) Elementary and Secondary Education, 7) Institute of Education Sciences, 8) Planning Evaluation and Policy Development, 9) Civil Rights, 10) Innovation and Improvement, 11) Special Education and Rehabilitative Services, 12) Management, 13) Chief Financial Officer and 14) Communications and Outreach, in the following categories:

1. All communications of the above-listed offices to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR" or DIBELS.

2. All communications of the above-listed offices, including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.

3. All communications of the above-listed offices, including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited, to Randy Best), Cambium Learning, Sopris West, and Intellitools.

Apart from Item 4 of CREW's original request, to which the Department has already responded in the form of a CD containing documents previously disclosed to the *Title I Monitor* and received by CREW on April 23, 2007, all other language in CREW's original request (pages 2-4) remains unchanged. We also note that it is not only emails, but "all communications," that CREW requested.

Thank you for your time and attention to this matter.

Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

---

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

**EXHIBIT G**

1 of 1 DOCUMENT

USA TODAY

April 16, 2007 Monday
FINAL EDITION

# Textbook scandal reaches Congress;
## Democrats will spell out possible conflict-of-interest case in program

**BYLINE:** Greg Toppo

**SECTION:** LIFE; Pg. 5D

**LENGTH:** 708 words

A slow-motion scandal surrounding a federal multibillion-dollar reading program has its first congressional hearing this week, but it remains to be seen whether the scrutiny will shed any new light on a complex, contradictory tale of textbooks, tests and allegations of federal arm-twisting.

A key part of President Bush's efforts to remake public education, Reading First was launched in 2002, giving schools $1 billion a year to improve reading in early elementary grades. Five years later, early evidence suggests that it may be helping. But investigators say a handful of advisers have railroaded schools into buying textbooks and other materials that they and associates developed.

The result: a conflict-of-interest case that took two years to jell as investigators in the Education Department connected the dots. To date, no criminal charges have been filed, but Democrats, now in control of Congress, promise to give the case a full airing.

"The purpose of Reading First is to help schoolchildren learn to read, not feather the nests of a select group of well-connected individuals and organizations," says Rep. George Miller, D-Calif., who chairs the House Committee on Education and Labor.

Miller and Sen. Edward Kennedy, D-Mass., are conducting probes. Kennedy plans hearings later this spring.

Miller will preside at the first hearing Friday, which brings together Chris Doherty, the program's former director, and three top advisers.

Atop the witness list: John Higgins, the Education Department's inspector general, who has issued six reports detailing how Reading First leaders and contractors looked the other way at possible conflicts of interest among advisers and others -- several of whom authored textbooks. He also found that Doherty and others strong-armed states and school districts into choosing from a small selection of materials that stress phonics.

In one e-mail Higgins cited, Doherty said of a publisher whose books downplayed phonics, "They are trying to crash our party, and we need to beat the (expletive) out of them in front of all the other would-be party crashers who are standing on the front lawn waiting to see how we welcome these dirtbags."

Doherty quit in September after the report's release.

Higgins also found that a 2002 conference for educators focused too exclusively on a few programs, creating what investigators said was a perception that there was an "approved list" of texts.

A related probe last month by the Government Accountability Office found that officials from 10 states complained that the Education Department told them to eliminate reading programs or tests that they didn't endorse. Federal rules prohibit the department from endorsing any curriculum.

Education Secretary Margaret Spellings, who until 2005 was a White House domestic policy adviser, says the troubles occurred before her move to the Education Department. But Mike Petrilli, a former associate deputy secretary under Spellings' predecessor, Rod Paige, says Spellings "micromanaged the implementation of Reading First from her West Wing office." She already has told lawmakers she is beefing up oversight of the program.

But even a few critics cautiously concede that the program has been a boon to schools. The Center on Education Policy, a Washington think tank that has criticized Bush's education programs, in September said Reading First is having "a significant impact" in schools.

A five-year, $30.5 million evaluation, begun in 2003, should produce complete results next year.

Cindy Cupp, a Savannah, Ga., educator, was among the first to complain in 2005, after Reading First schools in Georgia passed over her homegrown phonics program. Cupp compiled a huge dossier outlining the links between publishers, federal advisers, universities and the Bush administration. In findings issued last January, Higgins largely upheld her complaint.

She says it's irrelevant whether Reading First works: "To rationalize breaking the law by saying the program has been effective is just that -- a rationalization."

She also notes that part of the evaluation bid went to RMC Research Corp., which Higgins cited for turning a blind eye to conflicts of interest among three top advisers it hired. All three are scheduled to testify Friday.

**LOAD-DATE:** April 16, 2007

**LANGUAGE:** ENGLISH

**GRAPHIC:** PHOTO, B/W, Photos by Heather Wines, GNS
PHOTO, B/W

**DOCUMENT-TYPE:** EDUCATION

**PUBLICATION-TYPE:** NEWSPAPER

Copyright 2007 Gannett Company, Inc.
All Rights Reserved

**EXHIBIT H**

1 of 1 DOCUMENT

The New York Times

March 15, 2007 Thursday
Late Edition - Final

# Oversight Is Set for Beleaguered U.S. Reading Program

**BYLINE:** By DIANA JEAN SCHEMO

**SECTION:** Section A; Column 1; National Desk; Pg. 25

**LENGTH:** 810 words

**DATELINE:** WASHINGTON, March 14

Under attack for improprieties uncovered in its showcase literacy program for low-income children, the Department of Education will convene an outside advisory committee to oversee the program, known as Reading First, Education Secretary Margaret Spellings said Wednesday.

Facing tough questions at a hearing before a Senate subcommittee considering appropriations for the Bush administration's signature education law, known as No Child Left Behind, Ms. Spellings also promised to clean up the reading program in other ways.

In about a half dozen reports in recent months, the department's inspector general detailed irregularities in the program, which awards $1 billion a year in grants to states to buy reading materials and teacher training. The reports also found that federal officials overlooked conflicts of interest among private contractors who advised states applying for the grants. Ms. Spellings said her office's general counsel would examine the records of contractors accused of conflicts of interest, and remove those with actual conflicts from any role in the program.

Her promises came as Reading First faces growing attacks while heading for reauthorization. Representative David R. Obey, Democrat of Wisconsin and chairman of the House Appropriations Committee, said this week that the problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is a part.

Acknowledging that "there's certainly room for improvement" in Reading First, Ms. Spellings told the Senate panel Wednesday that her department had removed the program's leaders; expanded its staff to seven employees from two, to reduce its reliance on so many private contractors with the potential for conflicts; and accepted all the recommendations of the department's inspector general.

