## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:07-cv-00963 (RMU) |
| | : | |
| U.S. DEPARTMENT OF EDUCATION, | : | |
| | : | |
| MARGARET SPELLINGS, SECRETARY OF EDUCATION (in her official capacity), | : | |
| | : | |
| | : | |
| THE NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | : | |
| | : | |
| DR. ALLEN WEINSTEIN, ARCHIVIST OF THE UNITED STATES (in his official capacity) | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CLAIMS ONE THROUGH FOUR OF THE AMENDED COMPLAINT

The Department of Education ("Education") repeatedly attempts to recast the version of events surrounding Citizens for Responsibility and Ethics in Washington's ("CREW") Complaint under the Federal Records Act ("FRA") and the Freedom of Information Act ("FOIA"). Education employees twice told CREW's counsel that they sometimes use private email addresses to conduct official business and that this issue had arisen in the past in the context of other FOIA requests. See Declaration of Dan Roth, CREW Counsel ("Roth Decl.") at ¶ 9 (attached as Exhibit 1). CREW brought this lawsuit under the FRA after it was denied access to agency records that were created by agency employees using outside email accounts.

Before CREW filed its original Complaint against Education based on the agency's violation of the FRA, CREW sent a letter to the Secretary of Education ("Secretary"), the National Archives and Records Administration ("NARA") and the Archivist to put them on notice of Education's FRA violations. Once it was clear to CREW that none of these parties was investigating or resolving Education's violations of the FRA, CREW amended its Complaint to add these additional parties.

In addition, after exhausting all of its administrative remedies under the FOIA, CREW amended its Complaint to include allegations under the FOIA, based on Education's failure to respond fully to CREW's FOIA request and failure to grant CREW its request for a fee waiver. CREW filed its original FOIA request in March 2007. Next, at the suggestion of Education, CREW participated in a conference call with employees of Education in May 2007, to discuss narrowing its request. Finally, in May 2007, CREW sent another FOIA request narrowing the items requested under its original March 28th FOIA. Despite CREW's repeated attempts to narrow its FOIA request and despite the fact that it met the requirements under FOIA for a fee waiver, Education has continued to withhold documents responsive to CREW's FOIA and has denied CREW a fee waiver.

Defendants have now moved to dismiss claims one through four of CREW's Amended Complaint, which includes the additional FRA counts against the Secretary, Archivist and NARA, arguing that plaintiff lacks standing to sue and the claims are not ripe for adjudication. Defendants also argue that CREW's claim under the FOIA, based on Education's failure to provide CREW the documents it requested, must be dismissed because it is not ripe for adjudication and fails to state a claim.

Contrary to defendants' claims, CREW has been injured by the actions of Education in a manner recognized by the Court and therefore has standing under the FRA.  Moreover, CREW is entitled to the records and fee waiver it requested in accordance with the FOIA  - - which requires that agency records be made available upon a request that reasonably describes such records.  Here, there is no doubt that CREW has submitted a FOIA request that reasonably describes the information being sought, and has also satisfied the elements required for a fee waiver.  Under these circumstances defendants' motion to dismiss must be denied.

## FACTUAL BACKGROUND

On March 28, 2007, CREW sent a FOIA request to Education seeking records, regardless of format and including electronic records and information, of communications and other contacts concerning the Reading First program.  Amended Complaint, ¶ 30 and Exhibit A to Roth Decl., ¶ 2.

On April 16, 2007, Education sent CREW a letter acknowledging CREW's FOIA request, enclosing a CD containing 421 pages of documents in response to item 4 of the FOIA request, seeking clarification for items 1 through 3 of the FOIA and denying CREW's fee waiver request.  Amended Complaint, ¶ 31 and Exhibit B to Roth Decl., ¶ 4.

In its letter denying CREW's fee waiver request, Education stated that CREW failed to show both that disclosure of the documents to CREW would contribute to the understanding of the public at large, because the public would be required to do its own analysis of the requested documents to reach any possible understanding of the information; and that CREW failed to show that the disclosure would contribute significantly to the public's understanding of government operations, because certain information already existed in the public domain on

Reading First.  Exhibit B to Roth Decl., ¶ 4.

On May 9, 2007, CREW's counsel participated in a conference call with Education about CREW's FOIA request.  Amended Complaint, ¶ 32 and Exhibit C to Roth Decl., ¶ 8. Education officials -- who included representatives from the agency's FOIA office, its Office of the General Counsel and its Office of Elementary and Secondary Education -- advised CREW that the agency could not search for email pertaining to any particular subject matter without having the identity of a specific recipient or sender.  Id.

In addition, a Department official advised CREW that Education personnel "often use private email addresses" and that Education "wouldn't have access to that."  Id.  Education officials confirmed that agency personnel use private email accounts for official business and that this issue had arisen in the past in the context of other FOIA requests.  Id.

On May 11, 2007, CREW sent an email to Education appealing its denial of CREW's fee waiver request.  Amended Complaint, ¶ 33 and Exhibit D to Roth Decl., ¶ 14. CREW's appeal explained that CREW's request would contribute significantly to the public's understanding of the issues involved because there were significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of the Reading First program prior to her becoming Secretary of Education.  Id.  The records CREW was seeking would clarify the public record.  Id.

CREW's letter further discussed Education's denial of CREW's fee waiver based on whether the information CREW was seeking would add to the public's understanding of the administration of the Reading First program because the public would be required to do its own analysis of the requested documents.  Id.  CREW explained that its FOIA request stated that

CREW would analyze the information responsive to its request, and would likely share its analysis with the public, either through memoranda, reports or press releases. Amended Complaint, ¶ 33 and Exhibit D to Roth Decl., ¶ 14.

In a follow-up telephone call on May 14, 2007, an Education FOIA officer confirmed to CREW's counsel that Education employees sometimes use private email addresses to conduct official business, that such material would not be included in the agency's response to CREW's FOIA request and that this issue had come up in the past. Amended Complaint, ¶ 34 and Roth Decl., ¶ 15.

In light of this information, CREW sent a letter to Education's Inspector General dated May 15, 2007, requesting that he commence an immediate investigation "to assess the extent and duration" of Education's practice of using outside email accounts to conduct official business, "the amount of official correspondence that has been lost or destroyed, and the effect of this practice on all records requests to the Department of Education." Amended Complaint, ¶ 35 and Exhibit C to Roth Decl., ¶ 17.