"I'd hate to throw the baby out with the bathwater," the secretary said, adding that despite the problems, the program was improving reading among poor children.

At Wednesday's hearing, Senator Tom Harkin, the Iowa Democrat who is the subcommittee's chairman, said he, too, was disturbed by the accusations against Reading First. "It has an odor that I don't like," Mr. Harkin said. But he said he was not considering eliminating financing.

After Ms. Spellings left the hearing, Robert Slavin of Johns Hopkins University, whose Success for All reading program was shut out of many states under Reading First, said he did not think the secretary's promises went far enough. "I haven't seen the slightest glimmer of even intention to change," Dr. Slavin said.

Because schools had already chosen their readng curriculums, promises to clean up Reading First now meant little, he said. He compared them to finding eight innings into a baseball game with a score of 23 to 0 that the opposing team had been playing with cork bats.

"Then they say, 'From now on, we're using honest bats.' " Dr. Slavin said. "I'm sorry, it's 23 to nothing. You can't just say, 'From now on.' "

Reading First was required by law to finance only reading programs backed by "scientifically based reading research," and the Education Department was prohibited from mandating or even endorsing specific curriculums. But the program has been plagued by accusations that states were steered toward a handful of commercial reading programs and testing instruments.

With only two Education Department employees in charge of the vast program, the administration relied largely on private contractors to advise states on their applications for grants, screen products for scientific validity and weigh applications. The inspector general found that several of these contractors wrote reading programs and testing instruments that were competing for money, and that they gave preference to products to which they had ties.

Ms. Spellings has maintained, and said again under questioning Wednesday, that the problems with Reading First occurred before she became education secretary.

She denied accusations from a former political appointee at the department, Michael Petrilli, who said she had essentially run Reading First from her post as domestic policy adviser at the White House. Mr. Petrilli is now a vice president at a nonprofit education research foundation. Asked about Madison, Wis., where educators gave up $2 million in Reading First money because they would have had to drop a so-called balanced literacy reading program that they said had been successful for the district, Ms. Spellings said she was unfamiliar with the particulars of Madison's reading program. But she defended Reading First's ground rules under her predecessor, Rod Paige, saying the program did not exclude specific reading curriculums, but intended only to ensure that they were backed by research.

**URL:** http://www.nytimes.com

**LOAD-DATE:** March 15, 2007

**LANGUAGE:** ENGLISH

**GRAPHIC:** Photo: Education Secretary Margaret Spellings spoke yesterday with Senator Arlen Specter at a hearing. (Photo by Doug Mills/The New York Times)

**PUBLICATION-TYPE:** Newspaper

Copyright 2007 The New York Times Company

**EXHIBIT I**

2 of 2 DOCUMENTS

Education Week

October 4, 2006

# Scathing Report Casts Cloud Over `Reading First'; Federal officials encouraged use of specific programs, inspector general finds.

**SECTION:** Pg. 1 Vol. 26 No. 6

**LENGTH:** 2098 words

The findings of a scathing report on the federal Reading First program continued to reverberate last week following its Sept. 22 release, fueling debates in Congress, on the Internet, and among professionals in the field about their gravity and potential impact.

Critics of the program's implementation said the conclusions drawn in the report by the U.S. Department of Education's inspector general validate complaints that federal officials may have steered the grant-application process to ensure that particular reading programs and instructional approaches were widely used by participating schools, and that others were essentially shut out.

Some supporters of the program characterized the findings as overblown and charged that they constituted a personal attack on department personnel, rather than a verdict on the $1 billion-a-year program itself, which was rolled out 4½ years ago as part of the No Child Left Behind Act.

Many educators and observers said the blistering review of the implementation and management of Reading First, though justified, could damage a program that is showing initial signs of effectiveness.

"There really needs to be a good, hard look at the program ... and a renewed focus on solid, research-based instruction," said Alan J. Farstrup, the executive director of the International Reading Association, in Newark, Del. "Reading First can be a more solid program."

The long-awaited evaluation, which includes excerpts from internal Education Department e-mail marked confidential and sometimes containing vulgar language, concludes that:

Department officials may have intended to "stack" the panels of grant reviewers with those who favored a particular teaching methodology, and their method of screening the panelists for conflicts of interest was ineffective;

Requirements for receiving grants under the program were expanded beyond what the law requires; and

Federal education officials may also have overstepped provisions of the No Child Left Behind Act that prohibit them from influencing or dictating the curricula, assessments, or instructional approaches used by schools or districts.

Reading First, which has already handed out nearly $5 billion in grants to some 1,700 districts and 5,600 schools, is designed to improve reading instruction in the nation's most disadvantaged schools through the use of research-based methods.

**Potential Conflicts**

The inspector general's findings correspond with charges leveled over the past several years by critics of the program, as well as by many reading experts and state officials.

*Education Week* has reported since 2002 many of the concerns among researchers and educators that the program favored only a handful of consultants and commercial products, and the potential financial conflicts between them. In an extensive analysis of documents and e-mail correspondence obtained through state and federal open-records requests, as well as interviews with state officials, the newspaper reported last fall a pattern of behavior that suggested federal employees and their representatives had directed or even pressured states to choose specific assessments, consultants, and certain kinds of texts as conditions for getting funding under Reading First. ("States Pressed to Refashion Reading First Grant Designs," Sept. 7, 2005.)

Cindy Cupp, a former state education official and the publisher of a little-known reading series, filed formal complaints in May 2005 with the Georgia and federal education departments. Shortly afterward, the Success for All Foundation in Baltimore and the Reading Recovery Foundation of North America, based in Columbus, Ohio, lodged similar complaints with the federal department's inspector general.

Investigators for Inspector General John P. Higgins Jr. found that Reading First's director, Christopher J. Doherty, nominated review panelists with professional connections to the Reading Mastery program associated with the Direct Instruction teaching method. Mr. Doherty had spent part of his career promoting the use of the program before joining the Education Department in 2001 under the Bush administration. Those panelists reviewed 23 Reading First state applications.

"The Reading First director took direct action to ensure that a particular approach to reading instruction was represented on the expert review panel," the report says.

The inspector general also found potential conflicts of interest among members of an assessment committee that reviewed tests suitable for use of Reading First in schools. Committee members themselves had produced five of those assessments.