CREW's May 15 letter also pointed out that in addition to CREW's FOIA request, reporters have also been requesting agency documents under the FOIA, as has Rep. George Miller, Chairman of the House Committee on Education and Labor. Amended Complaint, ¶ 36.

On May 21, 2007, CREW sent an email to Education narrowing its FOIA request in order to aid Education in its search for records responsive to the request. Amended Complaint, ¶ 37 and Exhibit E to Roth Decl., ¶ 18-21. The narrowed FOIA request revised the scope of Item 1 from the entire Department to a list of 14 of the 33 offices listed on Education's online Coordinating Structure Chart. Id.

In addition, request Item 1 sought records mentioning or relating to several enumerated reading programs and terms and "any other issue related to reading instruction or education." Id. In response to concerns raised by Education officials during the May 9, 2007 conference call, CREW narrowed this item further by deleting that phrase and replacing it with records related to "Early Reading First" and "Science-Based Reading Research." Id.

Finally, CREW narrowed Items 2 and 3 of CREW's FOIA request from contacts with and regarding all educational publishers to an enumerated list of seven publishers. Id.

On May 23, 2007, CREW sent a letter to Secretary Spellings advising her that it had filed a lawsuit against the Department of Education challenging the failure of the agency to preserve copies of electronic records of official Education business created by agency employees through the use of non-governmental email accounts. Amended Complaint, ¶ 38. CREW further requested that Secretary Spellings, with the assistance of the Archivist, initiate action to prevent the further removal or destruction of the electronic records. Id.

On June 8, 2007, Education sent CREW a letter responding to CREW's May 11, 2007 email appealing Education's initial denial of CREW's request for a fee waiver. Amended Complaint, ¶ 40 and Exhibit F to Roth Decl., ¶ 23. In its letter, Education affirmed its denial of CREW's request for a fee waiver. Id. Specifically, Education stated that its fee waiver denial was based on its conclusion that many of the records responsive to CREW's request had nothing to do with the Reading First program, and disclosure of those materials would not enhance public understanding of Education's administration of the program. Id.

Education's June 8, 2007 fee waiver denial also based its decision on its finding that CREW failed to identify and provide examples of the significant inconsistencies in the public

record with respect to Secretary Spellings' involvement in Reading First prior to her tenure as Secretary.  Id.

On June 21, 2007, CREW sent Education another letter appealing Education's denial of CREW's fee waiver request. Amended Complaint, ¶ 41, Exhibit G to Roth Decl. ¶ 23. CREW's letter outlined all of the previous communications between it and Education, including CREW's narrowing of its FOIA request.  The letter also discussed, in detail, how CREW satisfied the two-prong statutory test for a fee waiver.  Id.

First, CREW reiterated to Education that it had narrowed its request and now sought a smaller category of documents that specifically related to the Reading First Program.  Id. Second, and in response to Education's contention that it failed to identify and provide examples of the inconsistencies in the public record with respect to Secretary Spellings, CREW explained that Exhibit 1 to its original FOIA request contained documents that highlighted some of the inconsistencies.  Id.  CREW also listed additional examples of the serious inconsistencies in its June 21, 2007 letter.  Id.

Finally, CREW answered Education's contention - - and use of three internet links to make this point - - that information about the agency's contacts with educational publishers had already been examined in the public sphere.  Amended Complaint, ¶ 41, Exhibit G to Roth Decl. ¶ 23.  CREW pointed out that one of the links the agency provided was expired and the second and third links focused on a report that was categorically different and distinct from the information CREW was seeking in its FOIA request.  Id.

On August 23, 2007, Education sent a letter responding to CREW's May 11, 2007 email that narrowed its original FOIA request.  Amended Complaint, ¶ 42 and Exhibit H.  Education's

letter once again stated that CREW's narrowed FOIA request failed to identify the Department officials whose communications were sought, failed to identify a specific program or specific subject matter focus for the Department's search and that the time period identified in the request predated the legislation that is the subjection of the request.  Id.

On September 6, 2007, Education affirmed its denial of CREW's second fee waiver appeal of June 21, 2007.  Amended Complaint, ¶ 43 and Exhibit I.  Education's letter stated that CREW had failed to meet its burden with respect to the public interest prong of the fee waiver test because its FOIA request was "overbroad to qualify for a fee waiver;" that the FOIA request would not significantly enhance public understanding relative to the inconsistencies in the public record; and that the information CREW is seeking would not likely contribute significantly to the public's understanding of the extent to which publishers were in contact with Education and Administration personnel during the Reading First development and grant process.  Id.

## STATUTORY BACKGROUND

### The Federal Records Act

The FRA is a series of statutes that govern the creation, management and disposal of federal records.  See 44 U.S.C. §§ 2101-2118, 3101-3107 and 3301-3324.  Among other things, the FRA ensures "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," as well as "judicious preservation and disposal of records."  44 U.S.C. § 2902.

To fulfill this purpose, the FRA requires the head of each agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency."  Id. at § 3101.  Under the

statute, each agency must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," id. at § 3102, and must "establish safeguards against the removal or loss of records" the agency head determines are necessary and required by regulations of the Archivist. Id. at § 3105.

The FRA also prescribes the exclusive mechanism for the disposal of federal records, which it defines to include:

> all books, papers, maps, photographs, machine readable
> materials, regardless of physical form or characteristics,
> made or received by an agency of the United States
> Government under Federal law or in connection with
> the transaction of public business and preserved or
> appropriate for preservation by that agency . . as evidence
> of the organization, functions, policies, decisions, procedures
> operations, or other activities of the Government or because
> of the informational value of data in them.

44 U.S.C. § 3301. No records may be "alienated or destroyed" except pursuant to the disposal provisions of the FRA. Id. at § 3314.

An agency wishing to dispose of records must first submit to the archivist either lists of records the agency head determines "are not needed by it in the transaction of its current business," 44 U.S.C. § 303a(2), or "schedules proposing the disposal after the lapse of specified periods of time of records of a specified form or character" that the agency head determines will not have "sufficient administrative, legal, research, or other value to warrant their further preservation by the Government." Id. at § 3303a(3). Upon receipt of such a request, the archivist must issue a notice requesting public comment on the agency's proposal and the archivists's staff must conduct its own assessment of the value of the records the agency is proposing to destroy. Id. at § 3303a(a). The archivist is free to accept or reject an agency's

proposal.  Id.

## The Freedom of Information Act

The FOIA, 5 U.S.C. § 552, requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.  An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination whether or not to fulfill the request, and of the requester's right to appeal the agency's determination to the agency head.  5 U.S.C. § 552(a)(6)(A)(I).