Although Direct Instruction and Success for All are backed by the most scientific evidence of any reading programs, neither method has gotten a boost under Reading First. Reading Recovery, an intensive one-on-one tutoring program for struggling readers, which has also presented evidence of its effectiveness, was named in several of Mr. Doherty's e-mails in which he suggested that officials should try to discourage its use among grant recipients.

Also implicated in the report for their roles in setting requirements for the program were Susan B. Neuman, who served as the department's assistant secretary for elementary and secondary education from March 2001 until January 2003 and G. Reid Lyon, who directed the branch of the National Institute of Child Health and Human Development that supports reading research.

Ms. Neuman returned to her job as a reading researcher at the University of Michigan, in Ann Arbor. Mr. Lyon now works for Best Associates in Dallas.

In an interview, Ms. Neuman said she was not included in what she described as closed-door discussions between Mr. Doherty, other staff members, and consultants as they drafted guidance for the program and advised state officials on their grant proposals.

Mr. Lyon said his role was simply to explain and clarify what the research says is effective in reading instruction.

It is Mr. Doherty's role in directing the grant-application process that is outlined in detail in the report, including e-mail exchanges that express in sharp wording his disdain for what he viewed as insufficiently rigorous instructional materials. Just days before the report was released, Mr. Doherty announced that he would be leaving his position with the department Oct. 1 for work in the private sector. He could not be reached for comment.

The handful of remaining Reading First staff members have been reassigned within the Education Department, according to spokesman Chad Colby.

In past interviews with *Education Week*, Mr. Doherty has maintained that the department only pressed state and local officials to meet the law's demand for research-based materials, assessments, and practices, and provided counsel on how they could do that.

"In fact, what we've said about Reading First is that there is no approved list of programs or assessment, truthfully," Mr. Doherty said in an interview last year.

## Beyond the Law?

Some education experts said the Education Department had no choice but to push hard for states to change their approach to reading instruction. Many states, they said, wanted to continue using failed approaches or programs with no evidence of effectiveness.

In spring 2002, an *Education Week* survey found that most state officials were generally satisfied with their existing reading initiatives and planned to use Reading First money to expand, enhance, or supplement them without making wholesale changes.

Federal officials, however, said that simply tweaking existing approaches would not satisfy the rigorous demands of the new program. ("Federal Program Will Test States' Reading Policies," June 19, 2002.)

"In my view, Reading First is starting to get results, not in spite of the aggressive approach of the department, but because of it," said Michael J. Petrilli, a former official at the Education Department during the current administration. Mr. Petrilli, now the vice president for national programs and policy at the Washington-based Thomas B. Fordham Foundation, said the inspector general's report does not point to any illegal activity but chronicles how department employees pressed to ensure the law's intent was followed.

The inspector general, however, suggests that officials went beyond the law, which prohibits federal employees from influencing or directing states' decisions on curricula, tests, or instructional methods.

Some observers agree.

"The issue is that here are these folks who saw an opportunity to really, fundamentally move the debate on reading instruction," said Andrew J. Rotherham, a co-founder and the director of the Washington-based think tank Education Sector. "That doesn't allow them to deviate from what the law allows."

The inspector general's office is conducting five other audits related to Reading First. The reports could be completed by the end of the year, according to Mary Mitchelson, who serves as counsel to the inspector general.

In a statement, Secretary of Education Margaret Spellings said some of the actions described in the report "reflect individual mistakes" by federal employees. She added that she was "moving swiftly to enact all of the inspector general's recommendations."

The inspector general has recommended that the department review the structure and management of the Reading First office, establish guidelines to ensure staff members understand the prohibitions in the NCLB law, and set up greater oversight of programs as they are implemented.

## Spellings' Involvement

Mr. Petrilli, Mr. Rotherham, and others question Ms. Spellings' claims that the program was implemented without her input. Although she became education secretary in early 2005, after many of the practices outlined in the report occurred, she was closely involved in the establishment of the No Child Left Behind program overall, and Reading First, while she served at the White House as President Bush's chief domestic-policy aide during his first term, Mr. Petrilli said.

"Margaret Spellings was involved in this from day one in her role as domestic-policy adviser, and that's something she should have been proud of because it's one of the most successful education programs in the history of the department," he said.

"Instead of defending it and hailing its success, she's hanging one of her most loyal lieutenants out to dry," Mr. Petrilli said, referring to Mr. Doherty.

Ms. Spellings has not yet responded to those allegations.

State and local education officials have generally praised the program for focusing needed resources on professional development and materials in reading. And many are reporting that those efforts are having a positive bearing on student achievement. But those successes have not been linked to the curriculum and assessment decisions made by those states. It is also not known whether a greater choice of instructional program, combined with the additional resources for teacher professional development and support services provided to Reading First schools, would have had a similar outcome.

The program's results do not appease some officials who say the process may have hindered their ability to serve more children.

"The process we had to go through was so excruciating," said Lisa Y. Gross, a spokeswoman for the Kentucky education department. Kentucky had to revise its Reading First application at least three times, and officials said they gained approval only after buckling to Mr. Doherty's demands to change the assessment portion of the plan. Despite the benefits of the program, Ms. Gross said, "still we believe if we had gotten our first proposal accepted, we could have provided many more services for students or at least gotten started a lot sooner."

On Capitol Hill, meanwhile, Rep. George Miller, D-Calif., urged Republican members of the House Education and the Workforce Committee to hold hearings on the inspector general's findings.

"This was a concerted effort to corrupt the process on behalf of partisan supporters, and taxpayers and schoolchildren are the ones who got harmed by it," Rep. Miller, the committee's ranking Democrat, said in a statement. He was among a bipartisan group that initiated a separate investigation of the program by the Government Accountability Office. That report is due out in January

Sen. Richard G. Lugar, R-Ind., responded to the report in a letter to Ms. Spellings last month. The report "seemed to suggest that the department mismanagement was even worse than expected," he wrote. But, the senator added, that her promise to implement the inspector general's recommendations was "a good start."

**LOAD-DATE:** June 13, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2006 Editorial Projects in Education, Inc
All Rights Reserved

**EXHIBIT J**

1 of 1 DOCUMENT

US Fed News

September 28, 2006 Thursday 4:38 AM EST

# SEN. HARKIN CALLS ON DEPARTMENT OF EDUCATION SECRETARY SPELLINGS TO DISCLOSE INVOLVEMENT IN READING FIRST SCANDAL

**BYLINE:** US Fed News

**LENGTH:** 533 words

**DATELINE:** WASHINGTON

The office of Sen. Tom Harkin, D-Iowa, issued the following press release:

Sen. Tom Harkin (D-IA) today called on Department of Education Secretary Margaret Spellings to disclose her involvement in the Reading First scandal following a blistering report from the department's Inspector General released last week shows significant misconduct by senior officials. Harkin is the ranking Democrat on the subcommittee that funds education initiatives.