An agency must respond to a FOIA appeal within 20 working days, notifying the appealing party of the agency's determination to either release the withheld records or uphold the denial.  5 U.S.C. § 552(a)(6)(A)(ii).

This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B).

The FOIA also requires each agency to promulgate regulations specifying a fee schedule for the processing of FOIA requests and establishing procedures and guidelines for the waiver or reduction of fees.  5 U.S.C. § 552(a)(4)(A).  Defendant Education's fee waiver regulations are found at 34 CFR § 5.64.  Both the FOIA and Education regulations provide that documents should be produced at no charge to the requester or at a reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii); 34 CFR § 5.64(a).

10

## ARGUMENT

I.  **CREW HAS STANDING TO BRING THIS FRA LAWSUIT AGAINST THE SECRETARY OF EDUCATION, THE ARCHIVIST AND NARA CHALLENGING THEIR FAILURE TO TAKE ENFORCEMENT ACTION TO ENSURE ADEQUATE PRESERVATION OF ALL AGENCY RECORDS.**

CREW's standing to sue rests on an "an injury-in-fact that is "fairly traceable" to the challenged act and "likely to be redressed by the requested relief."  Allen v. Wright, 468 U.S. 737, 751 (1984); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  CREW's injury, an inability to obtain through the FOIA information necessary to accomplish CREW's mission, is directly traceable to Education's improper document retention procedures and the failure of the Secretary, Archivist and NARA to take enforcement action to ensure adequate preservation of Education's records.  This is all that Article III of the Constitution requires.

### A.  Plaintiff's Injury is Sufficient to Confer Standing

CREW has met its burden of establishing an injury-in-fact for Article III purposes.  CREW is an organization dedicated to informing and educating the public about the conduct of public officials.  Toward that end, CREW uses the FOIA to gather relevant information.

Here, CREW filed a FOIA request with Education for documents that would reflect, among other things, the degree to which the Reading First Program has been influenced by political and other outside interests.  Education's policy of knowingly permitting agency employees to use outside email accounts when conducting agency business deprived CREW of access to documents responsive to its FOIA request but not maintained by Education because they were not stored on agency servers.  CREW also put the Secretary, Archivist and NARA on notice of Education's refusal to comply with the requirements of the FRA when it sent them a letter on May 23, 2007, advising them of these practices.  Amended Complaint, ¶ 38.

11

Because of Education's record-keeping policies, CREW was frustrated in achieving its mission when it sought and was denied the requested information. Defendant's refusal to comply with the requirements of the FRA has hindered CREW's ability to report and publish information in furtherance of its programmatic activities.[1] Compare Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990) ("if an organization points to a concrete and demonstrable injury to its activities . . .the organization passes through the first [standing] gateway"). Article III requires nothing more. Additionally, the refusal of the Secretary, Archivist and NARA to initiate enforcement action to prevent Education's continued non-compliance of the requirements of the FRA, further frustrates CREW's mission and programmatic activities.

In arguing to the contrary, defendant misapplies American Friends Service Committee v. Webster, 720 F.2d 29, 46 (D.C. Cir. 1983), and mis-characterizes CREW as like those plaintiffs the Webster Court found were "questionable" for standing purposes. In Webster, various individuals and organizations challenged the FBI's records destruction program as contrary to law, including the FRA. Id. The Court in Webster recognized three categories of plaintiffs: (1) a group that included individuals and organizations whose need for documents arose out of their professions, and "had in the past made FOIA requests . . . had other requests pending, and intended to request FBI files in the future"; (2) a group that consisted of individuals who were subjects of FBI investigations or alleged victims of FBI activities; and (3) a group that included organizations seeking to further civil liberties and civil rights who argued that the destruction of

---

[1]As noted in its complaint, CREW uses a combination of research, litigation, advocacy and public education to expose unethical and illegal conduct by those involved in government. Complaint ¶ 4. CREW has been "harmed by Education's failure to comply with the FRA because that failure has denied CREW access to documents that are a critical part of the record concerning the Reading First Program." Id. at ¶ 24.

the documents deprived them of research materials that they could disseminate.  Id.

Here, Education argues that CREW is most analogous to this third group of plaintiffs.

Unlike this group, however, CREW has made FOIA requests in the past, has FOIA requests

pending with Education, and intends to request documents in the future.  This distinction makes

CREW like the first group of Webster plaintiffs and dictates here, as in Webster, that CREW has

standing to bring this FRA lawsuit.  Like that group, CREW uses the documents it seeks through

its FOIA requests, not for political purposes, but to share information with the public through

memoranda, reports, or press releases.  See Armstrong v. Bush, 924 F.2d 282, 288 (D.C. Cir.

1991) (finding plaintiffs that were researchers and historians who made extensive use of

government documents were within the zone of interests of the records creation and management

provisions of the FRA).  For example, on June 27, 2007, CREW released a report, *The Best Laid*

*Plans: The Story of How the Government Ignored its own Gulf Coast Hurricane Plan*, about the

problems with the federal government's response to Hurricane Katrina victims that relied

significantly on documents CREW obtained through a FOIA request to the Department of State.

CREW has used and will continue to use the FOIA to gain access to agency records that

relate to the propriety of government activity.  By adopting a policy whereby Education

employees use outside email accounts to conduct official business with the knowledge that

electronic records created as a result of that use were and continue to be sought under the FOIA,

Education has denied CREW access to requested records.  This policy is arbitrary, capricious,

and contrary to law because it results in the failure to preserve records containing adequate and

proper documentation of the organization, functions, policies, decisions, procedures and essential

transactions of the agency.  44 U.S.C. § 3101.  And for any future request, CREW is at the

complete mercy of Education's document policy.

To the extent <u>Webster</u> left open whether the kind of injury plaintiff has suffered here is sufficient for Article III standing purposes, as defendants suggest, post-<u>Webster</u> cases make clear that denial of information constitutes an injury-in-fact.  So, for example, in <u>Federal Election Comm'n v. Atkins</u>, 524 U.S. 11 (1998), the Supreme Court found that a plaintiff had standing to challenge the Commission's refusal to disclose campaign-related contributions and expenditures as the Federal Election Campaign Act requires, reasoning that informational harm is sufficiently concrete and specific to constitute an injury-in-fact.  Likewise, in <u>Public Citizen v. Dep't of Justice</u>, 491 U.S. 440 (1989), the Supreme Court recognized that denial of access to committee meetings and records under the Federal Advisory Committee Act constituted an injury-in-fact for Article III purposes.  And, in <u>Dep't of Justice v. Reporters Committee for Freedom of the Press</u>, 489 U.S. 749 (1989), a suit under the FOIA challenging the agency's denial of a request for specific agency records, standing was satisfied by the denial of requested records.