The IG's findings indicate senior employees mismanaged the billion-dollar-a-year initiative, steered school contracts to publishers they favored and away from others; and flagrantly ignored federal laws on maintaining local and state control of school curricula. Over the past five years, Congress has allocated nearly $5 billion to the Reading First program.

"Secretary Spellings responded to the report by blaming other department employees and noting that the events occurred before she took over the Department," Harkin said. "However, as President Bush's domestic policy adviser, she exerted enormous control over Department activities. A former Department official, Michael Petrilli, said this week that 'she micromanaged the implementation of Reading First from her West Wing office.' "

"If so, it's hard to imagine that Secretary Spellings didn't know anything about the abuses described in the Inspector General report," Harkin added. "Instead of making others take the fall for what happened, she needs to stand up and say whether she had any knowledge of or involvement in these activities when she worked at the White House."

As described by the Department of Education, Reading First focuses on "putting proven methods of early reading instruction in classrooms." Through the program, states and districts receive funding to apply "scientifically based reading research-and the proven instructional and assessment tools consistent with this research-to ensure that all children learn to read well by the end of third grade."

The IG report singled out a number of states for problems, including Massachusetts. There, the Reading First Director called a state official to say he had concerns about certain reading programs that four of Massachusetts' districts were using, all of which had already gone through the appropriate approval process. Following the call, three districts dropped the programs in question and continued to receive Reading First funding; the one that continued with its program had its Reading First funding stripped.

These and other actions highlighted in the IG report could be in violation of existing law, considering the statute that established the Education Department states:

"No provision of a program administered by the Secretary or by any other officer of the Department shall be construed

to authorize the Secretary or any such officer to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system...over the selection or content of?textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law."

**LOAD-DATE:** October 1, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newswire

Copyright 2006 HT Media Ltd.
All Rights Reserved

**EXHIBIT K**

RE:                                                                    Page 1 of 2    184

Nonresponsive

**From:** Bryan, Beth Ann
**Sent:** Thursday, January 30, 2003 9:48 AM
**To:** 'Lyon, Reid G. (NIH/NICHD)'
**Subject:** RE:

poifect

-----Original Message-----
**From:** Lyon, Reid G. (NIH/NICHD) [mailto:lyonr@exchange.nih.gov]
**Sent:** Thursday, January 30, 2003 9:41 AM
**To:** 'Bryan, Beth Ann'
**Subject:** RE:

I will be there about 10 to 4 - is that ok


# G. Reid Lyon, PhD

*Chief*
Child Development & Behavior Branch
National Institute of Child Health & Human Development
National Institutes of Health
6100 Executive Boulevard
Room 4B05 - MSC 7510
Bethesda, MD  20892
[for federal express use: Rockville, MD 20852-7510]
**Web site:** http://www.nichd.nih.gov/crmc/cdb/cdb.htm
   **Phone:** (301) 496-9849
      **Fax:** (301) 480-0230
   **E-mail:** rl60a@nih.gov


-----Original Message-----
**From:** Bryan, Beth Ann [mailto:BethAnn.Bryan@ed.gov]
**Sent:** Thursday, January 30, 2003 9:35 AM
**To:** Lyon, Reid G. (NIH/NICHD)
**Subject:** RE:

PS - Don't be late if you can.  BA

-----Original Message-----
From: Lyon, Reid G. (NIH/NICHD) [mailto:lyonr@exchange.nih.gov]
Sent: Thursday, January 30, 2003 8:34 AM
To: 'bethann.bryan@ed.gov'
Subject: Fw:

FROM A MAJOR PUBLISHER. CAN YOU FORWARD TO MARGARET. WE HAVE TO DISCUSS
PUBLISHERS TODAY WITH MARGARET. WE HAVE BEEN MEETING WITH SOME CEOs FROM

RE:

THE
INDUSTRY AND THEY WANT TO PLAY BALL. BUT WE ARE NOT HELPING THEM VERY
MUCH.
I WILL PROVIDE SPECIFICS.

R
------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)


-----Original Message-----
From: Maureen_DiMarco@hmco.com <Maureen_DiMarco@hmco.com>
To: Lyon, Reid G. (NIH/NICHD) <lyonr@exchange.nih.gov>; rl60a@hmco.com
<rl60a@hmco.com>
Sent: Wed Jan 29 22:27:32 2003
Subject:

First, I hear that Brent Staples at the New York Times is going to run an
editorial very critical of the actions in New York City Schools on
curriculum. Hurrah!

Second, I hear that you may be getting some heat for your comments. If
that is true I am not only outraged since all you did was speak the
truth....but also extremely alarmed. As I told you when we talked weeks
ago, we are putting together an entire operation to insure the research
base quality of all of our instructional materials. This is a major
commitment of attitude and money. The actions in New York City have put an
enormous chill on our people. They feel they have invested huge amounts of
money and effort and have become educated to be true believers.....but if
NYC is allowed to put in whole language and incidental phonics
window-dressing, then they realize the federal government has thrown in the
towel on its effort and it will collapse faster than it took to create it.
This is a watershed moment for SBR and NCLB. Your speaking up was
essential....for more than New York City. I hope someone there knows this.

Third, I hope to hell that Rod did NOT tell NYC that their plan sounded
fine!

**EXHIBIT L**

More conflicts disclosed in Reading First program - USATODAY.com        http://usatoday.printthis.clickability.com/pt/cpt?action=cpt&title=M...



PLUS nights and weekends $39.99/mo Stay connected for less. 1000 Whenever minutes



PRINT THIS

Powered by Clickability

Click to Print

SAVE THIS | EMAIL THIS | Close

## More conflicts disclosed in Reading First program

**By Nancy Zuckerbrod, AP Education Writer**

WASHINGTON — Officials who gave states advice on which teaching materials to buy under a federal reading program had deep financial ties to publishers, according to a congressional report Wednesday.

The report, compiled by Senate Education Committee Chairman Edward Kennedy, D-Mass., details how officials contracted by the government to help run the program were at the same time drawing pay from publishers that benefited from the reading initiative.