As a frequent FOIA user, CREW's interests are also within the zone-of-interests of the FRA. CREW has used and will continue to use the FOIA to gain access to agency records that relate to the propriety of government activity.  By adopting a policy whereby Education records are not adequately preserved, the defendants have denied CREW access to requested records. This policy is arbitrary, capricious, and contrary to law because it results in the failure to preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures and essential transactions of the agency.  44 U.S.C. § 3101. Moreover, the information sought by CREW has an undeniable effect upon CREW's ability to inform and educate the public, which it does on a continuing, ongoing basis.  See <u>Armstrong</u>,

924 F.2d at 288 (plaintiff researchers and historians who made extensive use of government documents were within the zone-of-interests of the records creation and management provisions of the FRA).

In sum, CREW's inability to obtain information it seeks through its FOIA request for Education documents has led and will continue to lead to "concrete damage" to CREW's mission. Through this impairment, CREW has met its burden of establishing an injury-in-fact for Article III standing purposes.

**B.    CREW's Injury is Traceable to Defendant's Practices under the FRA**

CREW's claims of injury are neither speculative nor hypothetical. In March 2007, CREW requested documents under the FOIA pertaining to Education's Reading First program and also sought a waiver of the fees associated with its request. In response to its FOIA and fee waiver requests, Education released to CREW a CD containing 421 pages of documents responsive to item four of the FOIA. Education, however, has refused to respond to the remaining items requested in CREW's FOIA based on the dubious argument that it needs clarification of the information CREW is seeking. Roth Decl. at ¶ 7. Moreover, despite CREW's May 11th and May 21st appeals which clearly outlined the required elements for a fee waiver, Education has continued to deny CREW's request for a fee waiver, based on its misguided assumption that the disclosure of the information CREW requested would not contribute to the understanding of the public at large and because it believes that the disclosure of the information will not contribute significantly to the public understanding of government operations or activities.

Although CREW sufficiently satisfied the required elements for a fee waiver in both of

its appeals, Education refuses to grant CREW a fee waiver, and now bases its Motion to Dismiss on its own conduct, not CREW's conduct.  The defendants, however, cannot defeat CREW's standing by unilaterally declaring CREW's request insufficient, particularly where their characterization defies the facts and commonsense.  Education continues to argue that it is unable to respond to CREW's FOIA request because CREW failed to clarify the request.  CREW, however, attempted to narrow the scope of its FOIA, but to no avail.

First, CREW's request for documents is sufficiently clear.  It is the conduct of Education that is deficient in failing to come to terms with CREW's FOIA request as written and clarified.  Each of the issues that Education outlined during the parties' teleconference and in writing regarding the broad nature of CREW's FOIA request were addressed in CREW's narrowed request of May 21, 2007.[2]  Despite CREW's narrowed request that addresses these issues, the

---

[2]CREW's narrowed May 21, 2007 FOIA request was not only sufficiently detailed, but it reasonably describes the information being sought:

Any and all documents and records from January 20, 2001, to the present, in the offices of: 1) The Secretary, 2) Senior Counselor, 3) Chief of Staff, 4) Deputy Secretary, 5) Management Improvement Team, 6) Elementary and Secondary Education, 7) Institute of Education Sciences, 8) Planning Evaluation and Policy Development, 9) Civil Rights, 10) Innovation and Improvement, 11) Special Education and Rehabilitative Services, 12) Management, 13) Chief Financial Officer and 14) Communications and Outreach, in the following categories:
    1. All communications of the above-listed offices to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR" or DIBELS.
    2.  All communications of the above-listed offices, including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.
    3.  All communications of the above-listed offices, including calendar references and

agency continues to claim that CREW has failed to identify the Education officials whose communications are sought, even though CREW's May 21ˢᵗ FOIA specifically requested the communications between 14 of the 33 offices listed on Education's online Coordinating Structure Chart and then-Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne. Moreover, even though CREW's FOIA is for records related specifically to the Reading First, Early Reading First, Scientifically Based Reading Research/Science Based Reading Research/SBRR or DIBELS programs, Education continues to argue that CREW's FOIA request fails to identify a specific program or a specific subject matter focus for the agency's search for responsive records.

Education is unable to meet its burden of justifying its continued withholding of the information requested by CREW. In FOIA lawsuits, it is the defendant agency that bears the burden of justifying its withholding of requested information under the FOIA, and Education has failed here to meets this burden. <u>LaRouche v. U.S. Dep't. of Justice</u>, 2001 U.S. Dist. LEXIS 25416 (D.D.C. 2001) (In order to justify the adequacy of its search the agency must prove that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt for the Act's inspection requirements."). Education has failed to justify its withholding of the remaining items requested in CREW's narrowed FOIA of May 21, 2007.

Second, because CREW is entitled to a fee waiver, Education's continued denial of CREW's request for a fee waiver actually reinforces CREW's injury-in-fact standing argument

---

meeting notes, that mention or related to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.

under Article III.  Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 35 (finding fault with analysis used by agency to award partial fee waiver).

As the record makes clear, CREW repeatedly met the requirements for a fee waiver and answered the questions raised by Education - - whether the disclosure of the documents would contribute to the understanding of the public at large, and whether the disclosure would contribute significantly to the public's understanding of government operations.  CREW explained that the documents it sought would contribute significantly to the public's understanding of the issues involved because of the significant inconsistencies in the public record as to the involvement of Secretary Spellings in the administration of the highly controversial Reading First program.  Moreover,  the documents CREW is seeking would add to the public's understanding of the administration of the Reading First program because CREW would analyze the information responsive to its request, and would share its analysis with the public, either through memoranda, reports or press releases.

Under these circumstances, plaintiff's injury is traceable exclusively to defendant's refusal to grant plaintiff a fee waiver and to release to plaintiff its requested records.

## II.    CREW's FRA AND FOIA CLAIMS ARE RIPE FOR ADJUDICATION

Finally, Education argues that CREW's claims are so "shapeless" as to be unripe. Defendant's Motion to Dismiss Claims One through Four of the Amended Complaint at 18-23.