Kennedy's report added new detail to a conflict-of-interest investigation by the Education Department's inspector general, John Higgens, who earlier had found that the Reading First Program favored some programs over others and that federal officials and contractors didn't guard against conflicts.

The new report focused on four contractors who headed centers that guided states in choosing reading programs aimed at kindergartners through third graders.

It found the contractors "had substantial financial ties to publishing companies while simultaneously being responsible for providing technical assistance to states and school districts." That damaged the program's integrity and illustrated the need for Congress to head off future conflicts, the report concluded.

The report zeroed in on four people who directed the program's regional Technical Assistance Centers:

—Edward Kame'enui, who headed the western technical assistance center based at the University of Oregon. Between 2002 and 2004, while holding positions in which he was evaluating Reading First assessment programs and giving state education agencies technical assistance, Kame'enui entered into three different contracts with the publisher Pearson/Scott Foresman, the report said.

"Due largely to his contracts with Pearson/Scott Foresman, Dr. Kame'enui's income soared in the period following the implementation of the Reading First program," the report said, adding that the majority of his royalties were derived from products used by states and districts in conjunction with Reading First.

Kame'enui, who now works as a commissioner at the Education Department's research arm, earned hundreds of thousands of dollars in royalties from Pearson/Scott Foresman between 2001 and 2006, the report said. He also received tens of thousands of dollars in consulting fees from Voyager, another publisher of products used by states under Reading First from 2000 to 2003.

Scott Foresman also tapped Kame'enui to travel to education conferences and workshops on the company's behalf while he was the western center director, the report said. Kame'enui did not respond to requests for comment.

Douglas Carnine, who replaced Kame'enui as the western center's director in 2005, when Kame'enui left to take up his federal position. Previously Carnine had other roles related to Reading First.

Even as he headed the western center, Carnine worked with and continues to work with numerous publishers, the report said.

Advertisement

**Mortgage Rates Fall Again!**

*I want a*
$525,000
*Mortgage for Under*
$1,849 /Month!



**Calculate New Payment**

**Click Your State**
Alabama

**Click Your Rate**
3.00% - 3.99%

**Click Credit Type**
Good

LendingTree.com

He earned hundreds of thousands of dollars in royalties from publishers that did well under Reading First, such as Houghton Mifflin Company from 2002 to 2006.

However, Carnine said in an interview Wednesday that his royalties from Houghton Mifflin and other publishers were for educational programs that had nothing to do with K-3 reading, the focus of Reading First.

Joseph Torgesen, who directed the eastern regional district at Florida State University from 2003 until the present. Torgesen is co-author of a McGraw Hill reading program that can be used under Reading First. The study found that from 2002 to 2006, Torgesen earned thousands of dollars in royalties and other payments from companies such as McGraw Hill and Pearson and Sopris West, which later was acquired by Cambium Learning.

In one internal e-mail, Torgesen questioned whether he should seek special permission from the department to review the new Scott Foresman curriculum for Maine. "I had a discussion with some folks in Washington yesterday who rightly pointed out that we might want to think about rewarding Pearson (Scott Foresman) for significantly strengthening their program," Torgesen wrote.

Torgesen, in an interview Wednesday, said a review for the state of Florida had initially identified a Scott Foresman reading program as weak. However, Torgesen said Scott Foresman subsequently made significant improvements to the program, after which education officials in Maine asked Torgesen's center to review the program again.

"That prompted my e-mail to the folks in Washington, who suggested perhaps we might make an exception to re-reviewing Scott Foresman, since they had worked so diligently to improve their program," Torgesen said.

Sharon Vaughn headed the central technical assistance center at the University of Texas-Austin from 2003 to 2005. She received tens of thousands of dollars in royalties from Pearson Education Inc. and "other income" from Voyager Expanded learning, two programs used under Reading First.

Vaughn's lawyer, Gaines West, said it was noteworthy that the report did not say that Vaughn was improperly influenced by her relationship with publishers while she was the center's director.

The report concluded by recommending that Congress adopt new restrictions to safeguard against financial conflicts in federal education programs.

"Individuals serving on advisory committees or in the peer review process for the department should be prohibited from maintaining significant financial interests in related educational products or activities," the report said.

Education Secretary Margaret Spellings is scheduled to testify in Congress on Thursday on the Reading First program and problems in the student loan industry.

Spellings said in an Associated Press interview Wednesday that she had not yet thoroughly reviewed Kennedy's report but that any new findings of wrongdoing would be addressed by the department.

She said, however, that it would be impossible to run department programs without relying on some people with ties to the private sector. "We want and need expertise as we make policy and do this work," she said.

*Copyright 2007 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

**Find this article at:**
http://www.usatoday.com/news/education/2007-05-09-reading-first-program_n.htm

🖨 Click to Print

SAVE THIS | EMAIL THIS | Close

☐ Check the box to include the list of links referenced in the article.

Copyright 2007 USA TODAY, a division of Gannett Co. Inc.

**EXHIBIT M**

MAJORITY MEMBERS:

GEORGE MILLER, CALIFORNIA, Chairman

DALE E. KILDEE, MICHIGAN, Vice Chairman
DONALD M. PAYNE, NEW JERSEY
ROBERT E. ANDREWS, NEW JERSEY
ROBERT C. "BOBBY" SCOTT, VIRGINIA
LYNN C. WOOLSEY, CALIFORNIA
RUBEN HINOJOSA, TEXAS
CAROLYN McCARTHY, NEW YORK
JOHN F. TIERNEY, MASSACHUSETTS
DENNIS J. KUCINICH, OHIO
DAVID WU, OREGON
RUSH D. HOLT, NEW JERSEY
SUSAN A. DAVIS, CALIFORNIA
DANNY K. DAVIS, ILLINOIS
RAÚL M. GRIJALVA, ARIZONA
TIMOTHY H. BISHOP, NEW YORK
LINDA T. SÁNCHEZ, CALIFORNIA
JOHN P. SARBANES, MARYLAND
JOE SESTAK, PENNSYLVANIA
DAVID LOEBSACK, IOWA
MAZIE HIRONO, HAWAII
JASON ALTMIRE, PENNSYLVANIA
JOHN A. YARMUTH, KENTUCKY
PHIL HARE, ILLINOIS
YVETTE D. CLARKE, NEW YORK
JOE COURTNEY, CONNECTICUT
CAROL SHEA-PORTER, NEW HAMPSHIRE



**COMMITTEE ON EDUCATION AND LABOR**
U.S. HOUSE OF REPRESENTATIVES
2181 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6100