To the contrary, CREW has alleged sufficient facts within its Complaint for the Court to make an informed decision about Education's violation of the FRA.  These allegations regarding Education's arbitrary, capricious and illegal policy relate to agency employees' use of outside email accounts to conduct official business with the result that Education is not preserving

agency records.  See Amended Complaint, ¶¶ 33-35, 38.  As such, CREW's claims are not based on "contingent future events that may not occur as anticipated, or indeed may not occur at all," nor are they based on some "abstract disagreements" of policy.  See Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2006).  Rather, the allegations in CREW's Complaint, which are detailed and specific enough for the Court to ascertain the contours for purposes of judicial review, are based on Education's articulated policy and its inability to produce documents responsive to CREW's FOIA as a direct result of that policy.

Moreover, the unresolved nature of the fee waiver issue does not deem CREW's claim that Education has failed to produce responsive records under the FOIA premature.  Education, without resolution of the fee waiver issue, has already produced over 400 documents to CREW.  Moreover, even though Education informed CREW of the requirement of prepayment of fees exceeding $250 because of the broad scope of CREW's FOIA request, Education has never informed CREW of the ultimate cost of producing the documents for CREW.  CREW's last appeal regarding the fee waiver issue was on June 21, 2007.  In this appeal, CREW included a packet of information that outlined the required elements for a fee waiver and included exhibits.  Education did not respond to CREW's final appeal until September 6, 2007, and never once informed CREW what the cost would be for the search and production of the documents at issue.  Instead, it merely concluded that CREW's appeal and Education's response constituted exhaustion of the administrative remedies available to CREW under FOIA, and informed CREW that it had the right to seek judicial review of the decision.  Therefore, CREW's claims under the FRA and the FOIA are ripe for adjudication.

### III.    PLAINTIFF'S CLAIMS ONE THROUGH FOUR STATE CLAIMS UNDER THE FRA AND THE FOIA

In order for a Court to grant a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it should accept the allegations of the complaint as true, draw all inferences in the plaintiff's favor, and affirm only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Croixland Properties Ltd. P'ship v. Corcoran, 174 F.3d 213, 215 (D.C. Cir. 1999). The Court will, therefore, look to whether the plaintiff can prove any set of facts consistent with the allegations in its complaint that will entitle it to relief. Id.

The FRA requires that the head of each agency "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency." 44 U.S.C. § 3101. The FOIA provides that each agency shall make its records promptly available upon request. 5 U.S.C. § 552(a)(3)(A). Here, CREW has alleged in its Amended Complaint the necessary facts to state claims under these statutes, specifically that it was denied access to agency records it requested under the FOIA that were created by agency employees using outside email accounts, and that the defendants knew employees were using outside email accounts but took no action to ensure appropriate preservation of all agency records. These facts alone are sufficient to state claims for relief under the FRA and the FOIA. CREW, however, has gone beyond these facts to provide additional facts within its Complaint of its attempt to work with Education to not only clarify and narrow its FOIA request, but also resolve any outstanding issues related to its request for a fee waiver. Amended Complaint, ¶¶ 32-34, 37, 41.

Looking at the totality of CREW's complaint it is clear that any deficiencies are those of

20

the defendants and their near complete failure to comply with their statutory obligations under the FOIA and FRA.  It necessarily follows that defendants' motion to dismiss for failure to state a claim must be denied.

## **CONCLUSION**

For the foregoing reasons, CREW respectfully requests that the Court deny defendants' motion to dismiss.

Respectfully submitted,


_____/s_____
Anne L. Weismann
(D.C. Bar No. 298190)
Kimberly D. Perkins
(D.C. Bar No. 481460)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
    In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
Phone: (202) 408-5565
Attorneys for Plaintiff

Dated: October 29, 2007

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:07-cv-00963 (RMU) |
| | : | |
| U.S. DEPARTMENT OF EDUCATION, | : | |
| | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DECLARATION OF DANIEL C. ROTH

I, Daniel C. Roth, hereby declare as follows:

1. I serve as Counsel to Citizens for Responsibility and Ethics in Washington ("CREW"), a nonprofit watchdog organization in Washington, D.C.

2. On March 28, 2007, I sent and faxed to the Department of Education ("Education") a Freedom of Information Act ("FOIA") request on behalf of CREW seeking "any and all Department documents and records dating from January 21, 2001, to the present, in the following categories" (attached as Exhibit A):

    i.      All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

    ii.     All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

    iii.    All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

    iv.    To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*. See Andrew Brownstein & Travis Hicks, <u>Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close</u>, Title I Monitor (undated) (Attached as Exhibit 1). As these documents have been already culled and processed for disclosure, we expect production of these records in short order. As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

    3. I also requested that all fees associated with the processing of the FOIA request be waived.

    4. On April 23, 2007, I received a letter from Education FOIA officer Maria-Teresa Cueva dated April 16, 2007, stating that CREW's FOIA request did not reasonably describe the records sought and thus could not be processed "without further clarification." Letter from Maria-Teresa Cueva to Daniel C. Roth (Apr. 16, 2007) (attached as Exhibit B). Specifically, Education wrote that "In an effort to process your request as expeditiously as possible, we need clarification for items 1 through 3 of your request." Those items, the letter continued, "encompass a large volume of information on broad topics related to individuals in the Department and 'White House staff', without identifying specific individuals, offices, or subjects." The letter also erroneously stated that "your request does not specify any relevant time frames." Education also denied CREW's request for a fee waiver.

    5. Enclosed along with the letter was a CD-ROM containing 421 pages of documents responsive to Item number iv of the March 28, 2007 FOIA request.

6. On May 4, 2007, I attempted to call the phone number listed in the letter, but the number was incorrect. I emailed Ms. Cueva to inform her that I had tried and failed to reach her by telephone, and that I was interested in addressing the issues raised in her April 16, 2007 letter.

7. Some time between May 4, 2007, and May 9, 2007, Ms. Angela Arrington responded to my email by telephone and provided me with the correct phone number. Ms. Arrington also stated that the Departed wanted to have a conference call with me in order to discuss narrowing CREW's request, which we scheduled for May 9, 2007. I did not request the conference call. I expected to engage in the narrowing process with a FOIA officer such as Ms. Arrington, as I have done with other agencies in the context of past FOIA requests.

8. On May 9, 2007, I participated in a conference call with Ms. Arrington, Ms. Cueva, Education Office of General Counsel attorneys Ms. Marcella Goodridge and Mr. Dennis Koeppel, and Mr. James Butler of the Office of Elementary and Secondary Education. We discussed the ways in which the request could be narrowed, as well as the fee waiver denial.