MAJORITY – 202-225-3725
MINORITY – 202-225-4527
http://edlabor.house.gov

MINORITY MEMBERS

HOWARD "BUCK" McKEON, CALIFORNIA,
Senior Republican Member

THOMAS E. PETRI, WISCONSIN
PETER HOEKSTRA, MICHIGAN
MICHAEL N. CASTLE, DELAWARE
MARK E. SOUDER, INDIANA
VERNON J. EHLERS, MICHIGAN
JUDY BIGGERT, ILLINOIS
TODD RUSSELL PLATTS, PENNSYLVANIA
RIC KELLER, FLORIDA
JOE WILSON, SOUTH CAROLINA
JOHN KLINE, MINNESOTA
CATHY McMORRIS RODGERS, WASHINGTON
KENNY MARCHANT, TEXAS
TOM PRICE, GEORGIA
LUIS G. FORTUÑO, PUERTO RICO
CHARLES W. BOUSTANY, JR., LOUISIANA
VIRGINIA FOXX, NORTH CAROLINA
JOHN R. "RANDY" KUHL, JR., NEW YORK
ROB BISHOP, UTAH
DAVID DAVIS, TENNESSEE
TIMOTHY WALBERG, MICHIGAN
DEAN HELLER, NEVADA

May 1, 2007

**VIA FACSIMILE- 202-401-0596**
The Honorable Margaret Spellings
Secretary
U.S. Department of Education
400 Maryland Avenue, SW, Rm. 7W301
Washington, DC 20202

Dear Secretary Spellings:

Over the past few weeks, the Committee on Education and Labor has held investigative hearings that produced evidence of unethical practices in the student loan industry and of pervasive mismanagement and conflicts of interest in the Reading First program. The Committee's ongoing investigations into these two multi-billion-dollar programs have uncovered significant lapses in oversight among senior level White House and Department of Education officials responsible for their stewardship.

For several years, the Administration has been aware of the unethical practices among lenders and schools participating in the federal student loan programs, yet has to act to protect the integrity of the $85 billion-a-year programs. Recent news accounts have cited formal warnings dating back to at least 2001 that highlighted the dangers of inducements and other prohibited activities if left unchecked. Similarly, warnings raised years ago about the overall mismanagement of the Reading First program – and of the failure to mitigate conflicts of interest in the program – were ignored by the Administration. This consistent failure to act in the interests of our nation's students raises significant questions about why such warnings have been ignored.

Given the preliminary results of our ongoing investigations and the daily public reporting of unethical practices in programs within the Education Department, I seek additional information about the Department of Education's stewardship of the government's student loan and Reading First programs.

I ask that you provide me with the details of all senior-level Department of Education communications regarding the unethical practices among student lenders and schools (e.g., prohibited inducements) and the design and implementation of the Reading First program beginning January 20, 2001, through the receipt of this request. Specifically, I request the communications of former Secretary of Education Rodney Paige; former Senior Advisor to Secretary Paige, Beth Ann Bryan; former Deputy Secretary William Hansen; former Under Secretary and Deputy Secretary Eugene Hickok; present Chief of Staff to the Secretary David Dunn; and any other senior-level staff with responsibilities for the student loan and Reading First programs. I am sending a similar request to the White House.

I respectfully request your written response within 10 days of receiving this letter. I further ask that your staff coordinate the production of the requested information with Michael Zola, Chief Investigative Counsel, House Education and Labor Committee at (202) ███-███.

Sincerely,


**GEORGE MILLER**
Chairman

cc: Senior Republican Member Howard "Buck" McKeon


Enclosure: Information Request Supplemental Instructions

# EXHIBIT H



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

AUG 2 7 2007

August 23, 2007

Daniel C. Roth, Esq.
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00655-F

Dear Mr. Roth:

This letter is in response to your letter dated July 11, 2007, regarding your May 11, 2007 request for information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. By letter dated June 20, 2007, we advised you of our determination that your request could not be processed because it does not describe the records sought in detail sufficient to enable Department staff with knowledge of the subject matter of the request to identify and locate potentially responsive documents with a reasonable amount of effort.[1]  Your July 11, 2007 letter challenges this determination.

However, your July 11, 2007 letter also states "[t]o the extent searching for those records presents a scope problem, or to the extent CREW could narrow its request to reduce the burden on Education without abandoning any rights to documents under FOIA, please provide information[.]"  In response to your invitation to discuss further clarification of the scope of your request, the Department is providing you with the following information:

- Your request for "any and all communications from January 20, 2001, to the present, between officials at the Department of Education" fails to identify the Department officials whose communications are sought.

- There are several programs implicated by the persons and entities identified in your request. Your request fails to identify a specific program or a specific subject matter focus for the Department's search for responsive records.

- The Department concluded that the two programs most likely implicated by your request – Early Reading First and Reading First – were created with the enactment of the No Child Left Behind Act of 2001. Thus, the time period identified in your request predates the legislation that is the subject of the request.

---

[1] The June 20, 2007 letter also denied your request for a fee waiver. However, the Department will address your appeal of that determination in a separate letter.

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-4500
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

Page 2 - Citizens for Responsibility & Ethics in Washington
No. 07-00655-F

The Department is unable to process your request further unless and until we receive clarification from you regarding the issues identified above.  Should you wish us to process your request further, please send the requested clarifying information to the U.S. Department of Education ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC  20202-4700, or by e-mail to: EDFOIAManager@ed.gov.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

# EXHIBIT I



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

ASSISTANT SECRETARY

**SEP 0 6 2007**

Daniel C. Roth, Esq.
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, DC 20005
(and via e-mail to: droth@citizensforethics.org )

　　　Re: FOIA Appeal—Request No. 07-00517-F (Fee Waiver)

Dear Mr. Roth:

I am writing in response to your June 21, 2007 letter appealing the Department's June 8, 2007
denial of CREW's request for a waiver of fees in connection with its March 28, 2007 request for
Department records pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552,
administratively denominated Request No. 07-00517-F. I regret the delay in responding to your
appeal.