9. Ms. Goodridge and Ms. Arrington, who did most of the talking for Education, explained that Education's search capabilities were limited and that, in order to fulfill CREW's request, each of the 4,500 Education employees' email accounts would have to be searched. I was told that the more information I could provide to aid the search, the better.

10. While discussing the narrowing of FOIA request Item ii regarding Education contacts with persons associated with educational publishers, I was informed that if I did not supply a list of Education personnel whose files should be searched for responsive records, each Education email account would have to be searched individually. Ms. Goodridge further stated that "people often use private email addresses," and "we wouldn't have access to that." I immediately sought

3

clarification of that statement, asking whether outside accounts would be used for official business. Ms. Goodridge replied that they would, and stated that the issue had arisen in the past. I suggested that such a practice would violate the Federal Records Act. None of the five Education officials on the call clarified, disputed or corrected Ms. Goodridge's statement in any way.

11. Despite Ms. Arrington's contentions, at no time did anyone from Education claim that the issue of private email use was limited to individuals associated with publishers, private contractors, or the public, and not Education employees. That is, no one ever stated that "an electronic search would not capture these same executives, employees, consultants, or contractors if they chose to contact Education employees using private e-mail accounts." Arrington Declaration, at ¶ 9. Nor did anyone state that "it is not unheard of for members of the public to contact Education employees using private e-mail accounts." Id.

12. During the conference call, we also spoke about the fee waiver denial. I raised several issues, including Education's incorrect statement that the request did not include a relevant time-frame. I noted that we sought records from January 21, 2001, to the present. I was asked to draft an informal appeal including this and other information relating to the fee waiver issue.

13. Later that afternoon, I sent an email to Ms. Arrington expressing my intent to send a fee waiver appeal by the end of the week.

14. On Friday, May 11, 2007, I emailed Ms. Arrington an informal fee waiver appeal as requested by Education officials during the conference call.

15. On Monday, May 14, 2007, I called Ms. Arrington to further discuss the narrowing

process and to confirm several details of the May 9, 2007 conference call.  The email I wrote to memorialize that conversation included the following:

> As I understand it from last Wednesday's telephone conversation, the Department's key concern with respect to our FOIA is that CREW is seeking records from 'any Department office, including any and all field offices.'  Ms. Marcel[l]a Goodridge stated that the Department's FOIA technology does not allow for subject matter or keyword searches throughout the email system, so a search undertaken pursuant to the original search terms of our request would require individual searches of each of the Department's approximately 4,500 employee email accounts.  Additionally, Ms. Goodridge noted that email communications on personal email accounts would not be covered by such a search (which is an issue that has arisen in the past).

Email from Dan Roth to Angela Arrington (May 14, 2007) (attached as Exhibit C).  Ms. Arrington did not provide any clarification regarding the use of outside email accounts during our May 14, 2007 phone conversation or after receiving this email.  Ms. Arrington did not suggest that "if [I] wanted the Department to proceed with searching private email addresses, [I] would need to provide Education with a list of the private email addresses [I] would like for the Department to include in its search," nor do my notes of the conversation reflect that such a statement was made.

16.  The email further requested that Education provide me with an estimate of time it would take to process the FOIA request as drafted and a second estimate as to the time it would take to process the same request within only the Office of the Secretary and Office of Elementary and Secondary Education.  I requested that I be notified if this estimate could not be completed before May 19, 2007.  I never received a response to this email.

17. On May 15, 2007, CREW Executive Director Melanie Sloan sent a letter to Department of Education Inspector General John Higgins requesting an investigation into the use

of private email accounts by Education officials.

18.  On May 21, 2007, having not received a response to my May 14, 2007 email requesting time estimates of various searches, I sent Ms. Arrington an email acknowledging Education's technological search limitations and proposing a narrowed search.  Email from Daniel Roth to Angela Arrington (May 21, 2007) (attached as Exhibit D).

19.  Specifically, I narrowed the scope of FOIA request Item i from the entire Department to a list of 14 of the 33 offices listed on Education's online Coordinating Structure Chart.  I chose these offices based on my judgment of where records responsive to our FOIA request might be located.

20.  In addition, FOIA request Item i sought records mentioning or relating to several enumerated reading programs and terms and "any other issue related to reading instruction or education."  In response to concerns raised by Education officials during the May 9, 2007 conference call, I narrowed this item further by deleting that phrase and replacing it with records related to "Early Reading First" and "Science-Based Reading Research."

21.  Also in response to the agency's concerns expressed on May 9, 2007, I narrowed Items ii and iii of CREW's FOIA request for contacts with and regarding all educational publishers to an enumerated list of seven publishers.

22.  Ms. Arrington states in her declaration that Item iii "borders on the nonsensical" because it "essentially seeks records of 'contacts ... that ...relate to contacts...'"  The sentence in the original March 28, 2007 request to which Ms. Arrington refers reads: "All Department contacts or communications that *mention or relate to* contacts with educational publishers, their

6

executives, or employees." (emphasis in original). As I believe is quite clear, the language was drafted to include intra-departmental communications regarding contacts with publishers.

23. By letter dated June 8, 2007, Ms. Cueva notified me that our fee waiver request had been denied. On June 21, 2007, I sent Education a formal appeal of the fee waiver denial.

24. Education never responded to my May 21, 2007 narrowing proposal. The first time anyone at CREW was notified that the proposal was considered inadequate was when Education filed its Motion to Dismiss.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 24th day of August 2007 in Washington, D.C.

Daniel C. Roth
Counsel
Citizens for Responsibility
    and Ethics in Washington

7

EXHIBIT A



# CREW | citizens for responsibility and ethics in washington

March 28, 2007

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**By fax, (202) 245-6623, and First Class mail**

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department) regulations, 34 CFR §§ 5.6 *et. seq.*

Specifically, CREW seeks any and all Department documents and records dating from January 20, 2001, to the present, in the following categories:

1.  All communications from any Department office, including any and all field offices, to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS, or any other issue related to reading instruction or education.

2.  All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors.  The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

3.  All Department contacts or communications that *mention or relate to* contacts with educational publishers, their executives, or employees.  The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4.   To the extent not included in the above request, please provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the *Title I Monitor*.  See Andrew Brownstein & Travis Hicks, <u>Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close</u>, Title I Monitor (undated) (Attached as Exhibit 1).  As these documents have been already culled and processed for disclosure, we expect production of these records in short order.  As of March 27, 2007, these documents do not appear to be posted at the Department's online reading room.