Background

Your Request No. 07-00517-F, as modified by e-mail communication dated May 21, 2007,
sought access to "any and all documents and records from January 20, 2001 to the present, in the
offices of: 1) The Secretary; 2) Senior Counselor; 3) Chief of Staff; 4) Deputy Secretary; 5)
Management Improvement Team; 6) Elementary and Secondary Education; 7) Institute of
Education Sciences; 8) Planning Evaluation and Policy Development; 9) Civil Rights; 10)
Innovation and Improvement; 11) Special Education and Rehabilitative Services; 12)
Management; 13) Chief Financial Officer; and 14) Communications and Outreach, in the
following categories:[1]

1. All communications . . . to, from, or referencing any member of the White House staff,
   including, but not limited to, then-Domestic Policy Advisor Margaret Spellings or
   Margaret LaMontagne, that mention or relate to Reading First, Early Reading First,
   "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR," or
   DIBELS.

---

[1] Your request also sought access to a fourth category of documents: "To the extent not included in the above
request, . . . all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks, and/or the Title I
Monitor. Your fee waiver appeal does not concern this aspect of your request because the Department has already
responded to it in full. Appeal, p. 2.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-4500
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

Page 2—Mr. Roth

2. All communications . . . , including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and IntelliTools.

3. All communications . . . , including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and IntelliTools.

Your request also asked for a waiver of associated processing fees. Your fee waiver request and a clarifying e-mail communication dated May 11, 2007[2] asserted: (1) that the records sought concern the operations of the federal government; (2) that their disclosure to CREW would likely contribute significantly to the public's understanding of the extent of White House involvement in the administration of the Department's Reading First program (which enhancement CREW would accomplish by analyzing the responsive records and sharing such analysis with the public via memoranda, reports, or press releases, and/or by disseminating the responsive records on an interactive website for public analysis and comment); and (3) that the request was made primarily for non-commercial purposes.

The Department denied your fee waiver request by letter dated June 8, 2007,[3] on the ground that you had not met your burden to demonstrate that disclosure of the records responsive to your request would contribute significantly to public understanding of government operations or activities. Specifically, the Department's fee waiver denial letter stated, in pertinent part:

The Department's April 16, 2007 letter to you outlined in detail the legal standard for analyzing fee waiver requests and assessing whether a waiver or reduction of fees is appropriate; that standard is referred to and incorporated by reference herein.

. . . [T]he Department assumes, for the sake of argument, that the documents responsive to items 1 through 3 of your FOIA request meet the first two elements of the public interest prong of the fee waiver analysis because they are presumed to relate to the Department's administration of the Reading First program. The Department has also concluded that, based upon the information contained in your May 11, 2007 e-mail, items 1 through 3 of your request meet the third element of the public interest prong of the fee waiver analysis. Nevertheless, the Department finds that you have not met your burden

---

[2]  Your May 11, 2007 e-mail communication was characterized by you as "an informal appeal" of the Department's April 16, 2007 letter initially denying your fee waiver request.

[3]  The June 8, 2007 denial of your fee waiver request followed up on the following additional communications between the parties: (1) the Department's April 16, 2007 letter initially denying your fee waiver request; (2) a conference call in which the parties discussed CREW's possible narrowing of the scope of its FOIA request; (3) your May 11, 2007 e-mail communication, informally appealing the Department's April 16, 2007 fee waiver denial; and (4) your two e-mail communications dated May 14 and May 21, 2007, concerning modifications to CREW's FOIA request.

Page 3—Mr. Roth

> with regard to the fourth element of the public interest prong of the fee waiver analysis,
> i.e., the requirement that disclosure of the records in question "contribute significantly" to
> public understanding of government operations or activities.

The Department found it unlikely that the public's understanding of the subject of the request –
the Department's administration of the Reading First program – would be significantly
enhanced, vis-à-vis its level of understanding prior to disclosure, because: (1) many of the
voluminous documents at issue in your fee waiver request could not in any way enhance the
public's understanding of the Reading First program, much less do so significantly, inasmuch as
they concern other program matters; (2) your fee waiver request argued that disclosure of the
documents at issue would clarify the public record with respect to alleged "significant
inconsistencies . . . as to the involvement of Secretary Spellings in the administration of Reading
First prior to her becoming Secretary of Education," but failed to demonstrate a nexus between
such alleged but unspecified "inconsistencies" and the contents of the documents at issue; and
(3) that several sources of information on the Department's contacts with educational publishers
already exist in the public domain, notwithstanding your argument to the contrary. Your appeal
ensued.

Decision on Appeal

Based upon a careful review of the correspondence between the parties, the nature of your
request and the information it sought, the arguments asserted in your appeal, and applicable legal
precedent, I find that the Department properly denied your request for a fee waiver. The reasons
for my decision are set forth below.

Legal Standard for Fee Waivers Under FOIA

The FOIA authorizes agencies to recover from requesters certain costs associated with
processing requests for access to government records. 5 U.S.C. § 552(a)(4)(A)(i) and (ii) (2000).
The statute further provides for the waiver of such fees in whole or in part where disclosure of
the information [requested] is in the public interest because it is likely to contribute significantly
to public understanding of the operations or activities of the government and is not primarily in
the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii) (2000); see also 34 C.F.R.
§ 5.64(a). The requester bears the burden of justifying entitlement to a fee waiver. See Casad v.
Department of Health and Human Services, 2003 U.S. Dist. LEXIS 13007 (D.D.C. June 20,
2003). As stated in the Department's April 16, 2007 letter, and discussed below, fee waiver
determinations turn on the consideration of six factors. To demonstrate entitlement to a waiver
of fees, a requester must not only request a waiver, but also address these factors in sufficient
detail to enable an agency to determine whether it can reduce or waive the fees. See Judicial
Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003). The Department may not waive or
reduce fees unless it makes the requisite findings regarding both the public interest and primary
interest. 34 C.F.R § 5.64(a).

Page 4—Mr. Roth

### Public Interest Prong

Once a requester has asserted a right to a waiver of fees, he or she must meet the first prong of the statutory test by supporting the request with evidence that establishes that disclosure of the information sought is in the public interest. 5 U.S.C. § 552(a)(4)(A)(ii) (2000). In order to determine whether the disclosure of the information responsive to a request furthers the narrow public interest cognizable under FOIA – i.e., significant contribution to increased public understanding of the operations of the government – the Department must consider the following four factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government" (in some instances, certain documents contained in records responsive to a request will meet this requirement while others will not);
2. In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested records must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large" as opposed to that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R § 5.64(b)(1) and (2). Only if a requester establishes all four elements of the public interest test outlined above, will the Department find that the first prong of the statutory requirement for a fee waiver has been satisfied.

### Primary Interest Prong

Where an agency determines that the public interest requirement for a fee waiver has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii) (2000). In order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

1. Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and
2. If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee wavier or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

See also 34 C.F.R Section 5.64(b)(3).