Please search responsive records regardless of format, medium, or physical characteristics.  Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM.  We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs.  Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), <u>cert. denied</u>, 415 U.S. 977 (1972).  As you are aware, a <u>Vaughn</u> index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." <u>Founding Church of Scientology v. Bell</u>, 603 F.2d 945, 949 (D.C. Cir. 1979).  Moreover, the <u>Vaughn</u> index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." <u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added).  Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" <u>Id</u>. at 224 (citing <u>Mead Data Central v. U.S. Dep't of the Air Force</u>, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records.  See 5 U.S.C. § 552(b).  If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document.  <u>Mead Data Central</u>, 566 F.2d at 261.  Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a <u>Vaughn</u> index.  If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

2

## Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent of White House involvement in the administration of the Reading First program, an issue on which the public record is unclear. For example, recently disclosed emails and statements by a former Department appointee appear to contradict statements by Secretary Spellings that she was not involved in Reading First until she became Secretary in January 2005. See Brownstein & Hicks, Congress Grills Spellings on Reading First Program; OIG Investigation Draws to a Close, Title I Monitor (undated).

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Attachment

4

EXHIBIT 1

-->



**THOMPSON**
Insight you trust.

Home | My page | Search | News Desk | Support | Resources | Contact us

*Title*i*online*

**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**  "I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller,D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers … but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

**Jumping Through Hoops**

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

**A Strong Firewall**

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

**Bias and Objectivity**

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

### Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries, "she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

### Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

### Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

### Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

### SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

**EXHIBIT B**



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

ASSISTANT SECRETARY

April 16, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00517-F

Dear Mr. Roth:

This letter is in response to your fax dated March 28, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on March 29, 2007. You asked for the following information:

1.  All communications from any Department office, including any and all field offices, to from or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings, that mention or relate to Reading First, "Science Based Reading Research"/"SBRR," DIBELS or any other issue related to reading instruction or education.

2.  All Department contacts or communications, including calendar references and meeting notes, with educational publishers, their executives, employees, consultants, or contractors. The List of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, and Cambium Learning, Sopris West, and IntelliTools.

3.  All Department contacts or communications that mention or relate to contacts with educational publishers, their executives, or employees. The list of educational publishers and/or their subsidiaries includes, but is not limited to, Houghton Mifflin, SRA McGraw Hill, Pearson Scott Foresman, Voyager, Cambium Learning, Sopris West, and IntelliTools.

4.  To the extent not included in the above request, provide all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks and/or the Title I Monitor. See Andrew Brownstein, Travis Hicks, Congress Grills Spellings on Reading First Program: OIG Investigation Draws to a Close, Title I Monitor (undated).

Enclosed is a CD containing 421 pages of documents responsive to item 4 of your request. The documents provided are: documents regarding the Reading First program that were previously disclosed under FOIA to the Title I Monitor.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

In an effort to process your request as expeditiously as possible, we need clarification for items 1 through 3 of your request. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Items 1 through 3 of your request encompass a large volume of information on broad topics related to individuals in the Department and "White House staff", without identifying specific individuals, offices, or subjects. In addition, your request does not specify any relevant time frames. Consequently, your request does not reasonably describe the records sought, and the Department is unable to process your request regarding items 1 through 3 without further clarification. See Dale v. Internal Revenue Service, 238 F.Supp.2d 99 (D.D.C. 2002).

Fee Waiver

In addition, you have requested a fee waiver for your request. The requester bears the burden of justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S. Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the information must be in the public interest because the information primarily benefits the general public and is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) disclosure of the information must not be primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the narrow public interest cognizable under the FOIA, the Department must consider the following four (4) factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government";
2. In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested information must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the Department conclude that a requester has satisfied the first prong of the public interest element of the statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

Page 3 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

1. Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and

2. If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee waiver or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

See also 34 C.F.R. § 5.64(b)(3).

For your information, the Department does not customarily grant blanket waivers, but rather considers each waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to provide sufficient information to justify the Department's grant of a fee waiver. You state that, "[t]he subject of this request concerns the operations of the federal government, and the disclosure will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way." Although not entirely clear from the information provided, the Department assumes, for the sake of argument, that the responsive materials for items 1 through 3 of your request meet the first two elements of the public interest prong of the statutory requirement for a fee waiver because they presumably relate to the Department's administration of the Reading First program. However, it is clear that you have not satisfied the burden with regard to the third and fourth elements of the public interest prong of the statutory requirement.

As stated above, the third factor of the public interest analysis requires that the disclosure contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons. In order to satisfy this element of the public interest prong, the public must derive the benefit from the disclosure of this information, and not the personal benefit that may be derived from the requester, or a narrow segment of the population. Mells v. Internal Revenue Service, 2002 U.S. Dist. LEXIS 24275 (D.D.C. Nov. 21, 2002). In this regard, the identity of the requester will be considered so that an agency may determine whether the requester is in a position to contribute to the public understanding through the disclosure of the requested materials. Burriss v. CIA, 524 F. Supp. 448 (M.D. Tenn. 1981). As part of this analysis, the Department will consider whether the requester has the expertise in the subject area, and a demonstrated ability and intent to disseminate the information to the general public. Id. Additionally, while not for profit organizations are often capable of disseminating information, they do not automatically qualify for a waiver or reduction of fees because of their non-profit status. VoteHemp, Inc. v. DEA, 237 F. Supp. 2d 55 (D.D.C. 2002); see also McClain v. U.S. Dep't of Justice, 13 F.3d 220, 221 (7th Cir. 1993).

In your request you have indicated that "CREW will disseminate any documents it acquires from this request to the public .... [through] an interactive website where members of the public can analyze and comment on public documents[.] ... Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests." While this statement does demonstrate that you intend to disseminate the information, it does not demonstrate how the potentially responsive documents in this case will contribute to the "understanding of the public at large." Based upon your letter, it appears that members of the public would have to individually "analyze" the data to reach any possible understanding of the information. Consequently, you have failed to meet the third prong of the public interest analysis.

Page 4 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

The fourth element of the public interest prong of the statutory requirement for a fee waiver requires that the disclosure must "contribute significantly" to public understanding of government operations or activities. For this element, an agency is required to determine whether the disclosure of the information will make a significant contribution to the public's understanding of the operations or activities of government. D.C. Technical Assistance Org. v. Dep't of Housing & Urban Development, 85 F.Supp.2d 46, 49 (D.D.C. 2000). "Significance" is measured by a likely enhancement of the public's understanding of the subject at issue as a result of the disclosure, compared to the public's level of understanding of that same issue prior to disclosure. Id.; see also Judicial Watch v. U.S. Department of Justice, 185 F.Supp.2d 54, 62 (D.D.C. 2002).