Page 5—Mr. Roth

Discussion

The Department concluded, for the purposes of its initial determination on your fee waiver request – and I do so here – that you had met your burdens as to Factors 1, 2, and 3 of the public interest prong of the two-part test outlined above. Nevertheless, the Department denied your fee waiver request based on a determination that you had failed to meet your burden, under Factor 4 of the public interest prong, to show how disclosure of the requested records will contribute "significantly" to the public's understanding of government operations and activities; in this regard, the initial decision noted that significance is measured by a likely enhancement of the public's understanding of the subject at issue as a result of the disclosure, compared to the public's level of understanding of that same issue prior to disclosure. D.C. Technical Assistance Org. v. Dep't of Housing and Urban Development, 85 F. Supp. 2d 46, 49 (D.D.C. 2000); see also Judicial Watch, Inc. v. U.S. Department of Justice, supra, 185 F. Supp. 2d at 62.[4]

Your appeal argues: (1) that the Department's denial was based in error on CREW's original March 28, 2007 request rather than on the "narrowed" request elucidated in your May 21, 2007 e-mail submission; (2) that the documents responsive to your request would significantly enhance public understanding relative to "serious inconsistencies" in the public record with respect to Secretary Spellings' involvement in Reading First prior to her tenure as Secretary; (3) that the information sought in Items 2 and 3 of the request "will likely contribute significantly to the public's understanding of the extent to which publishers were in contact with the Department and [A]dministration personnel during the Reading First development and grant process"; and (4) to the extent [the records sought] go beyond Reading First, they will shed light on the operations of the federal government, and therefore meet the public interest requirement for a fee waiver. For the following reasons, I do not find that any of these arguments states a basis for granting your appeal.

With respect to your first argument, it does appear that the Department's denial analyzed your fee waiver request in the context of your original March 28, 2007 request rather than the modified request submitted on May 21, 2007. However, your appeal mischaracterizes the modified request as, simply, "narrowed" in scope. Rather, while the modified request is narrower than the original in some respects (e.g., narrowed scope from Department-wide to 14 offices representing approximately one half of the Department's components; elimination of "any other issue related to reading instruction or education" from Item 1; elimination of catchall "including but not limited to" language in Items 2 and 3), it is significantly broader in other respects (e.g., the addition of new name search terms in all three items; the addition of a new program – Early Reading First – in Item 1; the addition of "calendar references and meeting notes" to Item 3). In any event, your argument fails even to address, much less effectively to challenge, the Department's finding that your request is overbroad to qualify for a fee waiver because many of the responsive documents are unrelated to the subject of your request – the Department's administration of the Reading First program. For example, the responsive time frame for all items of the request, commencing January 20, 2001, antedates by a year the creation of the Reading First program; and all items of the request seek access to communications

---

[4] As CREW failed to meet its burden with respect to the public interest prong of the fee waiver test, it is unnecessary to analyze whether it has satisfied the requirements of the primary interest prong.

Page 6—Mr. Roth

concerning matters other than Reading First. That is true for CREW's March 28, 2007 request and remains so for the May 21, 2007 modification.

Your first argument concludes:

> The Department cannot and does not argue that the records sought will not enhance the public's understanding of the operations of the federal government. This is all that the fee waiver provision of the FOIA requires of a requester that [sic] has shown that the information sought is not primarily in its commercial interest. See 5 U.S.C. § 552(a)(4(A)(3).

June 21, 2007 Appeal, p. 4. The quoted passage both misstates the law (omitting the word "significantly" from the cited statutory provision) and speaks to an element of the fee waiver test not at issue (i.e., Factor 3 of the public interest prong, as to which the Department found CREW had met its burden).

I also find your second argument – that the documents responsive to your request would significantly enhance public understanding relative to "serious inconsistencies" in the public record with respect to Secretary Spellings' involvement in Reading First prior to her tenure as Secretary – unpersuasive. Initially, I note, notwithstanding the references in your submissions to "serious inconsistencies" in the plural, the examples cited in fact represent statements regarding a single inconsistency attributed to a number of different sources. In any event, this inconsistency has been widely reported, as evidenced by the examples you have provided. However, none of your submissions demonstrates how the documents responsive to your request – other than Item 1 documents that specifically reflect Ms. Spellings' involvement or lack of involvement with Reading First before coming to the Department, if such documents exist – would enlighten the public as to either the alleged inconsistency or the broader subject of the Department's administration of the Reading First program.

Your third argument – that the information sought in Items 2 and 3 of the request "will likely contribute significantly to the public's understanding of the extent to which publishers were in contact with the Department and [A]dministration personnel during the Reading First development and grant process" – is made for the first time on appeal. In any case, I find this argument unpersuasive because it makes no connection between Department contacts with educational publishers while Reading First was being developed and the Department's later administration of the program. I note as well that this argument does not even suggest a connection between documents responsive to Items 2 and 3 that are unrelated to Reading First and the Department's administration of that program, much less show how the disclosure of such documents would inform the public in a significant way about Reading First.

And finally, I find your argument that, to the extent the records sought go beyond Reading First, they will shed light on the operations of the federal government, and therefore meet the public interest requirement for a fee waiver, similarly without merit. Your argument is conclusory and utterly lacking in specificity sufficient to meet the requester's burden: in essence, you state that unidentified records will shed light on unspecified activities not of this Department but, rather, of the "federal government." It follows, logically, that you fail to show how disclosure of such

Page 7—Mr. Roth

materials will increase public understanding of the Department's operations or activities in a significant way.

For all of these reasons, I must deny your appeal.

Right to Judicial Review

This letter constitutes exhaustion of the administrative remedies available to you under FOIA. You have the right to judicial review of this decision, pursuant to 5 U.S.C. § 552(a)(4), in the United States District Court for the district in which you reside, in which you have your principal place of business, in which the records are maintained, or for the District of Columbia.

Sincerely,

Michell Clark

**<u>CERTIFICATE OF SERVICE</u>**

IT IS CERTIFIED that the foregoing Motion to Amend Complaint and Amended

Complaint with exhibits was caused to be served upon Defendant Archivist's counsel on

September 20, 2007, in accordance with the Court's ECF Procedures, and by depositing a copy

thereof in the United States mail, postage prepaid, addressed as follows:

Dr. Allen Weinstein, Archivist
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740

/s/ Kimberly D. Perkins
Kimberly D. Perkins