In your letter, you stated "the disclosures [of the information] will likely contribute to a better understanding of relevant government procedures by ... the general public in a significant way", and specifically, refer to "the public's understanding of the extent of White House involvement in the administration of the Reading First program[.]" It is interesting to note that you refer to an article on the very issue that you contend is unclear. Accordingly, information regarding this issue already exists in the public domain. Consequently, you have failed to show how the disclosure of the requested information will significantly enhance the public's understanding of the Reading First program beyond the information that already exists in the public domain. Carney v. U.S. Dep't of Justice, 19 F.3d 807, 815 (2d Cir. 1994).

In sum, the Department's denies your request for a fee waiver in the present case.

Fees are charged for searching/reviewing and duplication for responsive records. The fee is calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge and the duplication costs are ten cents per photocopied page. Our regulations, 34 CFR § 5.61 require us to allow you to modify your request if the cost is more than $25.00. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is to be greater than $250.00, the requester must pay in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Your appeal should be received by the FOIA office on or before
Mary 24, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

**Appeal Address:**

U.S. Department of Education
Office of Management
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: FOIA Appeals
Washington, DC 20202-4500

Page 5 of 5 Citizens for Responsibility and Ethics in Washington
No. 07-00517-F

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request. Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

Enclosures

**EXHIBIT C**

# Dan Roth

**From:** Dan Roth
**Sent:** Monday, May 14, 2007 1:28 PM
**To:** 'EDFOIAManager@ed.gov'
**Subject:** No. 07-00517-F Narrowing Discussion

Dear Ms. Arrington,

As we discussed earlier today, I am writing to memorialize our conversation about narrowing CREW's March 28, 2007 FOIA request.

As I understand it from last Wednesday's telephone conversation, the Department's key concern with respect to our FOIA is that CREW is seeking records from "any Department office, including any and all field offices." Ms. Marcela Goodridge stated that the Department's FOIA technology does not allow for subject matter or keyword searches throughout the email system, so a search undertaken pursuant to the original terms of our request would require individual searches of each of the Department's approximately 4,500 employee email accounts. Additionally, Ms. Goodridge noted that email communications on personal email accounts would not be covered by such a search (which is an issue that has arisen in the past).

In order to aid CREW in the narrowing process, we request the following information from the Department:

1) An estimate of the time it would take to process CREW's request if we do not narrow it further
2) An estimate of the time it would take to process our request if we narrow and request communications only within the a) Office of the Secretary and b) Office of Elementary and Secondary Education.

If these time estimates will not be available before May 19 (this coming Friday), please let me know.

In addition, you affirmed that it would be helpful for CREW to limit the list of publishers in items 2 and 3 to the seven publishers already listed. We are considering a limitation along those lines (which would eliminate the phrase "includes, but is not limited to " in items 2 and 3 of the March 28 request) but have not yet made a decision.

CREW will formalize any narrowing language in a letter to the Department as soon as we receive the requested information.

Finally, I neglected to ask on the phone whether a copy of the Title I Monitor FOIA would be forthcoming soon, but I'll renew my request for it here.

Again, I greatly appreciate your time and assistance with this request. Please contact me any time.

Best Regards,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------
This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

**EXHIBIT D**

## Dan Roth

___

**From:** Dan Roth
**Sent:** Monday, May 21, 2007 3:18 PM
**To:** 'EDFOIAManager@ed.gov'
**Subject:** 07-00517-F Proposed Narrowing Terms

Dear Ms. Arrington,

As we discussed on May 9 and May 14, CREW is seeking to aid the Department in its search for responsive records by narrowing the terms of our March 28, 2007 FOIA request, No. 07-00517-F. Though our request sufficiently describes the records we seek, you and others at the Department have advised us that technological limitations of the Department's email search technology would require the Department to search approximately 4,500 email accounts unless the request is narrowed further. Accordingly, we suggest the following narrowed terms for the search in response to Request No. 07-00517-F:

Any and all documents and records from January 20, 2001, to the present, in the offices of: 1) The Secretary, 2) Senior Counselor, 3) Chief of Staff, 4) Deputy Secretary, 5) Management Improvement Team, 6) Elementary and Secondary Education, 7) Institute of Education Sciences, 8) Planning Evaluation and Policy Development, 9) Civil Rights, 10) Innovation and Improvement, 11) Special Education and Rehabilitative Services, 12) Management, 13) Chief Financial Officer and 14) Communications and Outreach, in the following categories:

1. All communications of the above-listed offices to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR" or DIBELS.

2. All communications of the above-listed offices, including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and Intellitools.

3. All communications of the above-listed offices, including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA/McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited, to Randy Best), Cambium Learning, Sopris West, and Intellitools.

Apart from Item 4 of CREW's original request, to which the Department has already responded in the form of a CD containing documents previously disclosed to the *Title I Monitor* and received by CREW on April 23, 2007, all other language in CREW's original request (pages 2-4) remains unchanged. We also note that it is not only emails, but "all communications," that CREW requested.

Thank you for your time and attention to this matter.

Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

___

This email and any attachments are for the sole use of the intended recipients and may be privileged or confidential. Any distribution, printing, or other use by anyone else is prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete this email and attachments. Thank you.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND   :
ETHICS IN WASHINGTON,   :
   :
   :
       Plaintiff,   :
   :
     v.   :   Civil Action No. 1:07-cv-00963 (RMU)
   :
U.S. DEPARTMENT OF EDUCATION,   :
   :
MARGARET SPELLINGS,   :
SECRETARY OF EDUCATION   :
(in her official capacity),   :
   :
THE NATIONAL ARCHIVES AND   :
   RECORDS ADMINISTRATION,   :
   :
DR. ALLEN WEINSTEIN, ARCHIVIST   :
   OF THE UNITED STATES (in his   :
official capacity)   :
   :
       Defendants.   :
   :
_____:

## [PROPOSED] ORDER

Upon consideration of Defendants' Motion to Dismiss Claims One through Four of

Plaintiff's Amended Complaint, Plaintiff's Opposition thereto and the entire record herein, and

for the reasons explained in the Memorandum Opinion issued on this date, it is hereby

**ORDERED** that Defendants' motion to dismiss be, and hereby is, **DENIED**.


Dated: _____              _____
                                       RICARDO M. URBINA
                                       United States District Court Judge